ORAL ARGUMENT SCHEDULED FOR JULY 7, 2025

Nos. 25-5097, 25-5098 (consol.)

# In the United States Court of Appeals for the District of Columbia Circuit

---

GLOBAL HEALTH COUNCIL, *et al.*,
*Plaintiffs-Appellees*,

*v.*

DONALD J. TRUMP, *et al.*,
*Defendants-Appellants*.

---

AIDS VACCINE ADVOCACY COALITION, *et al.*,
*Plaintiffs-Appellees*,

*v.*

DEPARTMENT OF STATE, *et al.*,
*Defendants-Appellants*.

---

On Appeal from the United States District Court for the District of Columbia

---

## BRIEF FOR APPELLEES

---

Lauren E. Bateman
Nicolas A. Sansone
Allison M. Zieve
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for AIDS Vaccine
Advocacy Coalition, et al*

William C. Perdue
Sally L. Pei
Stephen K. Wirth
Samuel F. Callahan
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5000

Daniel F. Jacobson
JACOBSON LAWYERS GROUP PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(301) 823-1148

*Counsel for Global Health Council,
et al.*

## CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), and Federal Rule of Appellate Procedure 26.1, the undersigned counsel certify as follows:

**Parties and *amici*.** Defendants-Appellants are President Donald J. Trump; the U.S. Department of State; the U.S. Agency for International Development; the Office of Management and Budget; Secretary of State and Acting Administrator of the U.S. Agency for International Development Marco Rubio; Acting Deputy Administrator for Policy and Planning of the U.S. Agency for International Development Jeremy Lewin; and Director of the Office of Management and Budget Russell Vought.

Plaintiffs-Appellees are Global Health Council; Small Business Association for International Companies; HIAS; Management Sciences for Health, Inc.; Chemonics International, Inc.; DAI Global LLC; Democracy International, Inc.; American Bar Association; AIDS Vaccine Advocacy Coalition, and Journalism Development Network, Inc. (Corporate Disclosure Statements follow this Certificate.)

The Constitutional Accountability Center was amicus in the district court. As of this filing, the States of Ohio, South Carolina, and 18 other States are amici in this Court.

**Rulings Under Review.** The ruling under review is a Memorandum Opinion and Order entered on March 10, 2025, in both *AIDS Vaccine Advocacy Coalition v. U.S. Department of State*, No. 25-cv-400 (D.D.C.), ECF 60, and *Global Health Council v. Trump*, No. 25-cv-402 (D.D.C.), ECF 60, by the Honorable Amir H. Ali, granting in part Plaintiffs' motions for preliminary injunctions in the two cases. The ruling is reported at 2025 WL 752378.

**Related Cases.** Appellants previously appealed earlier orders of the district court in each of these cases.

Those appeals were consolidated and subsequently dismissed by this Court. *See* Order, *AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*, Nos. 25-5046, 25-5047 (D.C. Cir. Feb. 26, 2025). Appellants then requested emergency relief in the Supreme Court, which denied that request. *See Department of State v. AIDS Vaccine Advocacy Coal.*, 145 S. Ct. 753 (2025).

With the exception of the appeals described above, these cases have not otherwise been in any court other than the district court from which they originated. Undersigned counsel are unaware of any related cases currently pending in this Court or any other court.

| | |
|---|---|
| */s/ Lauren Bateman* | */s/ Stephen K. Wirth* |
| Lauren Bateman | Stephen K. Wirth |
| *Counsel for AIDS Vaccine* | *Counsel for Global Health* |
| *Advocacy Coalition, et al.* | *Council, et al.* |

# CORPORATE DISCLOSURE STATEMENT
No. 25-5097

In accordance with Federal Rule of Appellate Procedure 26.1 and Local Appellate Rule 26.1.1, Plaintiffs-Appellees in No. 25-5097, state as follows:

Chemonics International, Inc. is owned by Chemonics Holdings, Inc. No publicly held corporation owns more than 10% of Chemonics International, Inc.'s stock.

DAI Global, LLC is owned by DAI Global Holdings, LLC, which, in turn, is owned by DAI ESOP, Inc., DAI GEO US, Inc., DAI GEO UK, Inc., DAI GEO III, Inc., DAI GEO VI, Inc., DAI GEO V, Inc., DAI GEO VI, LLC, and DAI GEO VII, Inc. No publicly held corporation owns 10% or more of its stock.

The remaining Plaintiff-Appellees in No. 25-5097, Global Health Council (GHC); Small Business Association for International Companies (SBAIC); HIAS; Management Sciences for Health (MSH); Democracy International, Inc.; and the American Bar Association (ABA), do not have any parent corporations and no publicly held corporation owns 10% or more of their stock.

## CORPORATE DISCLOSURE STATEMENT
No. 25-5098

In accordance with Federal Rule of Appellate Procedure 26.1 and Local Appellate Rule 26.1.1, Plaintiffs-Appellees in No. 25-5098, state as follows:

AIDS Vaccine Advocacy Coalition (AVAC) is a 501(c)(3) nonprofit corporation that works to hasten the end of the global HIV/AIDS epidemic by accelerating development and delivery of HIV prevention options. AVAC is a nonprofit, non-stock corporation. It has no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

Plaintiff Journalism Development Network, Inc. (JDN) is a 501(c)(3) nonprofit corporation that supports a global consortium of journalists from more than 70 nonprofit investigative centers and regional news organizations across the world to help people better understand how organized crime and corruption affect their lives. JDN is a nonprofit, non-stock corporation. It has no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................vii

GLOSSARY...........................................................................................xv

INTRODUCTION ..................................................................................1

STATEMENT OF THE CASE ...............................................................4

    A.  Congressional Appropriations for Foreign Assistance.......................4

    B.  The Challenged Directives ..................................................................9

    C.  Plaintiffs' Lawsuits...........................................................................12

    D.  The Preliminary Injunction..............................................................14

    E.  Consequences of Defendants' Actions .............................................18

SUMMARY OF ARGUMENT..............................................................20

ARGUMENT ........................................................................................25

I.    The District Court Properly Determined that Plaintiffs Are Likely to Succeed on the Merits. ......................................................................25

    A.  Defendants misunderstand the nature of the constitutional claims underlying the injunction. .................................................................25

    B.  The Constitution gives Congress exclusive authority over the spending of federal funds. ....................................................................30

    C.  The Constitution requires Defendants to heed Congress's directive to spend the *full* amount of the appropriations at issue. ....32

        1.  Appropriations require the Executive Branch to spend their full amount, unless Congress specifies otherwise. ........................33

        2.  The appropriations at issue confer no discretion on the Executive Branch to spend less than the appropriated amounts. ........................................................................................38

        3.  Defendants' contrary arguments fail..........................................40

    D.  That Congress appropriated the impounded funds for foreign assistance does not alter these fundamental principles.....................45

II.  Plaintiffs Satisfy the Remaining Preliminary Injunction Factors...........48

    A.  Plaintiffs have established irreparable harm.......................................48

    B.  The balance of harms and public interest favor Plaintiffs..................52

III. The Injunction is Appropriately Tailored. ...................................................55

CONCLUSION.......................................................................................................63

CERTIFICATE OF COMPLIANCE .................................................................64

CERTIFICATE OF SERVICE ............................................................................65

# TABLE OF AUTHORITIES

**Cases**                                                                    Pages

*AGMA Sec. Serv., Inc. v. United States,*
    152 Fed. Cl. 706 (2021) .........................................................................52

*AIDS Vaccine Advoc. Coal. v. Dep't of State,*
    2025 WL 621396 (D.C. Cir. Feb. 26, 2025) ......................................14

*Am. Inst. of Certified Pub. Accts. v. IRS,*
    804 F.3d 1193 (D.C. Cir. 2015)...........................................................29

*Armstrong v. Exceptional Child Ctr.,*
    575 U.S. 320 (2015).............................................................................27

*AIDS Vaccine Advoc. Coal. v. Dep't of State,*
    766 F. Supp. 3d 74 (D.D.C. Feb. 13, 2025) ...............................13, 50

*Bates v. United States,*
    522 U.S. 23 (1997)...............................................................................39

*Califano v. Yamasaki,*
    442 U.S. 682 (1979).............................................................................55

*CC Distribs., Inc. v. United States,*
    883 F.2d 146 (D.C. Cir. 1989)............................................................51

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.,*
    601 U.S. 416 (2024).......................................................................33, 34

*Chicago & S. Air Lines v. Waterman S.S. Corp.,*
    333 U.S. 103 (1948).............................................................................45

*City & County of San Francisco v. EPA,*
    145 S. Ct. 704 (2025) ..........................................................................39

*City & County of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018).............................................................31

*City of New Haven v. United States,*
    809 F.2d 900 (D.C. Cir. 1987)............................................................16

*Clarke v. Sec. Indus. Ass'n,*
   479 U.S. 388 (1987)...................................................................29

*Clinton v. City of New York,*
   524 U.S. 417 (1998)............................................................31, 32, 42

*Coal. of MISO Transmission Customers v. FERC,*
   45 F.4th 1004 (D.C. Cir. 2022) ..............................................51, 58

*Collins v. Yellen,*
   594 U.S. 220 (2021)............................................................27, 28

*Crossroads Grassroots Pol'y Strategies v. FEC,*
   788 F.3d 312 (D.C. Cir. 2015)..................................................28

*Cummings v. Premier Rehab Keller, PLLC,*
   596 U.S. 212 (2022)................................................................47

*Dep't of Navy v. FLRA,*
   665 F.3d 1339 (D.C. Cir. 2012).................................................30

*Dep't of State v. AIDS Vaccine Advoc. Coal.,*
   145 S. Ct. 753 (2025) .............................................................55

*Dep't of State v. AIDS Vaccine Advoc. Coal.,*
   604 U.S. __, No. 24A831, 2025 WL 698083 (U.S. Mar. 5, 2025)...................14

*Earle v. Dist. of Columbia,*
   707 F.3d 299 (D.C. Cir. 2012)..................................................29

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
   561 U.S. 477 (2010)................................................................27

*Haitian Refugee Ctr. v. Gracey,*
   809 F.2d 794 (D.C. Cir. 1987)..................................................28

*HIAS, Inc. v. Trump,*
   985 F.3d 309 (4th Cir. 2021)....................................................57

*Hills v. Gautreaux,*
   425 U.S. 284 (1976)................................................................56

*Hisp. Affs. Project v. Perez,*
   206 F. Supp. 3d 348 (D.D.C. 2016) ....................................................28

*In re Aiken Cnty.,*
   725 F.3d 255 (D.C. Cir. 2013)..........................................21, 31, 33, 45

*Kendall v. United States ex rel. Stokes,*
   37 U.S. (12 Pet.) 524 (1838) ............................................................32

*League of Women Voters of U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ..................................................17, 50, 54

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014)..........................................................................28

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024)..........................................................................46

*Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak,*
   567 U.S. 209 (2012)..........................................................................29

*Mendoza v. Perez,*
   754 F.3d 1002 (D.C. Cir. 2014)........................................................29

*Miles v. Apex Marine Corp.,*
   498 U.S. 19 (1990)............................................................................37

