# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

GLOBAL HEALTH COUNCIL, *et al.*,
*Appellees*,

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES OF AMERICA, *et al.,*
*Appellants.*

On Appeal from the United States District Court
for the District of Columbia

## BRIEF OF LAW SCHOLARS *AMICI CURIAE*
## IN SUPPORT OF APPELLEES

Jonas Monast
Patrick R. Jacobi
Alexandra L. St. Romain
CENTER FOR APPLIED ENVIRONMENTAL
LAW AND POLICY
712 H Street NE, Suite 90006
Washington, DC 20002
(703) 405-8950
patrick.jacobi@caelp.org

*Counsel for Law Scholars* Amici Curiae

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

A. *Parties and Amici*. Except for the following, all parties and *amici curiae* appearing before this Court are listed or referenced in the Brief for Appellees, Doc. 2119677 (filed June 6, 2025): *Amicus* for Appellees Alan B. Morrison, *Amicus* for Appellees Protect Democracy, and Law Scholars *Amici*.

B. *Rulings Under Review*. References to the ruling under review appear in Brief for Appellants, Doc. 2115253 (filed May 9, 2025).

C. *Related Cases*. A list of related cases appears in Brief for Appellants, Doc. 2115253.

Dated: June 13, 2025

*/s/ Patrick R. Jacobi*
Patrick R. Jacobi

# CIRCUIT RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to D.C. Circuit Rule 26.1, counsel for Law Scholars *Amici Curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

Dated:  June 13, 2025

*/s/ Patrick R. Jacobi*
Patrick R. Jacobi

# RULE 29 STATEMENTS

Counsel for Law Scholars *Amici Curiae* certifies that the parties in these consolidated proceedings have been consulted, and that no party opposes the filing of this brief.

Pursuant to Fed. R. App. P. 29(a)(4), Counsel for Law Scholars *Amici* states that no party or party's counsel authored this brief in whole or in part, and that no other person besides Law Scholars *Amici* or their counsel contributed money intended to fund the preparation or submission of this brief.

Pursuant to D.C. Cir. R. 29(d), Counsel for Law Scholars *Amici* states that a separate brief is necessary to allow Law Scholars *Amici* to set forth their specific perspective on the issues presented. These scholars are constitutional and administrative law experts who have a strong interest in the development of the consistent application of law in the federal courts. Counsel for Law Scholars *Amici* understands that there are other *amici* in support of Appellees, but, to date, no *amici* filing on behalf of Appellees has addressed the points raised herein. After reviewing the anticipated filing by the Constitutional Accountability Center and conferring with noticed counsel from Protect Democracy, Counsel for Law Scholars *Amici* does not expect any anticipated or noticed *amici* to address these same issues on behalf of Appellees.

Dated: June 13, 2025

*/s/ Patrick R. Jacobi*
Patrick R. Jacobi

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.............. ii

CIRCUIT RULE 26.1 CORPORATE DISCLOSURE STATEMENT ................... iii

RULE 29 STATEMENTS ........................................................................ iv

TABLE OF CONTENTS ......................................................................... v

TABLE OF AUTHORITIES ................................................................... vi

GLOSSARY ........................................................................................ x

INTEREST OF *AMICI CURIAE* ............................................................ 1

ARGUMENT ....................................................................................... 1

I.      The Unitary Executive Cases Recognizing the Need for Presidential Control Over Agency Leadership and Function Do Not Authorize the President to Violate Statutes When Directing Agency Policy. ........................................... 7

II.     The Major-Questions-Doctrine Cases Demonstrate That the President's Authority Remains Limited to the Bounds of Congressionally Delegated Authority, Even Where the President Has Exerted Significant Control Over Agencies Through the Chain of Dependence. ............................................... 12

III.    This Court Should Uphold the District Court's Injunction and Recognize the Important Role of Congress in Creating Agencies and Empowering and Constraining the Executive Branch. ............................................ 16

CONCLUSION ..................................................................................... 22

CERTIFICATE OF COMPLIANCE ......................................................... 23

CERTIFICATE OF SERVICE ................................................................. 23

# TABLE OF AUTHORITIES

## Cases

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
   No. 1:25-cv-00400-AHA, 2025 U.S. Dist. LEXIS 42875 (D.D.C. Mar. 10,
   2025) ..................................................................................................................20

*Am. Forest Res. Council v. United States*,
   77 F.4th 787 (D.C. Cir. 2023) .......................................................................... 11

*Biden v. Nebraska*,
   600 U.S. 477 (2023) ...........................................................................12, 15, 16

*Chamber of Com. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ..................................................................18, 19

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ...........................................................................................10

*Clinton v. City of New York*,
   524 U.S. 417 (1998) .............................................................................................2

*Collins v. Yellen*,
   594 U.S. 220 (2021) .............................................................................................9

*Dalton v. Specter*,
   511 U.S. 462 (1994).....................................................................................17, 18

