**ORAL ARGUMENT HELD ON JULY 7, 2025**

**Nos. 25-5097, 25-5098**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

GLOBAL HEALTH COUNCIL, et al.,
                                    *Plaintiffs-Appellees,*
v.
DONALD J. TRUMP, et al.,
                                    *Defendants-Appellants.*

---

AIDS VACCINE ADVOCACY COALITION, et al.,
                                    *Plaintiffs-Appellees,*
v.
UNITED STATES DEPARTMENT OF STATE, et al.,
                                    *Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Columbia

---

**RESPONSE TO PETITION FOR REHEARING EN BANC**

---

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

## TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION AND SUMMARY.................................................................. 1

STATEMENT ............................................................................................... 2

ARGUMENT ............................................................................................... 8

I.    The Panel Decision Was Correct on the Merits and Does Not Conflict with Any Holding of this Court or the Supreme Court ........... 8

    A.    The Panel Correctly Rejected Plaintiffs' Attempt to Bring a Freestanding Constitutional Claim Based Entirely on Asserted Statutory Violations ......................................................... 8

    B.    The Panel Correctly Concluded That Plaintiffs May Not Enforce the Impoundment Control Act ........................................ 12

II.    En Banc Review Is Unwarranted ........................................................... 16

CONCLUSION........................................................................................... 21

CERTIFICATE OF COMPLIANCE

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| ICA | Impoundment Control Act |
| J.A. | Joint Appendix |
| USAID | U.S. Agency for International Development |

## INTRODUCTION AND SUMMARY

Neither of the issues that plaintiffs raise warrants the full Court's review.  The panel's holding that plaintiffs are not entitled to constitutionalize garden-variety statutory disputes would be unremarkable even if the issue had not been resolved by the Supreme Court in *Dalton v. Specter*, 511 U.S. 462 (1994).  And the panel also correctly held, based on a careful analysis of the Impoundment Control Act (ICA), that Congress intended for inter-Branch disputes about the expenditure of appropriated funds to be resolved between the political branches rather than at the behest of private parties.

In addition to providing no basis for setting aside the panel's holdings on the merits, plaintiffs also vastly overstate their implications.  Plaintiffs are mistaken to suggest that the decision will effectively authorize the Executive Branch to disregard statutory mandates with no judicial oversight.  Plaintiffs may generally enforce compliance with statutory mandates through suits under the APA.  The panel decision simply reaffirms that plaintiffs may not end-run the limitations that Congress has placed on such suits by recasting fundamentally statutory claims as constitutional ones.

## STATEMENT

1.  Congress has established a statutory scheme for organizing and implementing the United States' foreign-assistance programs, primarily through the Foreign Assistance Act of 1961, Pub. L. No. 87-195, 75 Stat. 424. These authorities confer broad discretion on the President and the Secretary of State to determine how to align foreign-assistance programs with the United States' foreign policy. *See, e.g.*, 22 U.S.C. § 2382(c).

Since establishing that general statutory framework, Congress has regularly appropriated funds to allow the Executive Branch to implement those programs. Most recently, Congress appropriated substantial foreign-assistance funds in Division F of the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. F, 138 Stat. 460, 729. In general, that statute appropriates large sums for carrying out broadly defined types of foreign assistance. For example, Congress has appropriated nearly $5 billion for "necessary expenses to carry out the provisions of section 491 of the Foreign Assistance Act of 1961 for international disaster relief, rehabilitation, and reconstruction assistance," 138 Stat. at 742, and nearly $4 billion for global health programs—that is, for "such activities as" "child survival and maternal health programs," "immunization and oral rehydration

2

programs," "family planning/reproductive health," and others, 138 Stat. at

740.  Some appropriated funds remain available until September 30, 2025,

whereas other funds remain available until later dates or until expended.

*See, e.g.*, 138 Stat. at 742 (containing four appropriations, two of which

"remain available until expended" and the others of which remain available

until September 30, 2025, and September 30, 2028).