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
   583 U.S. 109 (2018)..........................................................................35

*OPM v. Richmond,*
   496 U.S. 414 (1990)..........................................................................31

*Quarles v. United States,*
   687 U.S. 645 (2019)..........................................................................41

*Reiter v. Sonotone Corp.,*
   442 U.S. 330 (1979)..........................................................................35

*Rochester Pure Waters Dist. v. EPA,*
   960 F.2d 180 (D.C. Cir. 1992)..........................................................30

*Roe v. Dep't of Def.*,
    947 F.3d 207 (4th Cir. 2020)..................................................................57

*Russello v. United States*,
    464 U.S. 16 (1983)................................................................................39

*Teton Historic Aviation Found. v. U.S. Dep't of Def.*,
    785 F.3d 719 (D.C. Cir. 2015).............................................................51

*Train v. City of New York*,
    420 U.S. 35 (1975)..................................................................26, 43, 44

*Trump v. Int'l Refugee Assistance Project*,
    582 U.S. 571 (2017)..............................................................................55

*United States v. Stover*,
    329 F.3d 859 (D.C. Cir. 2003).............................................................57

*Washington v. Reno*,
    35 F.3d 1093 (6th Cir. 1994)...............................................................54

*West Virginia v. EPA*,
    597 U.S. 697 (2022)..............................................................................16

*Wilkerson v. Rahrer*,
    140 U.S. 545 (1891)..............................................................................31

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..................................................................................55

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)..................................................3, 15, 27, 28, 46, 47

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015)...................................................16, 23, 45, 46, 54

x

## Constitutional Provisions

U.S. Const., art. I, § 8, cl. 1 ...............................................................30

U.S. Const., art. I, § 9, cl. 7 ...........................................................30, 31

U.S. Const., art. II, § 3 ........................................................................31

## Statutes

2 U.S.C.
  § 683 ..............................................................................36, 40, 41
  § 684 ......................................................................................36, 37

22 U.S.C.
  § 2151 .......................................................................................4, 5, 6
  § 2152k ........................................................................................5, 6
  § 2291(a)(4) ...................................................................................61
  § 2292 .............................................................................................5
  § 2293 ..........................................................................................5, 6
  § 2294 ..........................................................................................5, 6
  § 2346 .........................................................................................7, 59
  § 2348 ...........................................................................................61
  § 2601 .........................................................................................8, 60
  § 4411(b) .....................................................................................7, 60
  § 9808(b)(1) .................................................................................7, 59

Act of Sept. 29, 1789, 195 Stat. 95 ...................................................34

Act of Feb. 28, 1803, 2 Stat. 206 ......................................................34

Act of Nov. 29, 1989, 103 Stat. 1598 ................................................34

Consolidated Appropriations Act, 2024,
  Pub. L. No. 118-42, 138 Stat. 25 (Mar. 9, 2024) ...........................48

Further Consolidated Appropriations Act, 2024,
  Pub. L. No. 118-47, 138 Stat. 460 (Mar. 23, 2024) ..........5, 6, 7, 38, 39, 60, 61

Full-Year Continuing Appropriations and Extensions Act, 2025,
  Pub. L. No. 119-4, 139 Stat. 9 (Mar. 15, 2025) ...........................6, 8

**Executive Branch Materials**

Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025) ..........................9, 57

Presidential Authority To Impound Funds Appropriated For
    Assistance To Federally Impacted Schools,
    1 Supp. Op. O.L.C. 303 (1969)..........................................................................43

Off. of Mgmt. & Budget, *OMB Final Sequestration Report to the
    President and Congress for Fiscal Year 2024* (Apr. 12, 2024)....................48

Letter from Secretary of War J.D. Cameron to President Grant
    (Jan. 11, 1877), in Executive Documents of the House of
    Representatives, 44th Cong., 2d Sess., Exec. Doc. No. 23 (1877)...............34

Mem. from Pres. Donald J. Trump to the Congress, Proposed
    Rescissions of Budget Authority (May 28, 2025) ....................................18, 37

*Memorandum from the Secretary of State*,
    25 STATE 6828 (Jan. 24, 2025) ........................................................................10

U.S. Dep't of State, *Prioritizing America's National Interests One
    Dollar at a Time* (Jan. 29, 2025) .....................................................................11

USAID, *Initial Instructions for Implementing Executive Order
    Reevaluating and Realigning United States Foreign Aid*
    (Jan. 22, 2025).......................................................................................................10

USAID, *Notice on Implementation of Executive Order on
    Reevaluating and Realigning United States Foreign Aid*
    (Jan. 24, 2025).......................................................................................................10

USAID, *Follow-Up Instructions for Implementing Executive
    Order Reevaluating and Realigning United States Foreign Aid*
    (Jan. 24, 2025).......................................................................................................10

USAID, *Clarification on Implementing the President's
    Executive Order on Reevaluating and Realigning United
    States Foreign Aid* (Jan. 26, 2025) ................................................................10

## Legislative Branch Materials

54 Comp. Gen. 453 (1974) ..................................................................36

GAO, B-203057 (Sept. 15, 1981)..................................................36, 41

GAO, B-329092 (Dec. 12, 2017)...................................................35, 41

GAO, B-331298 (Dec. 23, 2020).........................................................37

GAO, B-333181 (Apr. 29, 2021).................................................36, 41

GAO, Principles of Federal Appropriations Law (3d ed. Jan. 2004) ..............35

Cong. Rsch. Serv., R47106, *The Appropriations Process: A Brief Overview* (2023)...................................................................8

Cong. Rsch. Serv., R48150, *Foreign Assistance: Where Does the Money Go?* (2024) ..................................................................8

Cong. Rsch. Serv., IF10261, *U.S. Agency for International Development: An Overview* (2025) ...................................................5

## Other Authorities

*The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (Jonathan Elliot ed., 2d ed. 1836) .......................31

The Federalist No. 58 (Clinton Rossiter ed., 1961) ...........................................30

Tom Bateman, *How a US Freeze Upended Global Aid in a Matter of Days*, BBC (Jan. 29, 2025)...........................................................10

Laura Kelly & Nathaniel Weixel, *Chaos and Uncertainty Swirl Around Trump's Foreign Aid Freeze*, The Hill (Jan. 30, 2025) .................10

KFF, *The Trump Administration's Foreign Aid Review: Status of U.S. Support for the Global Fund to Fight AIDS, Tuberculosis and Malaria* (May 29, 2025).......................................................62

Brett Murphy & Anna Maria Barry-Jester, *Death, Sexual Violence and Human Trafficking: Fallout From U.S. Aid Withdrawal Hits the World's Most Fragile Locations*, ProPublica (May 28, 2025)...............53

Stephanie Nolen, *Health Programs Shutter Around the World After Trump Pauses Foreign Aid*, N.Y. Times (Feb. 1, 2025)....................11

Jennifer Scholtes et al., *Congress Finally Gets Trump's Request to Codify DOGE Cuts to NPR, PBS, Foreign Aid*, Politico (June 3, 2025)........................................................................19

Sui-Lee Wee et al., *How the World Is Reeling from Trump's Aid Freeze*, N.Y. Times (Jan. 31, 2025)..............................................................11

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| FAA | Foreign Assistance Act of 1961 |
| FCAA | Further Consolidated Appropriations Act of 2024 |
| OLC | Office of Legal Counsel |
| USAID | U.S. Agency for International Development |

## INTRODUCTION

A defining feature of our Constitution is that Congress holds the power of the purse, and the President must faithfully execute Congress's spending directives. Congress exercises its spending power by enacting appropriations laws that give specific sums of money to the Executive Branch to spend for specific purposes. Unless Congress specifies otherwise, the Executive Branch must spend the full amounts appropriated before the deadline that Congress sets for the funds to expire.

Fifty years ago, the Executive Branch challenged this understanding of appropriations laws, claiming that appropriations statutes do not require the Executive Branch to spend the full amounts appropriated, unless Congress specifies that spending is mandatory. Congress conclusively rejected this interpretation of the meaning of appropriations statutes in passing the Impoundment Control Act of 1974. That Act incorporates into law the premise that appropriations laws require agencies to spend the full sums appropriated, absent language granting spending discretion. The Act provides procedures for the President to follow if he wishes to get out from an appropriation law's command. Congress enacts every new appropriation knowing this framework and the presumption it carries that appropriated funds must be spent in full.

1

In 2024, Congress appropriated more than $10 billion dollars to the United States Agency for International Development (USAID) and the State Department to spend on foreign assistance programs. Among other specified programs, Congress appropriated funds for programs to build the capacity of public health institutions and organizations in developing countries, including through child survival and maternal health programs; immunization programs; nutrition, water, and sanitation programs for mothers and children; assistance for displaced children; programs for the prevention and treatment of other infectious diseases; disaster preparedness; and programs for responding to emergent global health threats. Through grants, cooperative agreements, and contracts, the Department of State and USAID obligated funds to Plaintiffs in these consolidated cases and their members to carry out this important work.

In the relevant foreign assistance appropriations statutes, Congress did not provide the agencies discretion to spend less than the full amounts appropriated. The new Administration, however, decided it did not like Congress's decision to fund foreign assistance. The Administration abruptly froze all foreign assistance and declared that it will not spend the vast majority of the appropriated funds. In the face of this attack on the separation of powers, the

district court preliminarily enjoined Defendants to fulfill their constitutional duty and spend the appropriated amounts.

The premise of Defendants' appeal is that the district court enjoined Defendants' refusal to spend foreign assistance funds based on an Administrative Procedure Act claim alleging a violation of the Impoundment Control Act. In fact, though, the district court expressly rested its injunction on Plaintiffs' constitutional claim that Defendants are violating the separation of powers. The Impoundment Control Act is relevant here only insofar as it factors into the constitutional analysis under *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), and reflects settled law that the Executive Branch must spend appropriated funds unless Congress enacts a law rescinding the appropriation.

The district court also correctly held that Plaintiffs are suffering irreparable harm, in the form of grave damage to their businesses and their missions. The balance of the equities and the public interest also weigh heavily in favor of a preliminary injunction, in light of the disastrous consequences to people in need around the world and to American interests abroad. This Court should affirm.

## STATEMENT OF THE CASE

### A.    Congressional Appropriations for Foreign Assistance

In the Foreign Assistance Act of 1961 (FAA), Pub. L. No. 87-195, 75 Stat. 424, Congress set forth principles to guide U.S. policy as it relates to foreign assistance. The Act "reaffirms the traditional humanitarian ideals of the American people" and "renews" the nation's "commitment to assist people in developing countries to eliminate hunger, poverty, illness, and ignorance." 22 U.S.C. § 2151(a). The Act also establishes specific priorities for foreign assistance: "(1) the alleviation of the worst physical manifestations of poverty among the world's poor majority; (2) the promotion of conditions enabling developing countries to achieve self-sustaining economic growth with equitable distribution of benefits; (3) the encouragement of development processes in which individual civil and economic rights are respected and enhanced; (4) the integration of the developing countries into an open and equitable international economic system; and (5) the promotion of good governance through combating corruption and improving transparency and accountability." *Id.* "[P]ursuit of these goals," the statute declares, "requires that development concerns be fully reflected in United States foreign policy and that United States development resources be effectively and efficiently utilized." *Id.*

4

Congress has implemented these policies by directing USAID and the Department of State to establish foreign assistance programs that promote specific substantive aims, from promoting global health to increasing agricultural production to providing disaster relief. *Id.* §§ 2151–2152k, 2292–2294. And for more than a half-century, USAID and the Department of State have fulfilled these statutory mandates by leading American efforts to alleviate poverty, disease, and humanitarian need; to support developing countries' economic growth; and to build foreign markets' capacity to participate in world trade. *See* Cong. Rsch. Serv. (CRS), IF10261, *U.S. Agency for International Development: An Overview* 1 (2025).