*Doe v. Musk*,
   __ F. Supp. 3d __, No. 25-0462-TDC, 2025 U.S. Dist. LEXIS 49603 (D. Md.
   Mar. 18, 2025) ......................................................................................................2

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) .......................................................................................8, 10

*In re Aiken Cnty.*,
   725 F.3d 255 (D.C. Cir. 2013) .......................................................................8, 11

*In re United Mine Workers of Am. Int'l Union,*
190 F.3d 545 (D.C. Cir. 1999) ...........................................20

*Kendall v. United States,*
37 U.S. 524 (1838) ...........................................20

*Kovac v. Wray,*
109 F.4th 331 (5th Cir. 2024) ...........................................21

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ...........................................7, 17, 18

*Marbury v. Madison,*
5 U.S. 137 (1803) ...........................................3, 7

*Nat'l Fed. of Indep. Bus. v. Dep't of Lab.,*
595 U.S. 109 (2022) ...........................................14

*New York v. McMahon,*
__ F. Supp. 3d __, Nos. 25-10601-MJJ, 25-10677-MJJ, 2025 U.S. Dist. LEXIS
97722 (D. Mass. May 22, 2025)...........................................3

*Seila L. LLC v. Consumer Fin. Prot. Bureau,*
591 U.S. 197 (2020) ...........................................7, 9

*Trump v. United States,*
603 U.S. 593 (2024) ...........................................3, 6, 11

*United States v. Arthrex,*
594 U.S. 1 (2021) ...........................................9, 10

*United States v. Texas,*
599 U.S. 670 (2023) ...........................................19

*Util. Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014) ...........................................14

*West Virginia v. EPA,*
597 U.S. 697 (2022) ...........................................6, 12, 13, 14, 15

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) .................................................................................6, 19

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) .............................................................................20

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl. 1 ...............................................................7, 10

U.S. Const. art. II § 3 .........................................................................20

U.S. Const. art. II, § 8, cl. 1 ...............................................................21

**Executive Branch Materials**

Memorandum Directing the Appeal of Unlawful Regulations, Presidential Mem.
    (Apr. 9, 2025), https://www.whitehouse.gov/presidential-
    actions/2025/04/directing-the-repeal-of-unlawful-regulations/ .........................5

Office of Mgmt. & Budget, Exec. Office of the President, M-25-28: Guidance
    Implementing the President's Memorandum Directing the Repeal of Unlawful
    Regulations (May 7, 2025) https://www.whitehouse.gov/wp-
    content/uploads/2025/02/M-25-28-Guidance-Implementing-the-Presidents-
    Memorandum-Directing-the-Repeal-of-Unlawful-Regulations.pdf ..................6

Remarks and a Question-and-Answer Session at the Future Investment Initiative
    Priority Summit in Miami Beach, Florida, 2025 Daily Comp. Pres. Doc. 280
    (Feb. 19, 2025)....................................................................................2

Remarks at Georgetown University, 2013 Daily Comp. Pres. Doc. 452 (June 25,
    2013) ...............................................................................................15

Remarks by the President in Announcing the Clean Power Plan, 2015 Daily Comp.
    Pres. 546 (Aug. 3, 2015)......................................................................15

**Other Authorities**

Application to Stay the Order Issued by the United States District Court for the
    Northern District of California and Request for an Immediate Administrative

Stay, *Trump v. Am. Fed'n of Gov't Emps., AFL-CIO*, No. 24A1174 (June 2, 2025), https://www.supremecourt.gov/DocketPDF/24/24A1174/362080/20250602120234175_Trump_v_AFGE_Stay_Appl_2.pdf ......................................................5

Andrew Kent, Ethan J. Leib, & Jed Handelsman Shugerman, *Faithful Execution and Article II*, 132 Harv. L. Rev. 2111 (2019)............................................19, 20

Editorial, *A Tough, Achievable Climate Plan*, N.Y. Times, Aug. 4, 2015 ...............20

Jodi L. Short & Jed H. Shugerman, *Major Questions About Presidentialism: Untangling the "Chain of Dependence" Across Administrative Law*, 65 B.C. L. Rev. 511 (2024) ......................................................................................14, 16

Natasha Brunstein & Donald L. R. Goodson, *Unheralded and Transformative: The Test for Major Questions After* West Virginia, 47 Wm. & Mary Env't L. & Pol'y Rev. 47 (2022)..........................................................................................13

Noah A. Rosenblum & Roderick M. Hills, Jr., *Presidential Administration after* Arthrex, 75 Duke L.J. (forthcoming 2026), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5122594.........................9

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| PTAB | Patent and Trial Appeal Board |
| USAID | United States Agency for International Development |

## INTEREST OF *AMICI CURIAE*

Law Scholars *Amici* are law professors who teach and write in the fields of constitutional and administrative law. *Amicus* William W. Buzbee is the Edward and Carole Walter Professor of Law at Georgetown University Law Center. *Amicus* Noah Rosenblum is an Associate Professor of Law at New York University School of Law. *Amicus* Jodi Short is the Mary Kay Kane Distinguished Professor of Law at University of California College of Law, San Francisco.