    2.  Congress has sought to impose certain requirements on the

Executive's decisions whether to obligate and expend appropriated funds

through the Impoundment Control Act of 1974, Pub. L. No. 93-344, tit. X, 88

Stat. 297, 332.  The current version of that statute provides that the

President must "transmit to both Houses of Congress a special message"

whenever he "determines that all or part of any budget authority will not be

required to carry out the full objectives or scope of programs for which it is

provided or that such budget authority should be rescinded for fiscal policy

or other reasons" or "whenever all or part of budget authority provided for

only one fiscal year is to be reserved from obligation for such fiscal year."  2

U.S.C. § 683(a).  That special message must contain various information

about the proposed rescission, such as "the amount of budget authority"

involved and "the reasons why the budget authority should be rescinded."
*Id.*

Upon receiving a special message, Congress may consider a rescission
bill to rescind some or all of the relevant funds. The statute provides
procedures to ensure timely consideration of any such rescission bill. *See* 2
U.S.C. § 688. But if Congress has not "completed action on a rescission bill
rescinding all or part of the amount proposed to be rescinded" within 45
days, then the statute states that the amount proposed to be rescinded "shall
be made available for obligation." *Id.* § 683(b). The statute provides for
various enforcement mechanisms by the Comptroller General, an official
within the Legislative Branch. *See id.* § 687.

3. Consistent with an Executive Order that directed agencies to ensure
that certain foreign-assistance funding aligned with the President's foreign
policy, the State Department and U.S. Agency for International
Development (USAID) conducted a review of their foreign-assistance
awards. The agencies ultimately determined to retain hundreds of
preexisting USAID awards and thousands of preexisting State Department
awards, but terminated the rest. *See* J.A. 43.

4

Meanwhile, plaintiffs—organizations that receive, or have members who receive, federal funds for foreign-assistance work—brought this suit and moved for preliminary relief.  The district court granted that motion in part.

As relevant here, the district court ordered that the government was "enjoined from unlawfully impounding congressionally appropriated foreign aid funds and shall make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024."  J.A. 82.  That order followed from the court's conclusion that plaintiffs were likely to succeed on their claims that, by not expending appropriated funds, the agency defendants "are acting in violation of the separation of powers" and "the expression of those powers through statutes that constrain the Executive's authority in relation to foreign aid spending and the impoundment of appropriated funds."  J.A. 63.  In particular, the court concluded that the agencies "are acting to rescind or defer the funds Congress has appropriated and have no intent to spend them" but have "not undertaken the procedures required for the impoundment of congressionally appropriated aid" as specified in the ICA. J.A. 65-66.

5

4. The government appealed, and a panel of this Court vacated the preliminary injunction in relevant part. As relevant to plaintiffs' petition, the panel held that plaintiffs could neither assert a right of action based in equity to enforce constitutional claims nor pursue a claim under the APA.

First, the panel held that plaintiffs could not pursue "a freestanding constitutional claim that the government violated separation-of-powers principles." Op. 15. The panel explained that plaintiffs' attempt to assert that constitutional claim is foreclosed by the Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994). There, the Supreme Court "rejected [the plaintiffs'] effort to recast statutory claims as constitutional ones" and emphasized the important distinction "between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." Op. 18 (quotation omitted). Failure to properly police the line between constitutional and statutory claims, the panel explained, would improperly permit plaintiffs "to avoid statutory limits on review by reframing any alleged statutory violation by the President as a constitutional one." *Id.*

Here, the panel explained, plaintiffs' purported constitutional claim based on the separation of powers is simply a repackaged statutory claim. In

short, plaintiffs' constitutional contentions necessarily turn on "alleged statutory violations." Op. 20.

Second, the panel held that plaintiffs could not bring suit under the APA to enforce the ICA provisions governing when the Executive Branch must make funds available for obligation. The panel explained that APA review is not available if another statute "precludes judicial review." Op. 25 (quotation omitted). And, the panel explained, the Supreme Court has made clear that where Congress establishes a "complex and delicate" scheme that provides for judicial review for only some parties, that scheme may "by necessary implication preclud[e]" other parties from seeking review under the APA. Op. 26-27 (quotation omitted).

Here, the panel explained, "the ICA created a complex scheme of notification," potential "congressional action," and "suit by a specified legislative branch official" after notice to Congress. Op. 27. "[I]t does not make sense that the Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits at any time and without notice to the Congress of the alleged violation." *Id.* Thus, plaintiffs "have no cause of action to undergird their APA contrary-to-law claim." Op. 29.

7

Judge Pan dissented, primarily disagreeing with the panel majority's conclusion regarding plaintiffs' inability to make out a freestanding constitutional claim. In her view, the "factual scenario presented" by plaintiffs' claims "plainly implicates the structure of our government and the roles played by its coordinate branches." Dissent 2-3. Based on that view, Judge Pan would have concluded that the Executive Branch's purported "refusal to implement the Appropriations Act" by expending all of the obligated funds "creates a conflict between the Legislative Branch and the Executive Branch of constitutional"—not merely statutory—"dimensions." Dissent 33.