Congress has repeatedly appropriated funds for foreign assistance programming to accomplish those goals. The Further Consolidated Appropriations Act of 2024 (FCAA), enacted into law March 23, 2024, specifically appropriates funding for global health programs, development assistance, disaster relief, and initiatives to promote and strengthen democracy abroad, among other objectives. *See* FCAA, Pub. L. No. 118-47, div. F, tits. II–III, 138 Stat. 460, 739–43. Congress appropriated much, but not all, of this funding to last through two fiscal years, meaning many of the foreign assistance funds appro-

5

priated in 2024 will expire on September 30, 2025. The funding levels established in the FCAA were again appropriated at the same levels, and for the same number of fiscal years, by the Full-Year Continuing Appropriations and Extensions Act, enacted on March 15, 2025. *See* Pub. L. No. 119-4, div. A, tit. I, § 1101(a)(11), 139 Stat. 9, 10–12.

These appropriations direct the Executive Branch to spend for specific, congressionally enumerated purposes. For example, in the FCAA, Congress appropriated nearly $4 billion to USAID for "training, equipment, and technical assistance to build the capacity of public health institutions and organizations in developing countries." Pub. L. No. 118-47, tit. III, 138 Stat. at 740; *see* 22 U.S.C. §§ 2151–2152k, 2293–2294 (FAA provisions). Congress instructed USAID to effectuate these purposes through "such activities as" child-survival and maternal-health programs; immunization and oral rehydration programs; nutrition, water, and sanitation programs that directly address the needs of mothers and children; assistance for displaced children; programs for the prevention and treatment of HIV/AIDS, tuberculosis, polio, malaria, and other infectious diseases; disaster preparedness; programs for responding to emergent global health threats; and family planning and reproductive health. Pub. L. 118-47, tit. III, 138 Stat. at 740. The FCAA provides that this

6

$4 billion appropriation is "available until September 30, 2025," and directs that funds appropriated for the specified global health programs "shall be apportioned directly to [USAID]." *Id.*

The FCAA contains a host of other specific foreign assistance appropriations. It appropriates, for example, $55 million to implement the Complex Crisis Fund established by the Global Fragility Act of 2019, which Congress has directed USAID to administer "to support programs and activities to prevent or respond to emerging or unforeseen events overseas." Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743; 22 U.S.C. § 9808(b)(1). It appropriates $3.89 billion to implement the FAA's Economic Support Fund, which Congress has directed the State Department and USAID to administer to furnish "assistance to countries and organizations … to promote economic or political stability." Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743; 22 U.S.C. §§ 2346(a), (b). It appropriates $140 million "to carry out the provisions of the [FAA] for the promotion of democracy globally, including to carry out" the pro-democracy training, institution-building, and pluralism purposes of the National Endowment for Democracy Act. Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743; 22 U.S.C. § 4411(b). It also appropriates $3.93 billion for migration and refugee assistance, including to "enable the Secretary of State to carry out

[specified] provisions … of the Migration and Refugee Assistance Act of 1962." Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 744; *see* 22 U.S.C. § 2601. This illustrative list does not come close to exhausting the varied, and specific, purposes for which Congress appropriated funding. And through the March 15 appropriations statute, Congress reiterated its desire to continue funding foreign assistance at these levels. *See* Pub. L. No. 119-4, div. A, tit. I, § 1101(a)(11), 139 Stat. 9, 10–11 (Mar. 15, 2025).

The federal government accomplishes the vast majority of this foreign assistance work through partnerships with private "implementing partners"—nonprofits, companies, and academic institutions that receive foreign assistance awards issued by the State Department or USAID. *See* CRS, R48150, *Foreign Assistance: Where Does the Money Go?* 1 (2024). When the agencies make these awards—in the form of contracts, grants, and cooperative agreements—they "obligate" funds appropriated by Congress to be paid. CRS, R47106, *The Appropriations Process: A Brief Overview* 1 (2023). Implementing partners then use those obligated funds to carry out project work that furthers one or more statutory aims. CRS, R48150, at 3–6.

**B.    The Challenged Directives**

On January 20, the President issued an executive order directing a wholesale 90-day "pause" of congressionally appropriated foreign-assistance funding pending a "review[] of such programs for programmatic efficiency and consistence with United States foreign policy." Exec. Order No. 14,169 at § 3, 90 Fed. Reg. 8619 (Jan. 20, 2025). President Trump's order claimed that "[t]he United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values" and that "[t]hey serve to destabilize world peace." *Id.* § 1. He further asserted that "[i]t is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States." *Id.* § 2.

To implement the "pause," the Secretary of State and officials at USAID issued a series of agency memoranda immediately halting virtually all foreign

assistance funding and ordering implementing partners to stop work.[1] In addition to effectuating the "pause," Defendants also began terminating foreign assistance awards en masse. *AVAC* Dkt. 17 and *GHC* Dkt. 21 at 3–4.[2]

These actions, undertaken without warning, caused immediate, serious harm. Contemporaneous and undisputed reports identified by Plaintiffs, *see AVAC* Dkt. 13-1 at 5–6, explained that non-governmental organizations across the world began "shutting doors, sending staff home and turning away their dependents." Laura Kelly & Nathaniel Weixel, *Chaos and Uncertainty Swirl Around Trump's Foreign Aid Freeze*, The Hill (Jan. 30, 2025), https://tinyurl.com/4w7b7ha3. Programs that immediately shut down included humanitarian operations at refugee camps in Syria, Tom Bateman, *How a US Freeze*

---

[1] See *Memorandum from the Secretary of State*, 25 STATE 6828 (Jan. 24, 2025); USAID, *Notice on Implementation of Executive Order on Reevaluating and Realigning United States Foreign Aid* (Jan. 24, 2025); USAID, *Initial Instructions for Implementing Executive Order Reevaluating and Realigning United States Foreign Aid* (Jan. 22, 2025); USAID, *Follow-Up Instructions for Implementing Executive Order Reevaluating and Realigning United States Foreign Aid* (Jan. 24, 2025); USAID, *Clarification on Implementing the President's Executive Order on Reevaluating and Realigning United States Foreign Aid* (Jan. 26, 2025).

[2] Citations to the docket in Case No. 25-cv-400 take the form "*AVAC* Dkt." Citations to the docket in Case No. 25-cv-402 take the form "*GHC* Dkt."

*Upended Global Aid in a Matter of Days*, BBC (Jan. 29, 2025), https://tinyurl.com/24ubaf8r; soup kitchens that feed nearly a million people in famine-stricken Khartoum, Sui-Lee Wee et al., *How the World Is Reeling from Trump's Aid Freeze*, N.Y. Times (Jan. 31, 2025), https://tinyurl.com/2s3f2hz2; counterterrorism programs to gather intelligence on Al Qaeda in the Ivory Coast, *id.*; and programs that deliver rehydration salts to toddlers in Zambia who are suffering life-threatening diarrhea, Stephanie Nolen, *Health Programs Shutter Around the World After Trump Pauses Foreign Aid*, N.Y. Times (Feb. 1, 2025), https://tinyurl.com/3ry4mzfc.

Defendants' goal in undertaking these actions was to prevent foreign assistance spending permanently. They said so themselves, proudly, publicly, and repeatedly. *See* JA65–66; U.S. Dep't of State, *Prioritizing America's National Interests One Dollar at a Time* (Jan. 29, 2025), https://tinyurl.com/2eyamdfm (touting in late January that "even at this early stage," Defendants' actions had already "prevented" over $1 billion in foreign assistance spending); *see also* @elonmusk, X (Feb. 2, 2025, 12:20PM), https://tinyurl.com/4bnu7b7z (statement from then–presidential advisor Elon Musk that "USAID is a criminal organization" and that it is "[t]ime for [USAID] to

die"); @realDonaldTrump, TruthSocial (Feb. 7, 2025, 9:31AM), https://ti-nyurl.com/3wmdpvex (Presidential statement calling to "CLOSE [USAID] DOWN").

### C.    Plaintiffs' Lawsuits

Plaintiffs in these consolidated cases are implementing partners, or associations comprising implementing partners, that have received awards from the State Department or USAID—through grants, cooperative agreements, or contracts—to carry out work authorized by Congress with funds appropriated by Congress. The work performed by Plaintiffs and their members supports communities around the world and is funded by a vast range of FCAA foreign assistance appropriations.

Plaintiffs' State Department and USAID award-funded projects include supporting and accelerating HIV prevention research in African countries, JA87–88; building and sustaining investigative news outlets across the world, JA88–89; providing medical care to young students who were injured in violent crackdowns on protesters in Bangladesh, JA348; providing shelter for minors seeking protection from recruitment into criminal gangs in Central America, JA335; enabling early identification of famine, JA322; protecting religious

freedom in Asia, JA357–58; and providing life-saving services to displaced and at-risk children across South America and Africa, JA261.

In the two lawsuits consolidated here, Plaintiffs challenge the Executive Order and the directives implementing it as violating the constitutional separation of powers and the Administrative Procedure Act (APA), and as *ultra vires*. Plaintiffs in both cases moved for a temporary restraining order and preliminary injunction and, in support, produced evidence that, as a consequence of Defendants' actions, they faced immediate, devastating, irreparable harm. *AIDS Vaccine Advoc. Coal. v. Dep't of State*, 766 F. Supp. 3d 74, 79–82 (D.D.C. Feb. 13, 2025) (*AVAC*); *see* JA106 ¶¶ 11–12; JA111 ¶¶ 10–13; JA249–50 ¶¶ 8–11; JA254–55 ¶¶ 10–11; JA264–65 ¶¶ 21–22; JA313–19 ¶¶ 6–12; JA324–29 ¶¶ 7–15; JA334–38 ¶¶ 7–13; JA347–51 ¶¶ 11–15; JA360–63 ¶¶ 15–16, 20–22.

On February 13, 2025, the district court determined that Defendants' suspension of all foreign aid was likely arbitrary and capricious, and issued a temporary restraining order enjoining the government from implementing the challenged actions. *AVAC*, 766 F. Supp. 3d at 82, 85. Defendants failed to comply with that order for weeks, and Plaintiffs moved on multiple occasions to enforce the order. On February 25, as a first step to compliance, the district court ordered Defendants to unfreeze foreign assistance funding for work

13

completed before the entry of the temporary restraining order. JA43. This Court dismissed Defendants' appeal of the February 25 order, and the Supreme Court denied Defendants' application to vacate that order. 2025 WL 621396, at *1 (D.C. Cir. Feb. 26, 2025); 604 U.S. __, No. 24A831, 2025 WL 698083 (U.S. Mar. 5, 2025).