Law Scholars *Amici* have a strong interest in the sound development of constitutional and administrative law in the federal courts and are submitting this brief because of the importance of the separation-of-powers issues implicated by the Trump Administration's recent actions seeking to effectively eliminate the United States Agency for International Development ("USAID") and other congressionally created and funded agencies. As leading constitutional and administrative law scholars, Law Scholars *Amici* are well-positioned to provide insights that may assist the Court in evaluating Appellees' arguments concerning separation-of-power principles.

## ARGUMENT

This case requires this Court to determine the proper relationship between Congress and the Executive Branch. As in many other cases arising from President Trump's first few months in office, the Administration here relies on an unbounded

view of presidential power to support its attempt to withdraw duly appropriated funds as part of its effort to, in the President's words, "effectively eliminate" a statutorily-created-and-funded agency in violation of statutory law. Remarks and a Question-and-Answer Session at the Future Investment Initiative Priority Summit in Miami Beach, Florida, 2025 Daily Comp. Pres. Doc. 280 (Feb. 19, 2025); *see also Doe v. Musk*, __ F. Supp. 3d __, No. 25-0462-TDC, 2025 U.S. Dist. LEXIS 49603, at *11–*22 (D. Md. Mar. 18, 2025) (detailing the Administration's actions eliminating the USAID in a parallel proceeding). In this Court, the Administration argues that its refusal to spend the funds allocated by Congress—and necessary to continue the existence of the USAID—is not reviewable, contending that resolution of the issue should be left to the "hurly-burly" of the political process. Appellants' Br. at 1, 33, Doc. 2115253 (arguing that the district court's injunction "constitutes improper judicial intrusion into matters left to the political branches").

While Law Scholars *Amici* take no position on the specific statutory disputes at issue in this case, Appellees' Brief correctly explains why judicial review is warranted here. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *see also* Appellees' Br. at 31–32, Doc. 2119677 (discussing *Clinton* and other authority). Accordingly, neither the President nor an executive agency may, without Congress, eliminate statutorily created federal

agencies. *See New York v. McMahon*, __ F. Supp. 3d __, Nos. 25-10601-MJJ, 25-10677-MJJ, 2025 U.S. Dist. LEXIS 97722, at *83–*86 (D. Mass. May 22, 2025) (summarizing authority on this question). For those reasons alone, the Administration's arguments fail.

This amicus brief argues that the Administration's position reflects its larger attempt to gerrymander the judiciary's duty to "say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803), seeking to preclude judicial review in cases challenging this President's actions while supercharging review in cases challenging the prior President's actions. But when, as here, the power at issue derives from congressionally enacted statutes rather than a "conclusive and preclusive" authority of the President, *Trump v. United States*, 603 U.S. 593, 607 (2024) (citations omitted)—and the Administration expressly concedes that even the broadest notion of presidential authority at issue here is shared with Congress, Appellants' Br. at 50[1]—courts must ensure that the Executive Branch complies with those statutes, regardless of the action under review. This amicus brief explains why this conclusion follows from two emerging bodies of the Supreme Court's separation-of-powers jurisprudence: one focused on presidential power and another focused on executive-agency actions.

---

[1] "Although the President has significant authority in the area of foreign affairs, the Constitution provides a role for Congress as well, which the Executive Branch continues to honor."

3

In a series of cases generally relying on aspects of the "unitary executive theory" to extend the President's authority to remove certain agency leadership the Court has proclaimed the President the most democratically accountable government official and has stressed the importance of a "chain of dependence" between the President and the rest of the Executive Branch. It is that "chain of dependence," the Court has explained, that provides political accountability and democratic legitimacy to Executive Branch actions.

In another series of cases, known as the "major questions doctrine" cases, the Court has subjected agency actions carrying out presidential directives to stringent review, characterizing them as the work of unaccountable bureaucrats at executive agencies. The Court grounds these major-questions-doctrine limits in a constitutional imperative to protect the authority vested in the democratically elected Congress. In every instance, however, the invalidated action (be it regulatory or spending) was duly promulgated at the direction of the President by the politically appointed agency Secretary or Administrator, through the "chain of dependence" that is the focus of the unitary-executive removal cases.

The Supreme Court has yet to clarify how these two lines of cases interact with one another. But it cannot be true that the President is the most democratically accountable government actor, connected to executive agencies through a chain of dependence *and* that executive agencies must be subject to

particularly stringent review because they are not accountable to the people. In particular, in the major-questions-doctrine cases, agency actions of major political significance have been subjected to heightened judicial scrutiny.