## ARGUMENT

## I.     The Panel Decision Was Correct on the Merits and Does Not Conflict with Any Holding of this Court or the Supreme Court

### A.     The Panel Correctly Rejected Plaintiffs' Attempt to Bring a Freestanding Constitutional Claim Based Entirely on Asserted Statutory Violations

1. As the panel correctly recognized, plaintiffs advanced no bona fide constitutional claim. Although plaintiffs repeatedly describe their claim as implicating separation-of-powers principles, plaintiffs' fundamental contention is statutory: that the Executive Branch is violating the relevant

8

appropriations statute and the ICA by failing to expend appropriated funds without complying with the ICA's procedures. *Cf.* J.A. 63 (describing plaintiffs' constitutional claim as contending that defendants acted in violation of "the expression of [Congress's] powers through statutes"). *But see* Opening Br. 35-57, Reply Br. 10-24 (explaining the error in plaintiffs' understanding of the relevant statutes). Plaintiffs' entire brief in this Court illustrates the point. *See* Pls. Br. 33 (admitting that this case hinges on "statutory indication[s]"); *id.* at 35 (describing an "interpretive question" that is informed by statutes like "the [ICA]"); *id.* at 43 (arguing that the ICA has "conclusively settled" the "governing rule of construction" (quotation omitted)); *id.* at 37-39 (citing canons of statutory construction).

But as the panel properly recognized, the Supreme Court has expressly rejected the notion that "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). The Court rejected, in particular, an effort to evade a limitation on review under the APA on the theory that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471. Claims alleging simply that an official has

9

"exceeded his statutory authority are not 'constitutional' claims" that can be asserted through a direct right of action. *Id.* at 473.

The panel properly applied these principles to reject plaintiffs' attempt to advance a freestanding constitutional claim based entirely on alleged statutory violations—and thereby avoid the limits Congress has placed on APA enforcement of those same statutes. And indeed, both the majority and dissent in a more recent decision of this Court suggested that the panel decision here properly applied *Dalton* to claims that were essentially statutory in character. *See NTEU v. Vought*, No. 25-5091 (D.C. Cir. Aug. 15, 2025), slip op. 47 n.10; *id.* at 102-03 (Pillard, J., dissenting).

2.  Plaintiffs' contrary arguments were properly rejected by the panel.

First, plaintiffs (at 10-12) misread *Dalton* as applying only to circumstances where statutes delegate discretion to the President and the President has assertedly violated the scope of that delegation. But, as the panel explained, *Dalton* had multiple holdings. *See* Op. 22-23. The holding that plaintiffs now reference is irrelevant here; it relates to the scope of judicial review for claims that the President has violated the discretion conferred on him by statute. *See id.*; *see also Dalton*, 511 U.S. at 474-76. But an entirely different holding—the one applied by the panel here—"explained

10

that statutory claims cannot be transformed into constitutional ones."  Op. 23; *see also Dalton*, 511 U.S. at 473-74.

Second, plaintiffs contend (at 9-10) that the panel's decision conflicts with decisions of the Supreme Court allowing plaintiffs "to bring separation-of-powers claims."  But the panel explained that, in those cases, "the plaintiffs challenged the constitutionality of the statute itself" (a constitutional claim)—rather than, as here, "seek[ing] to enforce the statutes" (a statutory claim).  Op. 18-19.  And although plaintiffs assert (at 10) that the panel improperly limited constitutional claims to only those claims challenging a statute or challenging executive action taken without any statutory authority, the panel nowhere claimed to be exhaustively canvassing the scope of possible constitutional claims.  Instead, the panel merely held that claims like plaintiffs', which seek at their core to enforce statutes, are statutory rather than constitutional.  And plaintiffs cite no case of the Supreme Court or this Court allowing claims like theirs to proceed as freestanding constitutional claims.

Third, plaintiffs argue (at 12-13) that the panel's decision conflicts with the decision in *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013).  But as the panel explained, *Aiken County* involved a claim seeking an order under the

11

APA to enforce a statutory obligation.  Op. 21-22.  That case thus has no

relevance to whether plaintiffs may avoid the APA's limitations by advancing

a freestanding constitutional claim.

Finally, plaintiffs briefly assert—in their introduction, although not in

their argument—a conflict with the Ninth Circuit's decision in *Murphy Co. v.*

*Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023).  But as the panel noted, "the

Ninth Circuit has taken an expansive view of the constitutional category of

claims highlighted in *Dalton*."  Op. 24 n.15 (quotation omitted).  Not only is

that view incompatible with *Dalton* but also "the Supreme Court has

signaled"—in the case relied on by *Murphy*—"that the Ninth Circuit errs in"

taking that view.  *See id.*  Plaintiffs' failure to develop any substantive

argument relying on the Ninth Circuit's decision highlights the absence of

any firm basis for second-guessing the panel's decision here based on that

Court's erroneous application of *Dalton* in other contexts.