Meanwhile, Defendants continued to rapidly terminate foreign assistance awards. Of the 13,000 USAID and State Department awards that existed as of January 20, 2025, Defendants have terminated all but 500 USAID awards and all but 2,700 State Department awards. JA43. Hundreds of Plaintiffs' awards were among those terminated. *See AVAC* Dkt. 49; *GHC* Dkt. 50 at 4–5. Defendants have neither suggested nor introduced evidence that they are making new awards with the foreign assistance appropriations at issue.

### D.    The Preliminary Injunction

On March 10, 2025, the district court granted, in part, Plaintiffs' motions for preliminary injunctions.

The court rejected Defendants' "unbridled view of Executive power," JA36, and concluded that Plaintiffs were likely to succeed on their constitutional separation-of-powers claims. Explaining that Plaintiffs' separation-of-powers claims are "distinct in scope from Plaintiffs' APA claims," the court

14

noted that the separation-of-powers claims rest on the argument that, "irrespective of any particular agency action that may be subject to APA review, Defendants are engaging in a unilateral rescission or deferral of congressionally appropriated funds in violation of Congress's spending power." JA63. The record, the court explained, "show[ed] that Defendants are acting to rescind or defer the funds Congress has appropriated and have no intent to spend them." JA65. Defendants had "explicitly said so," JA67, in "public statements," JA70. And Defendants had "not disputed" this intent "when given the opportunity" to do so. JA70. But it is Congress, not the President, that maintains "core and exclusive power over the federal purse." JA66 (quotations omitted). And because the Executive had taken actions incompatible with the will of Congress, as expressed through relevant appropriations acts and the Impoundment Control Act, the Executive's power is 'at its lowest ebb.'" JA66 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).

The court rejected Defendants' argument that their actions were nevertheless justified by the President's supposedly "'vast and generally unreviewable' powers in the realm of foreign affairs," JA67, noting that "the Supreme

15

Court has explicitly rejected" that argument and emphasized that "it is essential the congressional role in foreign affairs be understood and respected." JA68 (quoting *Zivotofsky ex rel. Zivotofsky v. Kerry,* 576 U.S. 1, 21 (2015)). The court recognized that the President has significant discretion in "*how*" appropriated funds are used, but "the appropriations laws reflect an exercise of Congress's own, core constitutional power to determine *whether and how much* money is spent." JA70. The court further held that "the notion that the Executive has simply 'paused' appropriations does not avoid the problem," JA70, because "Defendants' impoundment was specifically 'designed to negate congressional budgetary policies,'" JA71 (quoting *City of New Haven v. United States*, 809 F.2d 900, 908 (D.C. Cir. 1987)).

"[F]or similar reasons," the district court concluded that Plaintiffs are likely to succeed on their claims that Defendants acted *ultra vires*: "Defendants do not identify any authority, statutory or otherwise, that would authorize this sort of vast cancelation of congressionally appropriated aid," and "[e]ven if they did, Defendants do not dispute that they would be in the territory of having to show 'clear congressional authorization' based on the 'vast economic and political significance' of these actions." JA72 n.18 (quoting *West Virginia v. EPA*, 597 U.S. 697, 716, 723 (2022)).

The district court held that the remaining preliminary injunction factors also favored entry of an injunction against continued impoundment, citing the "immense" and "unrebutted" "irreparable harm to businesses and organizations across the country." JA72. And it found that the balance of the equities and the public interest supported an injunction because there is "generally no public interest in the perpetuation of unlawful agency action," JA76–77 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)), and Defendants "have made no effort" to rebut Plaintiffs' "stark" showing of harms and evidence that the "freeze has had dire humanitarian consequences." JA77.[3]

The court therefore enjoined Defendants from "unlawfully impounding congressionally appropriated foreign aid funds" and directed them to "make available for obligation the full amount of funds that Congress appropriated in the [FCAA]." JA82. On April 3—after the preliminary injunction had been in effect for more than three weeks—Defendants filed this appeal.

---

[3] The district court also preliminarily enjoined Defendants' unlawful withholding of foreign-assistance funds owed to implementing partners for work completed prior to February 13, 2025. JA81–82. Defendants have not appealed that portion of the court's order.

### E.     Consequences of Defendants' Actions

Although Defendants were ordered more than two months ago to cease the unlawful impoundment of congressionally appropriated funds, they have yet to spend foreign assistance funds that Congress appropriated, including billions in funds that will expire on September 30, 2025. *See, e.g.*, JA246 ¶ 6 (Defendants' May 1 status report stating that they "continue to evaluate the appropriate next steps to address the provision in this Court's March 10, 2025, order regarding obligation of funds"). Indeed, there is no evidence that Defendants have taken a single step to even *begin* the potentially months-long process of obligating funds that will soon expire (*e.g.*, by issuing notices of funding opportunities to receive applications for new grants, or bid solicitations for new contracts). Meanwhile, the money that Congress appropriated remains unspent, and the opportunity to spend much of it will very soon be irretrievably lost.

On May 28, the President submitted several proposed rescissions of budgetary authority under the Impoundment Control Act, including proposed rescissions of billions in funding under several foreign-aid appropriations. *See* Mem. from Pres. Donald J. Trump to the Congress, Proposed Rescissions of Budgetary Resources, at 2–17 (May 28, 2025), https://tinyurl.com/5pvthded.

The proposed foreign assistance rescissions concern funds appropriated in Fiscal Year 2025 (none of which are expiring in September), not those appropriated in Fiscal Year 2024 (which are expiring). *Id.* But the Administration has previewed plans to let additional funds expire using a tactic known as a "pocket rescission"—*i.e.*, proposing a rescission close to the end of a congressional session and treating Congress's "acquiesce[nce]" (Defs. Br. 46) in the proposal as authorizing the impoundment. *See* Jennifer Scholtes et al., *Congress Finally Gets Trump's Request to Codify DOGE Cuts to NPR, PBS, Foreign Aid*, Politico (June 3, 2025), https://tinyurl.com/mrn6fefn. In particular, the Director of the Office of Management and Budget has signaled plans to propose rescissions "later in the year," enabling the Administration to "bank some of these savings[] without [a rescission] bill actually being passed." *Id.*

The human toll of Defendants' actions continues to mount. Without federal foreign assistance funds being spent as Congress directed, many of those who depend on Plaintiffs' work face starvation, disease, and death. *See, e.g.*, JA106, 249–50, 261, 326–29, 357–60. Beyond the harms suffered by Plaintiffs and those who depend on them, unrebutted evidence—including from internal USAID sources—establishes that Defendants' actions have created a global

19

humanitarian crisis. In early March, the USAID Acting Assistant Administrator for Global Health at the time, Nicholas Enrich, stated that, if the foreign assistance were not restored, it would lead to an additional 71,000–166,000 deaths by malaria, two to three million additional deaths from failure to immunize against vaccine-preventable diseases, 1 million children not treated for severe acute malnutrition, and over 11 million newborns deprived of critical postnatal care, annually. JA216–20.

## SUMMARY OF ARGUMENT

Defendants do not seriously dispute that they are impounding billions of dollars of foreign assistance funds appropriated by Congress. Nor do they dispute the devastating consequences that the impoundment is having on Plaintiffs, American workers, and poor, sick, and needy people across the world. This Court should affirm the preliminary injunction.

**I.A.** The district court held that Plaintiffs are likely to prevail on their claims that Defendants are violating the Constitution by "engaging in a unilateral rescission or deferral of congressionally appropriated funds in violation of Congress's spending power." JA63. The court enjoined Defendants' impoundment of funds based on Plaintiffs' constitutional separation-of-powers claims. Yet Defendants' brief takes as its premise that the injunction afforded relief

on an APA claim alleging a violation of the Impoundment Control Act. Although the district court addressed the Impoundment Control Act as part of its *constitutional* analysis, the court did not adjudicate or award relief on any Impoundment Control Act claim. In largely ignoring the district court's actual constitutional holding, Defendants lodge a variety of statutory arguments about private enforcement of the Impoundment Control Act, the zone of the statute's interests, and the ripeness of a challenge to the statute's constitutionality—none of which are relevant to the separation-of-powers claim underlying the injunction.

**B.** The district court's constitutional holding was also correct. It is a cardinal feature of the Constitution's design that Congress has the exclusive authority to make law and, through legislation, to appropriate funds for federal spending. Absent statutory language that explicitly gives an agency discretion to spend less than the appropriated amount, a congressional appropriation presumptively requires that the Executive Branch spend "the full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

**C.** Approximately fifty years ago, the Executive Branch advanced the view that appropriations establish a limit, not a floor, on spending. That view

21

was put to rest in the Impoundment Control Act of 1974. The Act embodies the premise that, absent an express exception, appropriations laws require agencies to spend the full amounts appropriated for a purpose. Where the President prefers not to, the Act creates a procedure that allows the President to *request* Congress to rescind appropriations. Unless Congress then enacts a law rescinding the appropriation, however, the Executive Branch must spend the funds before they expire.

Here, the relevant appropriations statutes do not afford the Executive discretion to spend less than the entire appropriation, and thus those statutes and the separation of powers require USAID and the State Department to spend the full amounts that Congress appropriated, before the funds expire. The district court ordered Defendant to comply with this constitutional mandate. Defendants have taken no steps to do so to this day, nor have they asked Congress under the Impoundment Control Act to rescind the foreign assistance funds set to expire in September.

Defendants argue that the Executive Branch must spend appropriations only *if* the President decides to request a rescission of funds under the Impoundment Control Act and *if* Congress then declines to enact the requested rescission. Or, Defendants say, the President can wait until shortly before

22

funds expire to submit a rescission proposal and simply allow the funds to expire, unless Congress affirmatively steps in and votes down the proposal. Defendants thus assert that the Impoundment Control Act—a law enacted to "control" impoundment—instead *facilitates* the President's impoundment of funds. Defendants' arguments would turn the Impoundment Control Act into a near replica of the Line-Item Veto Act that that the Supreme Court has held to be unconstitutional.

**D.** The foreign-affairs context in which this dispute arises does not alter this analysis. The Supreme Court has emphasized that the President's significant authority with respect to foreign affairs does not diminish Congress's own constitutional authority to legislate on such matters. *See Zivotofsky,* 576 U.S. at 16. When Congress does so through an appropriations law, the President must abide by that law, just as he must abide by any other constitutional exercise of congressional spending power.

**II.** The remaining preliminary injunction factors strongly favor Plaintiffs. Unrebutted evidence establishes that Plaintiffs have suffered and will continue to suffer immense irreparable harm from the continued impoundment of funds. Plaintiffs and their members include hundreds of organizations that consistently have received every type of foreign aid appropriation, and for

23

some Plaintiffs, funding from USAID and the State Department comprises nearly their entire base of business. Because Defendants are refusing to spend almost all foreign-assistance appropriations, Plaintiffs cannot compete for projects for which they are qualified, prepared, and eager to compete. The loss of the *opportunity* to pursue funding—a well-established form of harm—is catastrophic to Plaintiffs. Once appropriations expire without being spent, Plaintiffs will forever lose the opportunity to obtain those funds.