The Trump Administration attempts to exploit the potential tensions between these two doctrines. When seeking to eliminate executive agencies, the Administration relies upon the unitary-executive removal line of cases to empower the Executive Branch.[2] The Administration even goes so far, as it does here, to suggest that courts may not review their actions at all. Appellants' Br. at 1, 23, 46, 48–49. By contrast, when seeking to repeal the previous Administration's duly promulgated, still-valid regulations with minimal regard for statutory requirements, the Trump Administration invokes the major-questions line of cases that constrain Executive Branch authority.[3] This "heads I win, tails you lose" approach threatens

---

[2] For example, in a recent Supreme Court filing regarding the dismantling of various agencies via large-scale reductions in force, the Administration expressly relies on some of the unitary-executive removal cases discussed in this brief. *See* Application to Stay the Order Issued by the United States District Court for the Northern District of California and Request for an Immediate Administrative Stay at 1–2, 5, 22–25, *Trump v. Am. Fed'n of Gov't Emps., AFL-CIO*, No. 24A1174 (June 2, 2025), https://www.supremecourt.gov/DocketPDF/24/24A1174/362080/20250602120234 175_Trump_v_AFGE_Stay_Appl_2.pdf.

[3] *See* Memorandum Directing the Appeal of Unlawful Regulations, Presidential Mem. (Apr. 9, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/directing-the-repeal-of-unlawful-regulations/. The Administration's guidance for implementing this directive relies on the notion that executive-agency authority must be reviewed very stringently. *See* Office of Mgmt. & Budget, Exec. Office of the President, M-25-28: Guidance Implementing

the maintenance of ordered liberty envisioned in the Constitution.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (observing that "the Constitution diffuses power the better to secure liberty" (Jackson, J., concurring)).

Reading these two bodies of cases together leads to two straightforward conclusions.  First, a president's important authority to direct agency action does not preclude or exempt judicial review for compliance with substantive or procedural statutory requirements.  If it did, the presidentially directed policies at issue in the major-questions cases would not have been subject to review, never mind heightened scrutiny.  Second, judicial review of a president's authority in executing congressional statutes should not be supercharged in some cases and neutered in others.  Courts should align review of presidential and agency action where the authority being exercised is not within a specifically identified "conclusive and preclusive" constitutional authority of the President, *Trump*, 603 U.S. at 607 (citations omitted), but rather is governed by the statutory delegation of authority from Congress.  Where the President seeks to direct an agency's exercise

---

the President's Memorandum Directing the Repeal of Unlawful Regulations (May 7, 2025) (classifying *West Virginia v. EPA*, 597 U.S. 697 (2022), in which the Supreme Court first formally labelled the major questions doctrine, as (incorrectly) requiring review of whether the statutory authority for previous agency actions meets the purported "clear-statement canon imposed" in that case), https://www.whitehouse.gov/wp-content/uploads/2025/02/M-25-28-Guidance-Implementing-the-Presidents-Memorandum-Directing-the-Repeal-of-Unlawful-Regulations.pdf.

of statutorily delegated authority—as President Trump does here—the courts

should "say what the law is," *Marbury*, 5 U.S. at 177, under the "best reading" of

those statutes, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024)*,* and

need not place a thumb on the scale for or against executive action based on the

political significance of the case.

I.   **The Unitary Executive Cases Recognizing the Need for Presidential Control Over Agency Leadership and Function Do Not Authorize the President to Violate Statutes When Directing Agency Policy.**

Since 2010, the Supreme Court has issued a series of opinions that bolster

the President's control over agency leadership and function.  Specifically, these

cases rely on aspects of the unitary executive theory,[4] including recognition of the

President as "the most democratic and politically accountable official in

Government" and a requirement of a "chain of dependence" between the President

and executive agencies as necessary for faithful execution of the laws.  *Seila Law*,

591 U.S. at 224 (citations omitted); *see also, e.g.*, *id.* at 204 ("[T]he Constitution

gives the President 'the authority to remove those who assist him in carrying out

his duties.' . . .  'Without such power, the President could not be held fully

accountable for discharging his own responsibilities; the buck would stop

---

[4] *See, e.g.*, *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) ("Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3)).

somewhere else.'" (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561

U.S. 477, 513–14 (2010))). But none of these cases, nor *Trump v. United States*,

authorizes the President to act outside the bounds of congressionally delegated

authority as set out in statutes. *See In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir.

2013) ("[T]he Executive must abide by statutory mandates and prohibitions. Those

basic constitutional principles apply to the President and subordinate executive

agencies.").