## B.   The Panel Correctly Concluded That Plaintiffs May Not Enforce the ICA

The panel applied governing Supreme Court precedent to conclude

that plaintiffs are not proper parties to enforce the ICA.  That ruling is

correct and consistent with other decisions addressing the issue.  Plaintiffs

claim an error only by overreading the panel's decision and ignoring its actual holding.

1.  The Supreme Court has recognized that, by providing a detailed scheme for administrative and judicial review, Congress can displace the APA's default cause of action.  *See, e.g.*, *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345 (1984).  As the panel explained, preclusion of review may be apparent from a statute's "express language" or "the statutory scheme as a whole."  Op. 25 (quoting *Block*, 467 U.S. at 345, 349).  In the ICA, Congress constructed "a complex scheme" to govern the relationship between the Legislative and Executive Branches in matters of expending appropriated funds.  Op. 27.  The statute sets up a process for the President's "notification of the Congress" with any proposal to defer or rescind appropriated funds followed by "congressional action on [such] a proposed rescission or deferral."  Op. 27.

To the extent that the ICA contemplates litigation, it provides for "suit by a specified legislative branch official," the Comptroller General, subject to strict limitations designed to give Congress control over any such suit.  Op. 27.  The statute does not contemplate enforcement at the behest of private parties, much less allow private parties to bring enforcement actions without

13

regard to the procedural limitations that Congress imposed for the Comptroller General.  As the panel reasoned, "it does not make sense that the Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits at any time and without notice to the Congress of the alleged violation."  Op. 27.

The only ICA text that plaintiffs cite (at 15) states that "[n]othing contained in this Act" "shall be construed" as "affecting in any way the claims or defenses of any party to litigation concerning any impoundment."  2 U.S.C. § 681(3).  To the extent it is relevant, that provision rejects the idea that parties may rely on the ICA in litigation.  *See* Op. 27-28.

Plaintiffs offer no basis to disturb the panel's holding that their challenge to compel spending by the Executive Branch would pretermit any inter-Branch dialogue and thus "severely disrupt" the ICA's "complex and delicate" enforcement scheme.  Op. 26 (quoting *Block*, 467 U.S. at 348).  Plaintiffs have not even attempted to identify another court decision—other than the district-court decision vacated in this case—that has allowed private parties to enforce the ICA in this manner.  As far as the government is aware, the only courts to address the issue have uniformly reached the same conclusion as the panel.  *See General Land Office v. Biden*, 722 F. Supp. 3d

14

710, 733-35 (S.D. Tex. 2024); *Public Citizen v. Stockman*, 528 F. Supp. 824, 827-31 (D.D.C. 1981); *Rocky Ford Hous. Auth. v. U.S. Dep't of Agric.*, 427 F. Supp. 118, 134 (D.D.C. 1977).

2.  Plaintiffs barely engage with the panel's analysis.  Instead, in an effort to manufacture a conflict with precedent from this Court and the Supreme Court, plaintiffs exaggerate the issue decided.  Plaintiffs are simply incorrect when they say that the panel decision stands for the proposition that parties may never "bring APA challenges to the withholding of funds in violation of an appropriations act."  Pet. 14.  Because plaintiffs' claims in this case fundamentally seek to enforce the ICA, the panel properly focused on the narrower question whether "the ICA precludes [plaintiffs] from bringing suit under the APA to enforce its provisions."  Op. 25.  Nowhere does the panel endorse a categorical ruling that plaintiffs may never enforce a statutory obligation enshrined in an appropriations statute.

Indeed, the government did not dispute that the APA could provide a mechanism for the district court to order compliance with a specific statutory command.  The cases that plaintiffs cite (at 14-15) engaged in exactly this sort of analysis.  In *Train v. City of New York*, the Supreme Court explained that a court could enjoin a refusal to spend appropriated funds where the

15

relevant statutes required that the funds be spent. 420 U.S. 35, 42-43 (1975). And in *Aiken County*, this Court explained that a court can order "an agency to perform a statutorily mandated activity," even if the agency must spend money to fulfill that mandate, "so long as there is appropriated money available." 725 F.3d at 259-60.

The panel decision does not cast doubt on any of these principles. Neither the ICA, nor the panel's ruling that plaintiffs cannot enforce the terms of that statute, affects any "preexisting right" that "injured private parties" may have to enforce statutory obligations through a suit under the APA. Pet. 16.