As to the balance of equities and public interest, Defendants never confront the death, immiseration, and sickness they have visited upon some of the world's most vulnerable people, instead asserting a public interest in the President effectuating his foreign policy objectives. But Defendants do not explain why the President's agenda better reflects the public will than Congress's does, and there is no public interest in unlawful Executive action.

**III.** Finally, the district court did not abuse its discretion in tailoring the preliminary injunction to fit the scope of the constitutional violation. Defendants argue that the injunction impermissibly commands obligations of funds for which Plaintiffs are not willing and able to compete. Even accepting Defendants' approach, Plaintiffs and their members do compete for all the different categories of foreign assistance appropriations that Congress enacted.

24

Moreover, the sweeping nature of Defendants' violation and the broad range of Plaintiffs' programs amply support the full scope of the injunction.

## ARGUMENT

## I. The District Court Properly Determined that Plaintiffs Are Likely to Succeed on the Merits.

### A. Defendants misunderstand the nature of the constitutional claims underlying the injunction.

**1.** Defendants' argument in this Court rests on a profound misunderstanding of the district court's opinion. In this appeal, Defendants challenge only the portion of the district court's preliminary injunction order requiring them to make available for obligation funds appropriated by Congress. That portion of the order rested on the district court's determination that Plaintiffs were likely to succeed on their freestanding constitutional claims that Defendants' impoundment of funds violated the separation of powers. *See* JA63–72. Based on that determination, the court enjoined Defendants from "unlawfully impounding congressionally appropriated foreign aid funds" and directed them to "make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the [FCAA]." JA82.

Nonetheless, Defendants base their arguments on the premise that the district court's holding was tied to *APA* claims alleging *statutory* violations

25

based on the Impoundment Control Act, not a constitutional claim rooted in the separation of powers. *See* Defs. Br. 27 (stating that "the basis for the relevant portion of the district court's preliminary injunction was its conclusion that the Impoundment Control Act" imposes requirements on the Executive); *id.* at 39 (asserting that "the district court primarily justified its mandatory injunction by reference to the Impoundment Control Act").

The district court's opinion belies Defendants' characterization. Expressly noting that Plaintiffs' separation-of-powers claims "are distinct in scope from Plaintiffs' [statutory] APA claims," JA63, the court repeatedly underscored that its holding on impoundments was based on the constitutional claims. As the court explained, "[t]he argument here is that, irrespective of any particular agency action that may be subject to APA review, Defendants are engaging in a unilateral rescission or deferral of congressionally appropriated funds in violation of Congress's spending power." *Id.*; *see also* JA67 n.15 (noting that "even before the Impoundment Control Act took effect, the Supreme Court recognized that the Executive was not free to override Congress's spending power by making the unilateral decision to allot 'less than the entire amounts authorized to be appropriated'" (quoting *Train v. City of New York*, 420 U.S. 35, 41 (1975)). The court understood that the impoundment

26

claims are not "purely statutory," because "Plaintiffs assert that the Executive has attempted to usurp Congress's power over the purse in violation of the separation of powers." JA71 n.17.

The Supreme Court has long recognized the right of parties to seek to enjoin government officials from violating the Constitution, including for "separation-of-powers" violations. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (citing cases). "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *see also, e.g.*, *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers … reflects a long history of judicial review of illegal executive action."); *see also, e.g.*, *Youngstown*, 343 U.S. at 579 (affirming injunction against Secretary of Commerce on separation-of-powers grounds).

**2.** Because Defendants misapprehend the district court's opinion, their brief attacks conclusions that the district court did not reach. For instance, Defendants' argument that Plaintiffs may not enforce the Impoundment Control Act, Defs. Br. 27–33, is beside the point. The Impoundment Control Act and appropriations acts are *relevant* to the constitutional analysis in the sense

27

that they embody the "express[] … will of Congress" as to spending decisions. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring); *see* JA64–67. But, again, the order on appeal did not rest on Plaintiffs' APA claims for violation of the Impoundment Control Act. *See* JA63–72.

For the same reason, Defendants' argument that Plaintiffs are outside of the zone of interests of the Impoundment Control Act is also irrelevant. *See* Defs. Br. 34. "[T]he zone-of-interests test is a statutory one," *Hisp. Affs. Project v. Perez*, 206 F. Supp. 3d 348, 367 (D.D.C. 2016), that considers whether "this particular class of persons ha[s] a right to sue under this substantive statute." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). But as the Supreme Court has held, because "the separation of powers is designed to preserve the liberty of all the people," "any aggrieved party" with Article III standing may challenge a "separation-of-powers violation." *Collins*, 594 U.S. at 245. And where a plaintiff challenges official action as ultra vires, the zone-of-interests test does not apply. *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 811 n.14 (D.C. Cir. 1987).

In any event, the zone-of-interests test is not jurisdictional and may be waived. *Lexmark*, 572 U.S. at 128 n.4; *Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 319 (D.C. Cir. 2015). Here, Defendants did not raise the

28

issue below and, thus, have waived the point. *See Am. Inst. of Certified Pub. Accts. v. IRS*, 804 F.3d 1193, 1199 (D.C. Cir. 2015) (refusing to address zone-of-interests argument where the agency "never presented this argument to the district court, a prerequisite to our consideration of a non-jurisdictional issue absent 'exceptional circumstances'" (quoting *Earle v. Dist. of Columbia*, 707 F.3d 299, 308 (D.C. Cir. 2012)).[4]

Defendants' suggestion that the district court resolved a "dispute about the constitutionality of the Impoundment Control Act" that was "not ripe" and not "directly presented by the parties," Defs. Br. 49, likewise reflects their misunderstanding of the district court's decision. Again, the court did not decide a question about the constitutionality of *the Act*, but rather about the constitutionality of *Defendants' actions*. Moreover, there was nothing "premature" about the district court's resolution of Plaintiffs' constitutional claim,

---

[4] Even where the test applies, it "is not meant to be especially demanding." *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). Thus, "a plaintiff falls outside the group to whom Congress granted a cause of action only when its interests 'are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Mendoza v. Perez*, 754 F.3d 1002, 1017 (D.C. Cir. 2014) (quoting *Clarke*, 479 U.S. at 399)).

Defs. Br. 49, given Defendants' many statements that they would not spend the foreign-assistance funds that Congress appropriated.

### B.     The Constitution gives Congress exclusive authority over the spending of federal funds.

On the merits, the district court was correct: Defendants are likely violating the Constitution by refusing to spend congressionally appropriated funds. The Constitution vests Congress, not the Executive, with "exclusive power" over federal spending. *Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)). The spending power is the first among Congress's enumerated authorities. U.S. Const., art. I, § 8, cl. 1. And the Appropriations Clause denies that same authority to the Executive, mandating that expenditures shall be made only "in Consequence of Appropriations made by Law." *Id.* art. I, § 9, cl. 7.

Understood since the founding as "'the most complete and effectual weapon'" of a representative body, Congress holds exclusive power over federal spending, creating "a bulwark of the Constitution's separation of powers among the three branches of the National Government." *Dep't of Navy*, 665 F.3d at 1346–47 (quoting The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961)). By ensuring that "the purse is lodged in one branch,

and the sword in another," the Spending and Appropriations clauses protect liberty. 2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 349 (A. Hamilton) (Jonathan Elliot ed., 2d ed. 1836). When "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened." *Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring).

Consistent with the Constitution's division of legislative and executive powers, the President must "faithfully execute[]" Congress's spending directives. U.S. Const., art. II, § 3. Like other statutes enacted by Congress, an appropriations act is "Law." *Id.*, art. I, § 9, cl. 7; *see OPM v. Richmond*, 496 U.S. 414, 424 (1990). And Congress alone holds the "power to make a law." *Wilkerson v. Rahrer*, 140 U.S. 545, 562 (1891). Once enacted, "the President may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013); *see also id.* at 261 n.1. Accordingly, "[a]side from the power of veto" over an appropriations bill, "the President is without authority to thwart congressional will by canceling appropriations passed by Congress." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018).

The Supreme Court has long rejected the view that the Executive may countermand Congress's spending directives. *See Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 612–13 (1838). Because the Constitution denies the Executive "the power to cancel" duly enacted appropriations, *Clinton*, 524 U.S. at 439–40, the Executive has no power to withhold funds that Congress directed be disbursed. *See Kendall*, 37 U.S. at 612–13 (1838). As the Court stated emphatically in *Kendall*, "[t]o contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible." *Id.* at 613.

### C.    The Constitution requires Defendants to heed Congress's directive to spend the *full* amount of the appropriations at issue.

In 2024, and again in 2025, Congress exercised its exclusive constitutional spending authority by appropriating funds to USAID and the State Department for foreign assistance. *See supra* pp. 4–8. As explained above, because an appropriations act is a law like any other, the Constitution requires the President to carry out Congress's spending directives. Defendants nonetheless contend that their actions are lawful because the relevant appropriations statutes leave the executive discretion to spend less than the full amount

that Congress appropriated. Defendants are wrong. Longstanding principles of appropriations law, confirmed by the Impoundment Control Act, establish that when Congress makes an appropriation, it requires the executive to spend the appropriation in full, absent an express statutory indication that an agency has discretion to spend less than the full amount.

> 1.   *Appropriations require the Executive Branch to spend their full amount, unless Congress specifies otherwise.*

It is long settled that, absent an express indication to the contrary, an appropriation is a mandate that the Executive Branch spend "the full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d at 261 n.1. The President has no "unilateral authority to refuse to spend the funds." *Id.*

For this reason, when Congress intends for an agency to have discretion to spend less than the full appropriated amount, it expresses that intent through long-established, hallmark permissive language. Examples of such language "abound in our history." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 442 (2024) (Kagan, J., concurring) (quotations omitted). Dating back to the Founding, Congress has made "appropriation[s] of 'sums not exceeding' a specified amount," which do not "mandate that the Executive spend that amount," but "instead provide the Executive discretion over how

much to spend up to a cap." *Id.* at 432–33 (majority op.). The first appropriations law provided "a sum not exceeding one hundred and thirty-seven thousand dollars for defraying the expenses of the department of war." *Id.* at 432 (quoting Act of Sept. 29, 1789, ch. 23, 195 Stat. 95).[5] Ever since, Congress has used clear language when allowing the Executive Branch to spend less than the full amount appropriated, by appropriating funds "up to" or "not to exceed" a certain amount, or as the President or an agency head deems "necessary" in their "discretion." *Id.* at 442–43 (Kagan, J., concurring) (citing historical examples).

Today, every annual appropriations bill contains numerous examples where Congress appropriates sums "up to" or "not to exceed" a specified amount. *See CFPB*, 601 U.S. at 443 (quoting Act of Nov. 29, 1989, § 1605(a),

---

[5] The historical examples marshalled by Defendants, Defs. Br. 52–54, further illustrate this point: When President Jefferson declined to spend $50,000 that Congress had appropriated for gun boats, it was because Congress explicitly vested the President with the discretion to determine whether and how to spend those funds. *See* Act of Feb. 28, 1803, § 3, 2 Stat. 206, https://tinyurl.com/5byhrt3c (authorizing the President to build "a number not exceeding fifteen gun boats" and appropriating "a sum not exceeding fifty thousand dollars"). President Grant likewise justified his decision not to spend funds on river and harbor improvements in statutory, not Constitutional, terms. Letter from Secretary of War J.D. Cameron to President Grant (Jan. 11, 1877), in Executive Documents of the House of Representatives, 44th Cong., 2d Sess., Exec. Doc. No. 23, at 2–3 (1877), https://tinyurl.com/5dfuawdk (noting that the "law and authority are found in the act itself").