The modern line of cases reflecting this unitary-executive vision began in

2010 in *Free Enterprise Fund v. Public Company Accounting Oversight Board*,

561 U.S. 477. There, the Supreme Court concluded that the President must have

power to remove members of the Public Company Accounting Oversight Board,

even though that power conflicted with the two-layer legislative scheme protecting

the tenure of Board members. *Id.* at 483–84. *Free Enterprise Fund* elaborated on

the need for presidential control over agency function: "The growth of the

Executive Branch, which now wields vast power and touches almost every aspect

of daily life, heightens the concern that it may slip from the executive's control,

and thus from that of the people." *Id.* at 499. The President needs command of

government officials—described as a "chain of dependence"—because he is the

conduit by which the people control the agency. *Id.* at 498. This decision "shifted

the grounds of judicial review" of removal power from "a small set of formalistic

limits" to "a probing theoretical question": whether "the design of the agency undercut the connection between the people, the president, and the bureaucracy putatively necessary to maintain a democratic state?"[5]

The Court further delineated the scope of the President's removal power over agency leadership in the ensuing years.  In *Seila Law,* the Court struck down statutory removal protections for the Director of the CFPB, an agency considered to be otherwise "independent" from executive control, because the Director must be held accountable to the President as "the most democratic and politically accountable official in Government."  591 U.S. at 224–25.  In *Collins v. Yellen*, the Court deemed unlawful the Federal Housing Finance Agency's structure, which allowed for presidential removal of the single-Director head only for cause, because agency employees must "serve the people effectively and in accordance with the policies that the people presumably elected the president to promote." 594 U.S. 220, 226–28, 252 (2021).

In *United States v. Arthrex*, the Court addressed not the President's authority to remove agency heads on an at-will basis, but rather the amount of presidential control over substantive decision-making that Article II demands.  *See* 594 U.S. 1, 8–9, 17 (2021) (holding unlawful the structure of the Patent and Trial Appeal

---

[5] Noah A. Rosenblum & Roderick M. Hills, Jr., *Presidential Administration after* Arthrex, 75 Duke L.J. (forthcoming 2026) (manuscript at 31), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5122594.

Board ("PTAB"), which had authority to make final, binding decisions to invalidate previously issued patents in proceedings brought by private parties, because "the President can neither oversee the PTAB himself nor 'attribute the Board's failings to those whom he *can* oversee'" (quoting *Free Enter. Fund*, 561 U.S. at 496)). To remedy the identified constitutional violation, the Court ordered that the presidentially appointed Patent and Trademark Office Director have the opportunity to review the PTAB's decisions. *Id.* at 26 (plurality), 44 (Breyer, J., dissenting but joining remedy).

In sum, these cases embrace the unitary executive theory and conclude that a "chain of dependence" from agency leadership to the President ensures agencies' democratic accountability. *See Arthrex*, 594 U.S. at 17 ("The activities of executive officers may 'take legislative and judicial forms, but they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the executive Power,' for which the President is ultimately responsible." (quoting *City of Arlington v. FCC*, 569 U.S. 290, 305, n.4 (2013) (citing U.S. Const. art. II, §1, cl. 1))).

But the leadership appointment and removal cases do not turn all statutes into blank canvasses that a President can redraw based on policy preferences. Presidents can select and oversee executive-agency leadership but cannot unilaterally ignore or rewrite statutes. Indeed, *Arthrex* supports the proposition that

constitutional defects in agency design can and should be remedied by courts. *Cf.*

*In re Aiken Cnty.*, 725 F.3d at 259 ("[A]bsent a lack of funds or a claim of

unconstitutionality *that has not been rejected by final Court order*, the Executive

must abide by statutory mandates and prohibitions." (emphasis added))

This reading of the unitary-executive removal cases comports with the

Supreme Court's more recent articulation of executive power in *Trump v. United*

*States,* 603 U.S. 593 (2024). There, the Court distinguished between the

President's unreviewable and un-regulable authority to act pursuant to "conclusive

and preclusive" constitutional authority from the President's potentially reviewable

and regulable authority to act pursuant to shared constitutional powers and

statutorily delegated authority. *Id.* at 607–10. When the President is directing an

executive agency (as is the case here) to act through the chain of dependence

(again, as is the case here) and is doing so pursuant to congressional delegations of

authority as opposed to the President's "conclusive and preclusive" authority, the

Executive Branch must abide by the terms of the statutory delegation. In other

words, "the President may not decline to follow a statutory mandate or prohibition

simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d at 259. The

judiciary plays a vital role in protecting the prerogatives of Congress as embodied

in statutory delegations. *See Am. Forest Res. Council v. United States*, 77 F.4th

787, 796 (D.C. Cir. 2023) ("[A] claim alleging that the President acted in excess of

his statutory authority is judicially reviewable even absent an applicable statutory review provision." (citation omitted)).

## II.  The Major-Questions-Doctrine Cases Demonstrate That the President's Authority Remains Limited to the Bounds of Congressionally Delegated Authority, Even Where the President Has Exerted Significant Control Over Agencies Through the Chain of Dependence.