## II. En Banc Review Is Unwarranted

Plaintiffs likewise fail to establish that this case warrants review by the full Court.

1. Plaintiffs overstate the consequences of the panel's holdings. Contrary to plaintiffs' assertions, the judiciary remains empowered to police the Executive Branch's compliance with statutes, typically through the APA. *See* Op. 23 n.14; *see also NTEU*, No. 25-5091, slip op. 49 n.11 (explaining that the stakes of the application of *Dalton* are "not whether the government may avoid judicial review"). This case is only about whether a court should review

16

what is in effect a statutory claim after concluding that Congress declined to make judicial review available at the behest of private parties.

Even in the context of alleged unlawful impoundments, affected private parties may challenge an agency's asserted failure to comply with a substantive statutory obligation—including in cases where compliance will require the agency to expend appropriated funds.  This is, for example, why the plaintiffs in *Aiken County* were able to obtain judicial review of the agency's failure to comply with a statutory obligation.  The oddity of plaintiffs' claims in this case is that they have not identified any substantive statutory mandate that they seek to enforce; instead, they simply seek to require the Executive Branch to expend appropriated funds, without identifying any substantive obligations or grappling with the broad discretion that the relevant foreign-assistance statutes generally give the Executive Branch.

More broadly, plaintiffs contend that the panel's decision will implicate a large number of pending cases raising claims related to the Executive Branch's funding decisions.  *See* Pet. 13, 17-18.  But as explained, the question whether a plaintiff may seek judicial review of such a decision (and whether its claims may succeed on the merits) will turn in large part on the

17

specifics of the relevant statutory scheme and the asserted statutory
obligation that the plaintiff seeks to enforce.

2.  Various features of this case would also complicate en banc review.
In concluding that plaintiffs lacked a cause of action, the panel had no
occasion to address plaintiffs' underlying claim that statutory provisions
mandate the obligation and expenditure of all the foreign-assistance funds
covered by the preliminary injunction.  The district court similarly did not
attempt to survey the universe of statutory provisions that could bear on this
question, much less analyze their specific language or the import of
differences in wording among them.

To answer that interpretive issue, the Court would need to take into
account the various provisions recognizing that the President may furnish
foreign assistance "on such terms and conditions as he may determine."  *See,
e.g.*, 22 U.S.C. §§ 2151a(a)(1), 2151b(c)(1), 2151c(a), 2151d(b)(1), 2174(a),
2291(a)(4), 2346(a), 2347(a), 2348, 2349aa; *see also id.* § 2395(a) (providing
that "assistance under this chapter may be furnished on a grant basis or on
such terms" "as may be determined to be best suited to the achievement of
the purposes of this chapter").  The Court would need to consider the
language in the various appropriations, many of which merely provide a sum

18

of money for broad purposes like "global health activities" or "international disaster relief." Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, 138 Stat. 460, 740, 742. In a letter filed after their response brief, plaintiffs purported to discover for the first time new language in the appropriations statute relevant to this issue. The historical and foreign-affairs context would also be relevant to the Court's assessment.

Moreover, the parties presented a "dispute [about] the scope of the district court's remedy" that the panel did not need to resolve. Op. 33. As to that issue, the Court would need to examine plaintiffs' submissions in the district court to determine the specific funds for which they are willing and able to compete. These individualized issues make this interlocutory appeal a poor candidate for en banc rehearing.

3. Finally, in their accompanying motion for a stay, plaintiffs focus on various arguments related to party presentation or other issues that they do not develop in their rehearing petition. The mismatch between plaintiffs' lead arguments for affirmance of the district court's opinion and the arguments as to which they believe review by the full Court might plausibly be warranted illustrates the infirmities in their rehearing petition. And the degree to which the various issues are intertwined highlights the problems

19

with this case as a vehicle for resolving any issue of law likely to arise in other cases and the wisdom of the panel's approach of resolving, on the merits, that plaintiffs had no right to enforce the ICA.  In addition, this appeal is interlocutory, and the parties can flesh out, in further proceedings, the effects of the legal issues resolved by the panel on this litigation.

## CONCLUSION

For the foregoing reasons, the petition for rehearing en banc should be denied.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

/s/ *Sean R. Janda*
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

August 2025

**CERTIFICATE OF COMPLIANCE**

This response complies with the type-volume limit of this Court's order of August 15, 2025, because it contains 3878 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

/s/ *Sean R. Janda*
Sean R. Janda