103 Stat. 1598)); 2 GAO, Principles of Federal Appropriations Law, 6-28 (3d ed. Jan. 2004) (explaining that, with a "not to exceed" appropriation, "the agency is not required to spend the entire amount"). Such language would be entirely unnecessary if an appropriation standing alone gave the executive discretion to spend less than the appropriated amount. *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128–29 (2018) (noting that courts must "give effect, if possible, to every word Congress used" (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979))).

If there ever were any doubt that appropriations statutes containing no discretion-conferring language require expending the full amount, Congress conclusively answered that interpretive question in the Impoundment Control Act. During the Nixon administration, the executive branch took the position that appropriations statutes conferred discretion on the executive to withhold appropriated funds, even absent express statutory language to that effect. The Impoundment Control Act roundly rejected this misinterpretation of appropriations statutes.

As the GAO has explained, "the Impoundment Control Act operates on the premise that when Congress appropriates money to the executive branch, the President is required to obligate the funds." GAO, B-329092 (Dec. 12,

35

2017); *see* GAO, B-333181 (Apr. 29, 2021); GAO, B-203057 (Sept. 15, 1981). The Act takes as a given that appropriations, on their own force, require the Executive Branch to spend the full amounts appropriated, and the Act sets forth specific—and exclusive—processes whereby the President may secure authorization not to follow the appropriation's directive to spend the full measure of appropriated funds.

Specifically, if the President wishes to temporarily postpone the requirement to spend appropriations, he may submit a special message notifying Congress of a "deferral." 2 U.S.C. § 684. Deferrals are permissible only in three limited circumstances, and policy-based deferrals are *not* permitted. Any appropriations deferred must be obligated before the end of the period of availability. *Id.* § 684(b).; *see* 54 Comp. Gen. 453 (1974). On the other hand, if the President wants permanent relief from an appropriation's requirement to spend funds before they expire, including for policy-based reasons, the President must submit a special message to Congress formally proposing that Congress rescind the funds. 2 U.S.C. § 683. But unless Congress, within 45 legislative days, enacts legislation rescinding all or part of the amount proposed for

rescission, any appropriations that the President formally proposes to be rescinded must be made available for obligation before the funds expire. *Id.* § 684(b).[6]

Congress enacts new appropriations relying on the premise underlying the Impoundment Control Act—that absent explicitly conferred discretion to spend less than an appropriation, the full amount of appropriated funds must be made available for obligation. "Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.,* 498 U.S. 19, 32 (1990). Congress knows and intends that its appropriations will be spent as directed unless the Act's deferral or recission procedures are triggered.[7]

---

[6] The most recent example of a president's use of the Impoundment Control Act's rescission procedure came just last week. On May 28, 2025, the President sent to Congress a list of 22 "proposed rescissions." *See* Mem. from Pres. Donald J. Trump to the Congress, Proposed Rescissions of Budget Authority, at 1 (May 28, 2025), https://tinyurl.com/5pvthded. The accompanying letter from Defendant Vought effectively acknowledges that the Executive Branch is otherwise required to spend the appropriations, describing the rescissions as "proposed" and stating that "*if enacted*, these rescissions would decrease Federal outlays." *Id*. at 2 (emphasis added). Notably, none of the 22 proposed rescissions concern the appropriations at issue in this case that expire on September 30, 2025.

[7] As Defendants note, Defs. Br. 43, agencies may leave a small cushion "to cover unanticipated liabilities" and "unforeseen costs" that may arise over the course of the fiscal year. GAO, B-331298, at 4 (Dec. 23, 2020). This ability ensures that agencies do not spend *more* than the full amount appropriated. *See id.*

2.      *The appropriations at issue confer no discretion on the Executive Branch to spend less than the appropriated amounts.*

The 2024 Appropriations Act and the 2025 Continuing Resolution, without qualification, appropriate specified sums of money and direct that they be used for specified purposes, including USAID's global health programs, development assistance, disaster assistance, and initiatives to promote and strengthen democracy abroad. Pub. L. No. 118-47, div. F, tits. II-III, 138 Stat. 460, 739–43; *see supra* pp. 4–8. The Acts also, and again without qualification, appropriate funds to the Department of State for treating and preventing HIV/AIDS, promoting democracy, assisting refugees, preventing the proliferation of nuclear weapons, combatting terrorism, demining conflict zones, and controlling the international flow of narcotics. *Id.*, 138 Stat. at 744–49; *see supra* pp. 4–8. Because none of the relevant appropriations contains language giving USAID or State discretion to spend less than the top-line amount that Congress appropriated for a category of programs, they require that those amounts be spent in full.

By contrast, the discretion-conferring phrase "not to exceed" appears over 200 times in *other* parts of the 2024 Appropriations Act. Indeed, within the top-line $1.7 billion that Congress directed be used for USAID's operating

expenses, Congress specified that USAID may spend "not to exceed" $250,000 for representation and entertainment expenses. 138 Stat. at 730. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts *intentionally and purposely* in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (emphasis added) (quotations omitted). The Supreme Court has "invoked this canon time and time again," including earlier this term. *City & County of San Francisco v. EPA*, 145 S. Ct. 704, 714 (2025). This presumption carries particular force when the two provisions—like the required and permissive appropriations in the 2024 Appropriations Act—were "enacted at the same time." *Bates v. United States*, 522 U.S. 23, 29 (1997).

For this reason and the reasons explained above, Congress's appropriations require expenditure of the full amount unless Congress expressly provides otherwise. The district court correctly held that Defendants' refusal to spend congressionally appropriated foreign assistance funds likely violates the separation of powers.

### 3.   *Defendants' contrary arguments fail.*

**a.** Defendants do not contend that the text of the relevant appropriations explicitly gives USAID or the State Department discretion to spend less than the appropriated amounts. Instead, Defendants assert that appropriations statutes and the Impoundment Control Act, "together," do not require an agency to spend *any* funds unless and until: (1) the President "determines" the funds should be rescinded, (2) the President submits a rescission proposal to Congress, and (3) Congress fails to enact the proposal within 45 legislative days, or, if the President submits the proposal less than 45 legislative days before the funds expire, Congress actively votes down the proposal before the expiration date. Defs. Br. 21, 40–41, 45–46. In Defendants' view, if the President does not initiate the rescission process or waits until the eleventh hour to do so, the Executive Branch need not spend *any* of the funds that Congress appropriated.

Defendants' theory turns the Impoundment Control Act's statutory procedures for rescissions upside-down. *See* 2 U.S.C. § 683(a). As noted, the Act permits the President to submit a rescission proposal when he "determines"

that funds "*should be rescinded* for fiscal policy or other reasons." *Id.* (emphasis added).[8] Again, as GAO has explained, this procedure rests on the premise that the Executive Branch must spend appropriations if it does not successfully follow this process. *See* GAO, B-333181; GAO, B-329092; GAO, B-203057. Under Defendants' theory, however, this statutory procedure—the central feature of the Act—is never needed. If appropriations *themselves* did not require agencies to spend the funds before they expire, as Defendants contend, why would funds ever need to "be rescinded"? The appropriations would simply expire, unspent, without the President ever having to ask for them to be rescinded or risking that Congress would refuse his request.

This Court "should not lightly conclude that Congress enacted a self-defeating statute." *Quarles v. United States*, 687 U.S. 645, 654 (2019). But such a conclusion is precisely what Defendants urge by seeking to transform the Impoundment Control Act from a statute *rejecting* unilateral impoundment into one that *allows* the President to impound funds freely, as long as he does not make the mistake of unsuccessfully requesting rescission. The Act cannot

---

[8] The Act also permits the President to submit a rescission proposal where he determines that Congress's objectives and intended scope of work can be fulfilled without the full appropriated amount. 2 U.S.C. § 683(a). This part of § 683(a) does not apply where, as here, the President for policy reasons wishes not to fulfill Congress's objectives or intended program scope.

reasonably be read to reflect a decision by Congress to relinquish its constitutional spending authority, and the President's failure to invoke its procedures accordingly does not excuse him of his constitutional obligation to spend the funds that Congress directed him to spend in the relevant appropriation statutes.

In addition, Defendants assert that, under the Impoundment Control Act, the Executive Branch may do nothing to spend appropriations following their enactment, submit a rescission proposal less than 45 congressional-session days before the funds expire, and then allow the funds to expire unless Congress takes affirmative action to reject the rescission proposal before the fiscal year ends. Defs. Br. 45–46. This theory would effectively resurrect the unconstitutional procedure under the Line-Item Veto Act of 1996, which the Supreme Court struck down. *Clinton v. City of New York*, 524 U.S. 417 (1998). The Line-Item Veto Act authorized the President to send a special message to Congress stating that he intended to cancel appropriations, and made that cancellation effective unless Congress affirmatively stepped in and passed a "disapproval bill." *Id.* at 436–37. Defendants' theory would allow the President to do precisely what the Supreme Court in *Clinton* held that the Constitution forbids.

**b.** Defendants point to a 1969 Office of Legal Counsel (OLC) opinion asserting that appropriations are permissive rather than mandatory. Defs. Br. 37. In that opinion, which firmly rejected the President's "constitutional power to decline to spend appropriated funds," OLC commented that "an appropriation act permits but does not require the Executive Branch to spend funds." 1 Supp. Op. O.L.C. 303, 309 (1969). But the very next sentence characterized OLC's view as "basically a rule of construction"; OLC's view would be different "*where the appropriation act or the substantive legislation, fairly construed, requires such action.*" *Id.* (emphasis added). As explained above, the governing "rule of construction" has since been conclusively settled: Absent specific discretionary language to the contrary, the Executive Branch must spend the full amount of an appropriation.

The Supreme Court's decision in *Train v. City of New York*, 420 U.S. 35 (1975), cited by Defendants, Defs. Br. 37, likewise offers them no support. In the portion of the opinion on which Defendants rely, the Court highlighted that the relevant statute "authorized appropriation of '*not to exceed*' a specified sum." 420 U.S. at 43 (emphasis added). In light of that permissive language, the Court observed that the provision could "permit appropriation of … lesser

43

amounts" than Congress's specified sum. *Id.* The appropriations here contain no such language.

**c.** Finally, Defendants suggest that "the underlying statutes authorizing foreign assistance programs … generally provide … significant latitude" to the President and Secretary of State on foreign-policy matters. Defs. Br. 38. But whatever discretion Congress granted in an *underlying* authorizing statute does not alter the meaning of the foreign-assistance appropriations that Congress has since enacted. Countless statutes across the U.S. Code give executive officials discretion as to how best achieve congressional goals. But when Congress exercises its constitutional authority to enact appropriations, providing specific sums of money to the Executive Branch to achieve those goals, the money must be spent.