While the Supreme Court developed its unitary-executive removal precedents, it also developed another body of cases constraining exercises of executive-agency discretion by invoking Congress's constitutional primacy to address politically and economically significant issues through the legislative process.  To date, the Court's major-questions-doctrine cases have largely invalidated the challenged actions as beyond the bounds of the discretionary authority delegated to executive agencies.  *See generally, e.g.*, *Biden v. Nebraska*, 600 U.S. 477 (2023) (invalidating a federal loan-forgiveness program); *West Virginia v. EPA*, 597 U.S. 697 (2022) (striking down the Environmental Protection Agency's Clean Power Plan).  Importantly, they have done so even though the President directed the agencies to adopt each of the invalidated policies.  Although the major questions doctrine is not at issue in this case, these cases raise important insights regarding the scope of presidential authority to direct agency action.  Specifically, they demonstrate that the Executive Branch may not exceed its statutorily delegated authority even when the President directs executive agencies

to act through the chain of dependence, and that the courts play an important role in policing the Executive Branch's compliance with statutory law.

As set out in 2022, the major questions doctrine may apply in "extraordinary cases . . . in which the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer" the authority for the challenged regulation, absent "clear congressional authorization." *West Virginia*, 597 U.S. at 721 (citations omitted) (cleaned up). Scholars have boiled down the *West Virginia* majority's test for when the doctrine applies to three factors: whether the assertion of agency authority is unheralded, transformative, and of vast economic and political significance. *See generally* Natasha Brunstein & Donald L. R. Goodson, *Unheralded and Transformative: The Test for Major Questions After* West Virginia, 47 Wm. & Mary Env't L. & Pol'y Rev. 47 (2022). Where the Court determines that those factors are met, it requires a heightened showing of statutory clarity before it can conclude that Congress delegated sufficient authority for the challenged action. *Id.*

The constraints the Court has placed on agencies are particularly pronounced in precisely the cases where the President is most likely to be involved: those of vast political and economic significance. Yet those cases are largely silent about the President's role. Instead, members of the Court have, for example, faulted

agencies for "laying claim to extravagant statutory power over the national economy," *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014),[6] and seeking "to exploit some gap, ambiguity, or doubtful expression in Congress's statutes to assume responsibilities far beyond its initial assignment," *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 125 (2022) (Gorsuch, J., joined by Thomas, J., and Alito, J., concurring).  Justices have even invoked separation-of-power principles to frame the major questions doctrine as a means to protect the Constitution's vesting of all legislative powers in Congress against "a regime administered by a ruling class of largely unaccountable 'ministers.'" *West Virginia*, 597 U.S. at 737 (Gorsuch, J., joined by Alito, J., concurring) (citations omitted).

    This focus on unaccountable bureaucrats has obscured a key feature of the agency policies invalidated as major questions:  the role that a succession of presidents played in directing and shaping the challenged agency policies.[7]  For

---

[6] While the Court did not formally identify the major questions doctrine until *West Virginia*, that Court (majority and concurrence) identified previous cases from which the doctrine is derived.  *See* 597 U.S. at 721–25, 740–45 (discussing, among other cases, *Utility Air Regulatory Group*).

[7] *See* Jodi L. Short & Jed H. Shugerman, *Major Questions About Presidentialism: Untangling the "Chain of Dependence" Across Administrative Law*, 65 B.C. L. Rev. 511, 533–74 (2024) (explaining, in considerable detail, how the Court's majorities omitted the role of the President in effectuating the regulations challenged in what are now considered to be major-questions cases for the past twenty-five years while noting that some dissenting opinions attempted to account for the President's role).

example, the *West Virginia* Court largely omits the potential relevance of President Obama's express direction and active support in the development of the very regulation the Court invalidated—the Clean Power Plan. *See, e.g.*, Remarks at Georgetown University, 2013 Daily Comp. Pres. Doc. 452 (June 25, 2013) ("I'm *directing* the Environmental Protection Agency to put an end to the limitless dumping of carbon pollution from our power plants and complete new pollution standards for both new and existing power plants." (emphasis added)); Remarks by the President in Announcing the Clean Power Plan, 2015 Daily Comp. Pres. 546 (Aug. 3, 2015) (emphasizing his role in initiating the policy and his support for the final result). Where the Court addressed President Obama's involvement, it used his remarks not to demonstrate the importance of the President's chain of dependence in carrying out the Clean Power Plan but rather as evidence that the agency was attempting to act outside of the authority that Congress delegated. *See West Virginia*, 597 U.S. at 745 (concluding that Congress's failure to pass legislation similar to the Clean Power Plan "frustrated the Executive Branch and led it to attempt its own regulatory solution," quoting President Obama as "stating that 'if Congress won't act soon . . . I will'" (citations omitted)).