In short, the separation of powers requires the Executive Branch to spend the funds for the designated purpose unless and until Congress passes new legislation rescinding the funds. The district court correctly concluded Defendants failed their obligations here, and that failure violates the Constitution.

### D.    That Congress appropriated the impounded funds for foreign assistance does not alter these fundamental principles.

Invoking "Executive Branch discretion in the sphere of foreign affairs," Defendants suggest that the fact that these impoundments arise in the context of foreign assistance funding means that the President may withhold billions of dollars in appropriated funds for policy reasons. Defs. Br. 47. The principle that "the President does not have unilateral authority to refuse to spend the funds" that Congress appropriates, *Aiken Cnty.*, 725 F.3d at 261 n.1, applies equally in the context of foreign affairs. Indeed, the Supreme Court has rejected the notion that the President enjoys "unbounded power" in that realm, *Zivotofsky*, 576 U.S. at 20, and has cautioned that "it is essential the congressional role in foreign affairs be understood and respected," *id.* at 21. Accordingly, although the President "possesses his own powers 'as the Nation's organ in foreign affairs,'" Defs. Br. 47–48 (quoting *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 109 (1948)), that uncontroversial proposition does not resolve the constitutionality of executive action that runs headlong into Congress's own constitutional prerogative to legislate on matters that touch on foreign affairs, especially with respect to the use of federal funds for foreign affairs purposes. *See Zivotofsky*, 576 U.S. at 16 ("In foreign affairs, as

45

in the domestic realm, the Constitution 'enjoins upon its branches separateness but interdependence, autonomy but reciprocity.'" (quoting *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring))).

By disregarding Congress's power to appropriate foreign affairs funding for *specific purposes*, Defendants sidestep the separation-of-powers conflict that gives rise to Plaintiffs' constitutional claims. This case is not one in which the "absence of either a congressional grant or denial of authority" created a "zone of twilight in which [the President] and Congress may have concurrent authority." *Id.* at 10 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). Nor is this case one in which the underlying statutory duty is ambiguous. *But see Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). Here, where the Executive has "take[n] measures incompatible with the expressed or implied will of Congress," the bounds of permissible executive action are defined by the President's "own constitutional powers *minus* any constitutional powers of Congress." *Zivotofsky*, 576 U.S. at 10 (emphasis added) (quoting *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring)).

Defendants do not dispute that Congress has authority to direct how public funds are to be spent, irrespective of whether the exercise of Congress's spending power implicates foreign affairs. Nor could they, as "Congress alone

46

controls the raising of revenues and their appropriation and may determine in what manner and by what means they shall be spent," even in domains like "military and naval procurement" where the President may have independent power. *Youngstown*, 343 U.S. at 643 (Jackson, J., concurring); *see Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 216 (2022) ("Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds."). Defendants likewise do not dispute that Congress has unambiguously appropriated funds for the Executive to spend to support the sort of foreign assistance projects that Plaintiffs operate.

In impounding appropriated funds, then, Defendants' authority was at its "lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). As the district court noted, any potential problem that "could arise in conflicts between spending mandates and a foreign policy question" is not implicated here, where Defendants "do not ground the authority to impound here" in any Executive Branch constitutional obligation. JA69 n.16. They likewise "do not articulate *any* bounds to the authority; and they have not raised any challenge to the constitutionality of the governing statutes, as applied or otherwise, including the appropriations acts and Impoundment Control Act." *Id.*

47

Defendants' theory—that principles of constitutional avoidance demand that courts acquiesce to presidential impoundments of funds that implicate issues of foreign affairs—would create an exception to longstanding separation-of-powers principles that neuters those principles with respect to Congress's spending power. In the FCAA and its companion legislation, the Consolidated Appropriations Act, 2024, Pub. L. No. 118-42 (Mar. 9, 2024), Congress appropriated almost $900 billion in defense spending as well as nearly $60 billion in State Department and foreign operations spending, representing over 57% of the total discretionary spending appropriated by Congress. *See* Off. of Mgmt. & Budget, *OMB Final Sequestration Report to the President and Congress for Fiscal Year 2024*, at 7 (Apr. 12, 2024), https://tinyurl.com/mujruhed. Accepting Defendants' theory would render the judiciary toothless to address serious separation-of-powers issues stemming from Presidential impoundments of well over half the total U.S. discretionary budget.

## II.    Plaintiffs Satisfy the Remaining Preliminary Injunction Factors.

### A.    Plaintiffs have established irreparable harm.

Plaintiffs have suffered and continue to suffer irreparable harm from Defendant's unlawful impoundment of foreign assistance funds. In fact, the "evidence of the immense irreparable harm to businesses and organizations

across the country" caused by the unlawful withholding of foreign assistance was entirely "unrebutted by Defendants." JA72.

Among other things, the record shows that approximately 98% of Plaintiff Democracy International's revenues come from USAID awards. JA346 ¶ 7. For Plaintiffs Management Sciences for Health, Chemonics, and DAI, USAID funding constitutes 88%, 88%, and 80% of their business bases, respectively. JA311 ¶ 4; JA322-23; JA333 ¶ 4. USAID grant funding represents 40% of Plaintiff AVAC's total operating budget. JA106 ¶ 10, and State Department and USAID grants constitute 38% of Plaintiff Journalism Development Network's budget, JA109 ¶ 6. Without the foreign assistance funding opportunities for which Congress has appropriated money, these organizations' base of business is destroyed.

Thus, unrebutted evidence shows that Defendants' actions have forced Plaintiffs to "significantly cut down on staff or otherwise reduce core operations." JA72; *see, e.g.*, JA106 ¶¶ 11–12; JA111 ¶¶ 10–13; JA249–50 ¶ 11; JA254–55 ¶¶ 10–11; JA264–65 ¶¶ 21–22; JA313–16 ¶¶ 6–10; JA324–26 ¶¶ 7–12; JA334–37 ¶¶ 7–11; JA347–48 ¶ 11; JA360–61 ¶¶ 15–16. In addition, the unrebutted evidence shows that Defendants' actions have caused and, if not enjoined, will

continue to cause severe harm to Plaintiffs' "goodwill, reputation, and relation-ships with employees, partners, subcontractors, foreign governments, and other stakeholders." JA74 (quoting *AVAC*, 766 F. Supp. 3d at 81 n.2); *see, e.g.* JA325–29 ¶¶ 10, 15; JA362–63 ¶ 21.

As the district court found, unrebutted evidence also establishes that "'obstacles' created by Defendants' conduct 'make it more difficult for the [plaintiffs] to accomplish their primary mission[s].'" JA74 (alteration in original) (quoting *League of Women Voters*, 838 F.3d at 9); *see, e.g.*, JA106 ¶ 11; JA249–50 ¶¶ 8–11; JA335–37 ¶ 10; JA348 ¶ 12(a). Among other evidence, "[o]ne plaintiff asserts that the suspension of appropriated foreign aid has disrupted critical health programs, including maternal and child health programs and infectious disease prevention efforts administered by its member organiza-tions." JA73 (citing JA249 ¶ 8). Another plaintiff, forced to delay anti-malaria campaigns expected to benefit millions of people, attests that the refusal to spend "appropriated foreign aid funding 'is an existential threat to [its] mem-bers and their life-saving work.'" JA73 (alteration in original) (quoting JA250 ¶ 11).

Rather than challenge the irreparability of these harms directly, De-fendants contend that the order directing Defendants to make appropriated

foreign assistance funds available for obligation and expenditure will not *avoid* these injuries, because Defendants could spend the funds on other entities. Defs. Br. 57–60. Defendants are wrong that compliance with the injunction will not redress Plaintiffs' injuries.

If Defendants spend the soon-to-expire appropriations through new obligations, foreign assistance funding that is now blocked by Defendants' impoundment would once again be open to Plaintiffs to obtain, allowing them to restore their missions and redressing the grievous harms described above. As Defendants concede, Defs. Br. 63, denial of the *opportunity* to pursue federal funds is itself an injury. Regardless of whether a plaintiff "point[s] to one specific project it has been deprived of the opportunity to" obtain, a plaintiff suffers clear harm where "it has been walled off from an entire category of projects for which it is qualified, prepared, and eager to compete." *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1016 (D.C. Cir. 2022). The order to stop impounding appropriated funds thus redresses the injury, even if a plaintiff "may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity," *Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015) (quoting *CC Distribs.,*

*Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989)). And without the injunction, the harm would be irreparable: Once the funds lapse at the end of the fiscal year, it would no longer be possible for Plaintiffs to obtain them. Courts routinely find irreparable harm where a plaintiff would forever lose the opportunity to compete for a government funding opportunity. *See, e.g.*, *AGMA Sec. Serv., Inc. v. United States*, 152 Fed. Cl. 706, 740 (2021) (citing dozens of cases).

Moreover, given the fast-approaching deadline to spend the relevant appropriations, Defendants are likely to elect to restore terminated programs, including Plaintiffs' programs, as a means of compliance. That alternative course of action would obviously redress irreparable harms to Plaintiffs.

### B.    The balance of harms and public interest favor Plaintiffs.

Likewise, the balance of harms and public interest strongly favors the injunction. It is beyond dispute that Defendants' actions have led to mass death, impoverishment, sickness, and waste. *See* JA77 ("Plaintiffs have adduced ample evidence that the funding freeze has had dire humanitarian consequences."). The toll taken by Defendants' actions includes, among other grave consequences, an expected annual increase of 71,000–166,000 deaths by malaria, two to three million additional deaths from failure to immunize

against vaccine-preventable diseases, and 1 million children not treated for severe acute malnutrition. JA216–220; *see also* Brett Murphy & Anna Maria Barry-Jester, *Death, Sexual Violence and Human Trafficking: Fallout From U.S. Aid Withdrawal Hits the World's Most Fragile Locations*, ProPublica (May 28, 2025), https://tinyurl.com/mvubn6s3 (citing internal State Department reports indicating that foreign assistance cuts "yielded a sharp increase in criminality, sexual violence, and instances of human trafficking"). Defendants have "made no effort" to argue otherwise. JA77. Similarly, Defendants' actions have had a strong negative impact on American workers employed by "thousands of businesses and organizations around the country," whose layoffs are directly attributable to the withholding of foreign assistance funding, in turn harming workers' families, the local economies to which they contribute, and the broader national economy. JA55 (noting the "massive reliance interests of businesses and organizations that would have to shutter programs or close their door altogether").

Instead of confronting those equities, Defendants claim that the public has an interest in preserving the President's ability to effectuate his foreign policy objectives and in allowing the political branches to negotiate a compromise resolution to the Executive's impoundment. Defs. Br. 60–61. However,

there is "no public interest" in unlawful Executive action. *League of Women Voters*, 838 F.3d at 12; *see also Zivotofsky,* 576 U.S. at 21 ("The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue"). "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). And Defendants' invocation of the prospect for interbranch dialogue is disingenuous in light of their position that the President may impound congressionally appropriated funds without initiating that dialogue. *See supra* pp. 40–48.