The Court's reliance on the major questions doctrine to invalidate President Biden's plan to forgive federal student debt in *Biden v. Nebraska* evidences a similar pattern. While the Court briefly recognized that President Biden directed

the Secretary of Education to extend debt waivers during the COVID-19 emergency and then later declared the emergency over, the majority described the loan forgiveness program as allowing the Secretary of Education to "enjoy virtually unlimited power to rewrite the Education Act," "unilaterally define every aspect of federal student financial aid," and "unilaterally alter large sections of the American economy." 600 U.S. at 487, 502, 507. And the majority did not acknowledge, for example, President Biden's well-publicized efforts to campaign on enacting the loan forgiveness policy, direct the Department of Education to pause federal student loan repayments on his first day in office, champion the policy throughout its development, and embrace it as part of his re-election campaign. *See* Short & Shugerman, *supra* note 8, at 535–39 (citations omitted). The Court's omission of these quintessential examples of the chain of dependence at work reinforces that the President's role in directing agency policy is not a license for the President *or* the agency to undertake actions outside of congressionally delegated authority, including actions that violate a statutory mandate or prohibition.

## III. This Court Should Uphold the District Court's Injunction and Recognize the Important Role of Congress in Creating Agencies and Empowering and Constraining the Executive Branch.

It is critical that courts provide clarity for all three branches of government by harmonizing these two lines of cases. This Court can resolve the separation-of-

powers question presented here, as well as align these doctrines, in a straightforward manner: By reinforcing that, when the Executive Branch is exercising power conveyed by Congress in a statute, the *entire* Executive Branch must act within the bounds of—and consistent with—that delegated authority. This is the true whether the actor is the President or an agency official. Here, this approach would allow this Court to fulfill its duty to say what the law is and conclude that the President cannot effectively eliminate a congressionally created and funded agency. Congressional statutes require the USAID to exist and to fulfill its mission through the expenditure of congressionally appropriated funds. *See* Appellees' Br. at 31 (showing that appropriations statutes are law that must be followed).

Reaching this conclusion would reinforce bedrock principles of separation-of-powers and administrative law. Congress may delegate discretionary authority directly to the President in a statute. *See, e.g.*, *Dalton v. Specter*, 511 U.S. 462, 473–74 (1994) (discussing a statutory delegation to the President). Similarly, statutes often delegate considerable discretion to federal agencies. *See Loper Bright*, 603 U.S. at 394 ("In a case involving an agency, of course, the statute's meaning may well be that the agency is authorized to exercise a degree of discretion."). In each instance, Congress sets forth the scope of the delegated authority in the statute.

To maintain separation-of-power principles, courts must police the bounds of the delegation. *Loper Bright* expressly requires that courts police these boundaries for agencies. 603 U.S. at 404 ("[T]o stay out of discretionary policymaking left to the political branches, judges need only fulfill their obligations under the [Administrative Procedure Act ("APA")] to independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA."). *Dalton* does not suggest a different result when agency discretionary authority is directed by the President. The *Dalton* Court declined to consider whether the President had abused the discretion statutorily delegated expressly to the President, and its holding was grounded in statutory interpretation—namely, the Court's reading that the statute placed no limit on the discretion afforded to the President to make the determinations at issue in that case. *Dalton*, 511 U.S. at 476–77; *see also Chamber of Com. v. Reich*, 74 F.3d 1322, 1331–32 (D.C. Cir. 1996) (distinguishing *Dalton* on similar grounds). While there may be some distinctions in how courts review presidential and agency action, it would be "untenable to conclude that there are no judicially enforceable limitations on presidential actions, besides actions that run afoul of the Constitution or which contravene direct statutory prohibitions, so long as the President *claims* that he is acting . . . in the pursuit of governmental savings." *Chamber of Com.*, 74 F.3d at

1332. Otherwise, the President could "bypass scores of statutory limitations on governmental authority." *Id.*

Consistent with these principles, the President acts at the "lowest ebb" of his constitutional authority and power when he acts contrary to the will of Congress. *See Youngstown*, 343 U.S. at 638 (1952) (Jackson, J., concurring); *see also United States v. Texas*, 599 U.S. 670, 731 (2023) (Alito, J., dissenting) ("Our Constitution gives the President important powers, and the precise extent of some of them has long been the subject of contention, but it has been widely accepted that the President's power reaches its lowest ebb when he contravenes the express will of Congress, for what is at stake is the equilibrium established by our constitutional system." (citations omitted) (cleaned up)). Thus, it is the courts' role to determine what statutory limits Congress placed on the authority delegated to the Executive Branch and to invalidate Executive Branch actions when they are outside of those bounds.

Accordingly, Article II does not allow the President (or an agency) to unilaterally override Congress's choices. Otherwise, Congress would be a secondary branch with a mere advisory role. *Cf. Youngstown*, 343 U.S. at 587 ("[T]he President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."). To the contrary, the Take Care Clause is an *affirmativ*e command that requires good-faith execution of duly enacted laws, not a

license to ignore the will of Congress.  *See, e.g.*, Andrew Kent, Ethan J. Leib, &

Jed Handelsman Shugerman, *Faithful Execution and Article II*, 132 Harv. L. Rev.