Defendants also suggest that their actions serve the public interest by ensuring that tax dollars are not spent on projects that are "antithetical to American values." Defs. Br. 61. Yet they have not offered a shred of evidence to show that any such State or USAID-funded foreign assistance projects existed, much less that their actions targeted any such projects.

The Court should also reject Defendants' concerns that they will be unable to recoup funds in the event that they eventually prevail in this litigation. Defs. Br. 62. Defendants advanced those same concerns in their application to the Supreme Court to vacate the district court's order directing payment for

54

past work performed. *See* Appl. to Vacate Order and Req. for Immediate Admin. Stay at 25, *Dep't of State v. AIDS Vaccine Advocacy Coal.*, No. 24A831 (Feb. 26, 2025). The Supreme Court denied the application while acknowledging that the order required "the Government to issue payments … owed for work already completed." *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753, 753 (2025). Nothing distinguishes the recoverability of those payments from the recoverability of funds that Defendants are required to make available for obligation pursuant to the preliminary injunction.

Beyond that, Congress has already appropriated funds for precisely the sort of projects Plaintiffs perform. No harm redounds to Defendants from spending money that Congress has directed it to spend for the purposes that Congress has specified.

## III.    The Injunction is Appropriately Tailored.

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008)). The "scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And

where "a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Hills v. Gautreaux*, 425 U.S. 284, 293–94 (1976) (citations and internal quotation marks omitted).

In this case, the portion of the district court's order challenged on appeal reflected the court's judgment that Plaintiffs "are likely to succeed on their constitutional claims that Defendants' withholding of congressionally appropriated foreign aid funds violates the separation of powers." JA78–79. To redress the likely constitutional violation, the district court preliminarily "enjoined [Defendants] from unlawfully impounding congressionally appropriated foreign aid funds" and directed them to "make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024." JA82. The district court was well within its discretion to conclude that the relief ordered was "properly tailored" to the constitutional violation. JA79.

Defendants do not meaningfully dispute that they are currently impounding nearly all of the remaining foreign assistance funds Congress has appropriated. In doing so, Defendants have "relie[d] on a 'categorical policy'"

that foreign assistance spending is inconsistent with the administration's priorities. *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (quoting *Roe v. Dep't of Def.*, 947 F.3d 207, 232 (4th Cir. 2020)); *see* Exec. Order No. 14,169, § 1, 90 Fed. Reg. at 8619. Because Defendants' implementation of this policy, which gave rise to Plaintiffs' injuries here, is itself unlawful, "the facts would not require different relief for others similarly situated to the plaintiffs," making the district court's injunction "appropriate" here. *HIAS*, 985 F.3d at 326.

Notwithstanding this precedent, Defendants argue that the injunction is overbroad because it extends beyond "programs or funds for which [Plaintiffs] are willing and able to compete." Defs. Br. 63. As a threshold matter, this scope-related argument was not presented to the district court, so "cannot be considered for the first time on appeal." *United States v. Stover*, 329 F.3d 859, 872 (D.C. Cir. 2003). In any event, Defendants are incorrect. Even assuming that Defendants complied with the injunction by recompeting the funds, rather than resorting the grants and other awards, *supra* p. 52, the full scope of the injunction is amply supported by the district court's findings and the record below. In particular, given the breadth of the purposes that Congress articulated in the relevant appropriations, and breadth of the foreign-assistance

57

expertise and capability of Plaintiffs here, there is nothing to support Defendants' speculation that Plaintiffs collectively would be unwilling or unable to carry out the full range of appropriations covered by the injunction.

For example, Plaintiff SBAIC is a "membership organization" with "almost 170 members" who provide a broad array of "work in all sectors and geographies," including "economic growth, agriculture and food security, democracy and governance, water and sanitation, … global health and education," "humanitarian relief and crisis stabilization," and "monitoring and evaluation to ensure that U.S. Government taxpayer funds are evidence-based and achieve the highest return for every dollar." JA252 ¶¶ 2–3, 5. These members "are able to carry out both small and large contracts, with current U.S. government contracts ranging from $100,000 to over $70 million." JA253 ¶ 6. Even this *one* plaintiff organization stands "ready, willing and able," *MISO*, 45 F.4th at 1015, to pursue every category of appropriations at issue.

The record is replete with other examples demonstrating Plaintiffs' and their members' ability to compete for aid appropriated under each and every one of the relevant categories of foreign-aid appropriations in the 2024 Appropriations Act:

- For "global health activities." Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 740; *see, e.g.*, JA344–47 ¶¶ 5, 12 (Democracy International's assistance for essential medicines, medical services, food, shelter, and subsistence assistance); JA310–11 ¶¶ 2–3 (MSH's work preventing and preparing for public health threats).

- To carry out FAA provisions that help develop agriculture, education and human resources, energy production, schools and hospitals, small businesses, and human welfare in sub-Saharan Africa. Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 742; *see, e.g.*, JA249–50 ¶ 8 (GHC members' insecticide, netting, and anti-malarial programs for African nations).

- To carry out FAA provisions for international disaster relief, rehabilitation, and reconstruction assistance. Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 742; *see, e.g.*, JA321–22 ¶ 13 (Chemonics's work to prevent food crises, resettle migrants, and rehabilitate nations post-conflict).

- For "international disaster relief, rehabilitation, and reconstruction assistance," and to "support transition to democracy and long-term development of countries in crisis." Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 742; *see, e.g.*, JA354–63 ¶¶ 7–20 (ABA's efforts to advance democracy, and combat money laundering and terrorism).

- To implement the Complex Crisis Fund established by the Global Fragility Act of 2019, which USAID administers "to support programs and activities to prevent or respond to emerging or unforeseen events overseas," 22 U.S.C. § 9808(b)(1). *See* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743; *see, e.g.*, JA261 ¶ 14 (HIAS's work to help refugees and displaced children at risk of trafficking, sexual exploitation, abuse, and neglect).

- To implement the FAA's Economic Support Fund, which furnishes "assistance to countries and organizations … to promote economic or political stability," 22 U.S.C. § 2346(a). *See* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743; *see, e.g.*, JA332–33 ¶ 3 (DAI's support for crisis-stricken countries, and of broad-based economic growth, financial independence, and sustainability in emerging economies).

- To "carry out the provisions of the [FAA] for the promotion of democracy globally, including to carry out" pro-democracy training, institution-building, and pluralism purposes. Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743; *see, e.g.*, JA344 ¶¶ 3–6 (Democracy International's programs supporting political systems around the world to be responsive, inclusive, and competitive).

- For USAID assistance programs for eastern Europe, including "urgent humanitarian needs," "[e]stablishing a democratic and free society," "[d]eveloping free and independent media," currency stabilization loans, debt reduction, agricultural assistance, and other measures to promote democracy and free markets. Pub. L. No. 102-511, § 498(1)–(3), 106 Stat. 3320, 3325 (1992). *See* Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 744; *see, e.g.*, JA108–09 ¶¶ 3–6 (Journalism Development Network's coverage of global crime and corruption).

- To carry out FAA provisions "for the prevention, treatment, and control of, and research on, HIV/AIDS." Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 742; *see, e.g.*, JA104 ¶ 2 (AVAC's partnerships to accelerate HIV prevention).

- To carry out FAA provisions "for the promotion of democracy globally" consistent with the National Endowment for Democracy Act. Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 743; 22 U.S.C. § 4411(b); *see, e.g.*, JA332 ¶ 3 (DAI's support of political transition and stability in crisis-stricken countries).

- For migration and refugee assistance, including under the Migration and Refugee Assistance Act of 1962, 22 U.S.C. § 2601. Pub. L. No. 118-47, div. F, tit. III, 138 Stat. at 744; *see, e.g.*, JA257 ¶4 (HIAS's support of vulnerable refugees, asylum seekers, and other forcibly displaced people).

- For preventing the proliferation of nuclear weapons, combatting terrorism, and demining conflict zones pursuant to specified provisions of the FAA, FREEDOM Support Act, and Arms Export Control Act. Pub. L. No. 118-47, div. F, tit. IV, 138 Stat. at 748; *see, e.g.*, JA354–63 ¶¶ 7–20 (ABA's efforts to combat money laundering and terrorism).

- To carry out provisions of section 511 of the FAA "for peacekeeping operations and other programs carried out in furtherance of the national security interests of the United States," 22 U.S.C. § 2348. *See* Pub. L. No. 118-47, div. F, tit. IV, 138 Stat. at 749–50; *see, e.g.*, JA332 ¶ 3 (DAI's assistance to prevent and counter violent extremism in fragile states).

- To carry out section 481 of the FAA, which authorizes assistance "for the control of narcotic and psychotropic drugs and other controlled substances, or for other anticrime purposes," 22 U.S.C. § 2291(a)(4). S*ee* Pub. L. No. 118-47, div. F, tit. IV, 138 Stat. at 747; *see, e.g.*, JA321–22 ¶ 3 (Chemonics's work to counter incentives to join gangs and to create safe public spaces).

Given Plaintiffs' wide range of activities across Congress's enumerated programs, Defendants' contention that "some" plaintiffs "may not be equipped to run specific types of programs" falls flat. Defs. Br. 64. For example, even if Defendants were correct that Plaintiff Global Health Council would not likely compete "for grants involving … refugee needs," Defs. Br. 64, the record unequivocally supports that other Plaintiffs *would*. *See, e.g.*, JA257 (HIAS "protect[s] the most vulnerable refugees, asylum seekers, and other forcibly displaced people, helping them build new lives and reuniting them with their families in safety and freedom."). Defendants also point out that Plaintiffs could not compete for funding appropriated specifically for the Global Fund to Fight AIDS, Tuberculosis and Malaria. *See* Defs. Br. 63–64. This funding apparently has not been impounded, however, and thus is not within the scope of the injunction. *See* KFF, *The Trump Administration's Foreign Aid Review: Status*

61

*of U.S. Support for the Global Fund to Fight AIDS, Tuberculosis and Malaria*
(May 29, 2025), https://tinyurl.com/radhkrew.

Finally, Defendants suggest that the injunction is too broad because it encompasses appropriations that fund "operating expenses and capital expenditures necessary to implement foreign assistance programs." Defs. Br. 63. Impoundment of funds needed for operational expenditures deemed necessary to effectuate foreign assistance programs, however, obviously harms organizations like Plaintiffs, whose existence depends on the continuation of those programs.

62

# CONCLUSION

The Court should affirm the decisions below.

Respectfully Submitted,

/s/ *Lauren E. Bateman*

Lauren E. Bateman
Nicolas A. Sansone
Allison M. Zieve
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for AIDS Vaccine Advocacy Coalition, et al*

/s/ *Stephen K. Wirth*

William C. Perdue
Sally L. Pei
Stephen K. Wirth
Samuel F. Callahan
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5000

Daniel F. Jacobson
JACOBSON LAWYERS GROUP PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(301) 823-1148

*Counsel for Global Health Council, et al.*

June 6, 2025

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the attached Appellees' Brief contains 12,766 words and complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Century font.

Dated: June 6, 2025                         */s/ Stephen K. Wirth*
                                            Stephen K. Wirth

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2025, I caused the foregoing document to be electronically filed using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 6, 2025                    */s/ Stephen K. Wirth*
                                       Stephen K. Wirth