2111, 2118 (2019).  The Executive Branch thus violates the Take Care Clause

where it declines to execute or otherwise undermines statutes enacted by Congress

and signed into law.  *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d

545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside

congressional legislation by executive order. . . ."); *Kendall v. United States*, 37

U.S. 524, 612–13 (1838) (rejecting the argument that, by charging the President

with faithful execution of the laws, the Take Care Clause "implies a power to

forbid their execution").[8]  Notably, here the statutes at issue are an exercise of

_____

[8] For this reason, the Administration's argument that the President has a
"constitutional responsibility over the conduct of foreign relations," Appellants' Br.
at 23; *see also* 47–48, does not justify the Administration's action.  As the
Administration recognizes, the President's foreign affairs authority is not
unilateral.  *See id.* at 50; *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No.
1:25-cv-00400-AHA, 2025 U.S. Dist. LEXIS 42875, at *3 (D.D.C. Mar. 10, 2025)
("The provision and administration of foreign aid has been a joint enterprise
between our two political branches.  That partnership is built not out of
convenience, but of constitutional necessity.").  Instead, it is well established that,
"*whether the realm is foreign or domestic*, it is still the Legislative Branch, not the
Executive Branch, that makes the law." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576
U.S. 1, 21 (2015) (emphasis added).  The President must follow the law's clear
directives.  *See* U.S. Const. art. II § 3.

Moreover, the fact that this case touches upon foreign affairs does not distinguish it
from some of the major-questions cases.  *West Virginia* invalidated a regulation
aimed at combatting *global* climate change as a pillar of President Obama's foreign
policy.  *See* Editorial, *A Tough, Achievable Climate Plan*, N.Y. Times, Aug. 4,
2015, at A22 ("President Obama's Clean Power Plan . . . reinforces Mr. Obama's

Congress's power to appropriate funds, the very first among Congress's

enumerated authorities. U.S. Const. art. 1, § 8, cl. 1.[9]

Finally, aligning judicial review principles for presidential and executive-

agency actions based on the bounds of delegated authority in statutes will have

benefits for effective governance within the constitutional design. Consistent with

the Court's approach in *Loper Bright*, there would seldom be any need for courts to

put a thumb on the scale for or against agency action by considering non-statutory

factors, such as relative economic and political significance or whether a

democratically elected president is attempting to do something novel yet consistent

with campaign promises. *See, e.g.*, *Kovac v. Wray*, 109 F.4th 331, 335, 342 (5th

Cir. 2024) (admonishing a district court for considering the major questions

doctrine before undertaking *Loper Bright*'s best-reading requirement and

concluding that the major-questions analysis was unnecessary). This approach

offers the additional benefit of allowing the President to pursue policy goals by

---

credibility and leverage with other nations heading into the United Nations climate change conference in Paris in December.").

[9] The Administration asserts that this case regards a "sensitive context" in which "Congress and the President share responsibility for enacting the law, including appropriations statutes, and the President has constitutional authority to implement the law." Appellants' Br. at 25. But the Administration articulates no limiting principle for this assertion, which would seem to apply to any context in which Congress passes a statute for the Executive Branch to implement. In the context of this case, Congress's primary role is particularly clear.

directing executive-agency priorities even where the resulting agency actions may have vast political and economic significance, so long as the Executive Branch acts within the bounds of Congress's delegated authority.  Most important, it would ensure that the President does not act beyond the authority provided by Congress to protect the promise of ordered liberty enshrined in the Constitution.

## CONCLUSION

For the reasons stated above and in the Appellees' Brief, this Court should uphold the district court's injunction and reject the Administration's attempt to eliminate the USAID where statutory authority requires its existence and continued funding.  This Court should further conclude that when the Executive Branch is exercising power conveyed by Congress in a statute, the entire Executive Branch must act within the bounds of—and consistent with—that delegated authority.

Dated: June 13, 2025

Respectfully submitted,

*/s/ Patrick R. Jacobi*
Jonas Monast
Patrick R. Jacobi
Alexandra L. St. Romain
CENTER FOR APPLIED
ENVIRONMENTAL LAW AND POLICY
712 H Street NE, Suite 90006
Washington, DC 20002
(703) 405-8950
patrick.jacobi@caelp.org

*Counsel for Law Scholars* Amici Curiae

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitations set forth in D.C. Cir. R. 32(e)(3) and Fed. R. App. P. 29(a)(5) because this brief contains 5232 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1). The foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  June 13, 2025                       */s/ Patrick R. Jacobi*
                                               Patrick R. Jacobi


## CERTIFICATE OF SERVICE

I hereby certify that, on this 13th day of June, 2025, I caused the foregoing Brief of Law Scholars *Amici Curiae* in Support of Appellees to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the Court's CM/ECF system, which constitutes service on all parties and parties' counsel who are registered ECF filers.

                                               */s/ Patrick R. Jacobi*
                                               Patrick R. Jacobi