# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued July 7, 2025               Decided August 13, 2025
                            Reissued August 28, 2025

No. 25-5097

GLOBAL HEALTH COUNCIL, ET AL.,
APPELLEES

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT
OF THE UNITED STATES OF AMERICA, ET AL.,
APPELLANTS

———

Consolidated with 25-5098

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:25-cv-00402)
(No. 1:25-cv-00400)

———

*Sean R. Janda*, Attorney, U.S. Department of Justice, argued the cause for appellants.  With him on the briefs were *Brett A. Shumate*, Assistant Attorney General, *Eric D. McArthur*, Deputy Assistant Attorney General, and *Mark R. Freeman*, *Daniel Tenny,* and *Brian J. Springer*, Attorneys.

*Alan Wilson*, Attorney General, Office of the Attorney General for the State of South Carolina, *J. Emory Smith, Jr.*,

2

Deputy Solicitor General, and *Ben McGrey*, *Thomas T. Hydrick*, *Joseph D. Spate*, Assistant Deputy Solicitors General, *Dave Yost*, Attorney General, Office of the Attorney General for the State of Ohio, *T. Elliot Gaiser*, Ohio Solicitor General, *Mathura J. Sridharan*, Deputy Solicitors General, *Steve Marshall*, Attorney General, Office of the Attorney General for the State of Alabama, *Treg R. Taylor*, Attorney General, Office of the Attorney General for the State of Alaska, *Tim Griffin*, Attorney General, Office of the Attorney General for the State of Arkansas, *James Uthmeier*, Attorney General, Office of the Attorney General for the State of Florida, *Christopher M. Carr*, Attorney General, Office of the Attorney General for the State of Georgia, *Theodore E. Rokita*, Attorney General, Office of the Attorney General for the State of Indiana, *Brenna Bird*, Attorney General, Office of the Attorney General for the State of Iowa, *Kris Kobach*, Attorney General, Office of the Attorney General for the State of Kansas, *Liz Murrill*, Attorney General, Office of the Attorney General for the State of Louisiana, *Lynn Fitch*, Attorney General, Office of the Attorney General for the State of Mississippi, *Michael T. Hilgers*, Attorney General, Office of the Attorney General for the State of Nebraska, *Drew H. Wrigley*, Attorney General, Office of the Attorney General for the State of North Dakota, *Gentner Drummond*, Attorney General, Office of the Attorney General for the State of Oklahoma, *Marty Jackley*, Attorney General, Office of the Attorney General for the State of South Dakota, *Jonathan Skrmetti*, Attorney General and Reporter, Office of the Attorney General for the State of Tennessee, *Ken Paxton*, Attorney General, Office of the Attorney General for the State of Texas, *Derek E. Brown*, Attorney General, Office of the Attorney General for the State of Utah, and *John B. McCuskey*, Attorney General, Office of the Attorney General for the State of West Virginia, were on the brief for *amici curiae* States of Ohio, South Carolina, and 18 Other States in support of appellants.

3

*Daniel F. Jacobson* argued the cause for appellees.  With him on the brief were *Lauren E. Bateman*, *Nicolas A. Sansone*, *Allison M. Zieve*, *William C. Perdue*, *Sally L. Pei*, *Stephen K. Wirth*, and *Samuel F. Callahan.*

*Alan B. Morrison* was on the brief for *amicus curiae* Alan B. Morrison in support of appellees.

*Elizabeth B. Wydra* and *Brianne J. Gorod* were on the brief for *amicus curiae* Constitutional Accountability Center in support of appellees.

*Brian L. Schwalb*, Attorney General, Office of the Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, *Mark A. Rucci*, Assistant Attorneys General, *Kris Mayes*, Attorney General, Office of the Attorney General for the State of Arizona, *Rob Bonta*, Attorney General, Office of the Attorney General for the State of California, *Philip J. Weiser*, Attorney General, Office of the Attorney General for the State of Colorado, *William Tong*, Attorney General, Office of the Attorney General for the State of Connecticut, *Kathleen Jennings*, Attorney General, Office of the Attorney General for the State of Delaware, *Anne E. Lopez*, Attorney General, Office of the Attorney General for the State of Hawaii, *Kwame Raoul*, Attorney General, Office of the Attorney General for the State of Illinois, *Aaron M. Frey*, Attorney General, Office of the Attorney General for the State of Maine, *Anthony G. Brown*, Attorney General, Office of the Attorney General for the State of Maryland, *Andrea Joy Campbell*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Dana Nessel*, Attorney General, Office of the Attorney General for the State of Michigan, *Keith Ellison*, Attorney General, Office of the Attorney General for the State

4

of Minnesota, *Aaron D. Ford*, Attorney General, Office of the Attorney General for the State of Nevada, *Matthew J. Platkin*, Attorney General, Office of the Attorney General for the State of New Jersey, *Raul Torrez*, Attorney General, Office of the Attorney General for the State of New Mexico, *Letitia James*, Attorney General, Office of the Attorney General for the State of New York, *Jeff Jackson*, Attorney General, Office of the Attorney General for the State of North Carolina, *Dan Rayfield*, Attorney General, Office of the Attorney General for the State of Oregon, *Peter F. Neronha*, Attorney General, Office of the Attorney General for the State of Rhode Island, *Charity R. Clark*, Attorney General, Office of the Attorney General for the State of Vermont, *Nicholas W. Brown*, Attorney General, Office of the Attorney General for the State of Washington, and *Joshua L. Kaul*, Attorney General, Office of the Attorney General for the State of Wisconsin, were on the brief for *amici curiae* the District of Columbia, et al. in support of appellees.

*Patrick R. Jacobi* and *Alexandra L. St. Romain* were on the brief for *amici curiae* Law Scholars in support of appellees.

*Cerin M. Lindgrensavage* was on the brief for *amicus curiae* Protect Democracy Project in support of appellees.

Before: HENDERSON, KATSAS and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Dissenting opinion by *Circuit Judge* PAN.

KAREN LECRAFT HENDERSON, *Circuit Judge*:  This is a case about Executive impoundment of funds appropriated by the Congress.  On January 20, 2025, President Trump issued an executive order directing the State Department and U.S. Agency for International Development (USAID) to freeze

5

foreign aid spending.  Seeking to restore the flow of funds, aid grantees and associations (together, the grantees) sued under the Administrative Procedure Act (APA) and the U.S. Constitution.  This expedited appeal arises from the district court's grant of a preliminary injunction requiring, in relevant part, the government to make available for obligation the full amount of foreign assistance funds the Congress appropriated for fiscal year 2024.

The district court erred in granting that relief because the grantees lack a cause of action to press their claims.  They may not bring a freestanding constitutional claim if the underlying alleged violation and claimed authority are statutory.  Nor do the grantees have a cause of action to enforce the Impoundment Control Act (ICA) through the APA, because the ICA precludes such review.  And the grantees may not reframe this fundamentally statutory dispute as an ultra vires claim either.  Accordingly, we vacate the part of the district court's preliminary injunction involving impoundment.

## I.

### A.

Under the Constitution, the Congress has the power to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."  U.S. Const., art. I, § 8, cl. 1.  In other words, the Congress "may raise and appropriate money to advance the general welfare."  *Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2231 (2025) (citation modified).  The Constitution further mandates that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const., art. I, § 9, cl. 7.  The Congress therefore has "exclusive power over the federal purse."  *Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir.

6

2012) (citation omitted).  At the same time, the Take Care Clause "charges the Executive Branch with enforcing federal law," including spending-power laws.  *Medina*, 145 S. Ct. at 2229 (citing U.S. Const., art. II, § 3).

The Congress has also enacted legislation providing a framework for furnishing foreign assistance in support of specified international development goals.  *See* Foreign Assistance Act of 1961, Pub. L. No. 87-195, 75 Stat. 424 (codified as amended at 22 U.S.C. § 2151 *et seq.*).  To further those goals, the Congress appropriates foreign assistance funds for the State Department and USAID to obligate for certain purposes.  Here, the grantees allege that the Executive has unlawfully impounded—that is, improperly delayed or withheld—certain sums appropriated in fiscal year 2024 for bilateral economic assistance and international security assistance.  *See* Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tits. III–IV, 138 Stat. 460, 740–50 (2024 Appropriations Act).  For example, amounts at issue include almost four billion dollars for USAID to spend on global health activities until September 30, 2025, and over six billion dollars for HIV/AIDS programs to be spent until September 30, 2028.  *Id.* at 740, 742.

In 1974, the Congress imposed statutory requirements on the Executive dealing with the obligation and expenditure of appropriated funds.  *See* Impoundment Control Act of 1974, Pub. L. No. 93-344, tit. X, 88 Stat. 297, 332–39 (codified at 2 U.S.C. § 681 *et seq.*).  To reserve appropriated funds within the Executive until expiry or request the Congress to rescind funds, known as permanent impoundment, the President must send a special message to both chambers of the Congress.  2 U.S.C. § 683(a).  The message must address the (1) amount at issue; (2) department and project or functions involved; (3) reasons for rescission or reservation;  (4) fiscal, economic and

7

budgetary effects; and (5) relevant facts, circumstances and considerations as well as effects on the programs and their goals. *Id.* Any amount proposed to be rescinded or reserved "shall be made available for obligation" unless the Congress passes a rescission bill within 45 calendar days of receipt of the special message. *Id.* §§ 682(3), 683(b).

The President must also send a special message containing specific information to the Congress when he proposes to defer, or temporarily impound, appropriated funds. *Id.* §§ 682(1), 684. Although the President may make "trivial" and "everyday" deferrals for "routine programmatic" reasons, he may not do so based on "policy" disagreements, and he must still report programmatic deferrals to the Congress. *City of New Haven v. United States*, 809 F.2d 900, 902 n.3, 908–09 (D.C. Cir. 1987); *see also* 2 U.S.C. § 684. The Congress may disapprove a proposed deferral through an impoundment resolution. 2 U.S.C. § 682(4). The ICA also provides particular procedures to ensure timely congressional consideration of a bill or resolution regarding a proposed rescission or deferral, respectively. *Id.* § 688.

Finally, the ICA sets out a mechanism for reporting and enforcement by the Comptroller General. *Id.* §§ 686–87. The Comptroller General is the head of the Government Accountability Office (GAO), which is constitutionally part of the legislative branch. *See Bowsher v. Synar*, 478 U.S. 714, 727–32 (1986). If the Comptroller General finds that the President or another Executive official "is to" reserve or defer funds or "has ordered, permitted, or approved" such action and failed to send a special message, he must report the reserve or deferral to the Congress and that report then constitutes a special message. 2 U.S.C. § 686. Relatedly, if "budget authority is required to be made available for obligation" and is not, the Comptroller General is "expressly empowered" to

8

sue the Executive to "require such budget authority to be made available" after filing an "explanatory statement" with the Congress and waiting 25 calendar days. *Id.* § 687. If the Comptroller General brings suit, the U.S. District Court for the District of Columbia is "expressly empowered" to enter "any decree, judgment, or order which may be necessary or appropriate to make such budget authority available for obligation." *Id.* The ICA further provides that nothing in it "shall be construed" as "affecting in any way the claims or defenses of any party to litigation concerning any impoundment." *Id.* § 681(3).[1]

## B.

On January 20, 2025, the President issued an executive order to reevaluate U.S. foreign aid policies. Exec. Order No. 14,169, 90 Fed. Reg. 8,619 (Jan. 20, 2025) (Reevaluating Foreign Aid). Section 3 of the order required (a) an immediate pause in foreign development assistance, (b) a review of foreign assistance programs in consultation with the Director of the Office of Management and Budget (OMB) and (c) a determination within 90 days on whether to continue each program, subject to the Secretary of State's agreement. *Id.* § 3(a)–(c). Foreign assistance fund disbursement could be resumed earlier than 90 days if the Secretary of State or his designee—in consultation with the OMB Director—decided to continue the program and the Secretary of State could also waive the pause for specific programs. *Id.* § 3(d)–(e).

---

[1] Impoundment must also comply with the Anti-Deficiency Act. *See City of New Haven*, 809 F.2d at 906 n.18 (quoting 31 U.S.C. § 1512(c)); 2 U.S.C. § 684(b).

9

On January 24, the Secretary of State issued a memorandum suspending new funding obligations for State Department- or USAID-funded programs subject to certain waivers, USAID issued instructions to pause new programs and issue stop-work orders and OMB issued a memorandum pausing foreign-aid financial assistance. Within weeks, the State Department and USAID suspended or terminated thousands of grant awards. Since then, the State Department and USAID have also begun major restructuring and downsizing efforts and the State Department has completed its programmatic review of foreign assistance programs.

Recipients of foreign-assistance funds sued to enjoin various executive branch defendants from implementing the executive order.[2]  One group of grantees brought two constitutional and four APA claims.[3] Under the Constitution, they allege violations of (1) the separation of powers and (2) the Take Care Clause, and under the APA they allege (3) unlawful suspension of grants, (4) unlawful impoundment of appropriated funds, (5) violation of the ICA and (6) violation of the Anti-Deficiency Act. Another set of grantees brought four claims: (1) arbitrary and capricious action in violation of the APA, (2) action contrary to statutory

---

[2] Defendant-Appellants are the President, Secretary of State, Acting Administrator of USAID, Director of Foreign Assistance for the Department of State, Acting Deputy Administrator for Policy and Planning of USAID, Acting Deputy Administrator for Management and Resources of USAID, and the Director of OMB as well as the Department of State, USAID and OMB.

[3] Plaintiff-Appellees are AIDS Vaccine Advocacy Coalition and Journalism Development Network, Inc.

10

and constitutional law in violation of the APA, (3) violation of the separation of powers and (4) ultra vires action.[4]

On February 13, the district court granted in part and denied in part a temporary restraining order (TRO) and enjoined executive branch defendants other than the President from enforcing or giving effect to certain sections of the State Department memorandum and any other directives that implement sections 3(a) and (c) of the executive order. *AIDS Vaccine Advoc. Coal. v. Dep't of State* (*AVAC I*), 766 F. Supp. 3d 74, 84–85 (D.D.C. 2025).[5] After the district court entered a subsequent order to enforce its TRO, we dismissed the government's emergency appeal of that order for lack of appellate jurisdiction and denied mandamus relief. *AIDS Vaccine Advoc. Coal. v. Dep't of State*, No. 25-5046, 2025 WL 621396, at *1 (D.C. Cir. Feb. 26, 2025). In turn, the U.S. Supreme Court also rejected the government's request to vacate the enforcement order. *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753 (2025) (mem.).

_____

[4] Plaintiff-Appellees are Global Health Council; Small Business Association for International Companies; HIAS; Management Sciences for Health, Inc.; Chemonics International, Inc.; DAI Global LLC; Democracy International, Inc.; and American Bar Association.

[5] Restrained defendants are Marco Rubio, Secretary of State and Acting Administrator of USAID; Peter Marocco, then-Director of Foreign Assistance for the Department of State, then-Acting Deputy Administrator for Policy and Planning of USAID and then-Acting Deputy Administrator for Management and Resources of USAID, who was later removed as a defendant below; Russell Vought, Director of OMB; the Department of State; USAID; OMB; and their agents. *AIDS Vaccine Advoc. Coal. v. Dep't of State* (*AVAC II*), 770 F. Supp. 3d 121, 155 (D.D.C. 2025).

11

On remand, the district court granted in part and denied in part the grantees' motion for a preliminary injunction. *AIDS Vaccine Advoc. Coal. v. Dep't of State* (*AVAC II*), 770 F. Supp. 3d 121 (D.D.C. 2025). First, the court found that the grantees have Article III standing because they are financially injured by the defendants' blanket suspension of funds and an injunction against that suspension redresses at least in part that harm. *Id.* at 132–34. Next, the court addressed claims under the APA relating to the terminations, suspensions and stop-work orders issued between the dates of the executive order and the TRO for foreign assistance grants, cooperative agreements and contracts. *Id.* at 134–43. The district court held that the grantees would likely succeed on their APA claims as to the initial funding freeze, between the January 20 executive order and February 13 TRO, but not the subsequent large-scale termination of contracts. *Id.* Those claims are not on appeal.

As to the grantees' impoundment claims, the court determined that the grantees were likely to succeed in showing that the executive branch was unlawfully "engaging in a unilateral rescission or deferral of congressionally appropriated funds in violation of Congress's spending power." *Id.* at 143. The court emphasized that here the Congress used its spending power through the 2024 Appropriations Act and the ICA, and the President's power is at its "lowest ebb" when he "takes measures incompatible with the expressed or implied will of Congress." *Id.* at 144 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).

The court further found no indication that the President had complied with the procedures required by the ICA or the Anti-Deficiency Act for impounding congressionally appropriated funds and thus reasoned that his actions likely violated the three statutes at issue and the Constitution. *Id.* at 144–48 & nn.14, 18. The court additionally rejected the

12

government's arguments that the grantees cannot bring a freestanding constitutional claim and that the ICA precludes the grantees from suing under the APA to enforce the ICA. *Id.* at 148 n.17. It also held that the defendants likely acted ultra vires. *Id.* n.18. The court did not reach the grantees' Take Care Clause claim. *Id.* n.17.

Regarding the other preliminary injunction factors, the court found that the grantees were likely to suffer irreparable injury from financial harm threatening their continued existence and imposing obstacles to their missions. *Id.* at 149–52. Moreover, it found that the equities and public interest weighed in favor of an injunction because there is no public interest in unlawful agency action and the executive branch may still review foreign aid programs. *Id.* at 152.

Accordingly, the court enjoined the government in relevant part "from unlawfully impounding congressionally appropriated foreign aid funds" and ordered it to "make available for obligation the full amount of funds" appropriated in the 2024 Appropriations Act. *Id.* at 155. The government timely appealed and we agreed to expedite the appeal.

## II.

The government does not dispute Article III standing except as it relates to the appropriate scope of relief granted. Nevertheless, we have "an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (citation omitted). To establish standing, the grantees must show (1) injury in fact that is concrete and particularized and actual or imminent rather than conjectural or hypothetical, (2) causation fairly traceable to the defendants' challenged actions and (3) redressability by a favorable decision that is likely as opposed to merely speculative. *Lujan*

13

*v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Because "standing is not dispensed in gross . . . , plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citations omitted).

The Executive's initial funding freeze and suspension of contracts plainly caused the grantees "immense harm, including by inflicting massive financial injuries [on the grantees], forcing them to significantly reduce core operations and staff." *AVAC II*, 770 F. Supp. 3d at 133 (citing *AVAC I*, 766 F. Supp. 3d at 78–82). That harm could be redressed at least in part by a "determination that the blanket suspension was unlawful." *Id.* But in the earlier TRO the district court cites for support, it observes that the grantees did "not assert this harm based upon expectations of receiving future grants or aid." *AVAC I*, 766 F. Supp. 3d at 79. Instead, they did so based only "upon expectations set in existing contracts with the respective agencies." *Id.* The government has paid out substantially all of the amounts owed on existing contracts for work completed between January 20 and February 13, as required by the part of the district court's injunction that is not on appeal. Thus, the question before us is whether the grantees also established standing as to their impoundment claims.

At oral argument, the grantees' counsel relied on the district court's preliminary injunction hearing and their declarations to support impoundment standing. Earlier, at the preliminary injunction hearing, the grantees had asserted that the court could redress their injuries by ordering funds to be made available because the grantees would be eligible to compete for the funds even if not guaranteed to obtain them. *See* Prelim. Inj. Hr'g at 14–15, *AVAC II*, 770 F. Supp. 3d (D.D.C. Mar. 10, 2025) (No. 1:25-cv-402), Dkt. 58. Indeed, a plaintiff may be harmed by denial of the opportunity to

14

compete for a pool of funds for which they are able and willing to compete. *See Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1014–16 (D.C. Cir. 2022). And the declarations make clear the degree to which the grantees are financially dependent on appropriated foreign assistance funds. For example, Democracy International attests that 96 per cent of its 2024 revenue came directly from USAID. J.A. 346. Moreover, even the prospect of a "single dollar" can "effectuate a partial remedy" and thereby "satisf[y] the redressability requirement." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (citation omitted).

Thus, because even the prospect of competing for funds months later would partially redress the injuries to the grantees' finances, they have established standing. Because we hold that the grantees have standing due to their financial injuries, we need not separately address alleged harm to their missions.

## III.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008) (citations omitted). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Id.* at 24 (citation omitted).

The balance-of-equities and public-interest factors merge if the government is the opposing party. *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "In this circuit, it remains an open question whether the 'likelihood of success' factor is 'an independent, free-standing requirement,' or whether, in cases where the other three factors strongly favor issuing an

injunction, a plaintiff need only raise a 'serious legal question' on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 393, 398 (D.C. Cir. 2011)).

We review the district court's decision whether to grant a preliminary injunction for abuse of discretion, its legal conclusions de novo and its findings of fact for clear error. *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (per curiam). Here, we conclude that the district court abused its discretion in granting a preliminary injunction because the grantees failed to show they are likely to succeed on the merits and the other *Winter* factors do not "strongly favor" the issuance of an injunction.

## A.

The district court held in the main that the grantees were likely to succeed on their constitutional claim that the government violated separation-of-powers principles by impounding funds in violation of the 2024 Appropriations Act, the ICA and the Anti-Deficiency Act. *AVAC II*, 770 F. Supp. 3d at 143–48. In a footnote, it rejected the government's arguments that the court could not also find action contrary to law under the APA based on a violation of the ICA. *See id.* at 148 n.17. In another footnote, it held that the grantees were likely to succeed on their ultra vires claim. *See id.* at 148 n.18. Because the grantees lack a cause of action to bring any of these claims, the district court committed legal error.[6]

---

[6] The dissent argues that our discussion of the statutory and ultra vires causes of action is dicta because "any merits arguments that have no connection to the separation-of-powers analysis are irrelevant to the court's granting of the preliminary injunction" and because the ultra vires claim "is not raised in the government's

16

1.

"Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts. Instead, constitutional rights are generally invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024) (first citing *Egbert v. Boule*, 596 U.S. 482, 490–91 (2022); and then citing 42 U.S.C. § 1983). Here, the grantees assert a non-statutory right to vindicate separation-of-powers principles but they are foreclosed from doing so by *Dalton v. Specter*, 511 U.S. 462 (1994).

As a threshold matter, the grantees argue in a surreply brief that the government has forfeited reliance on *Dalton* by failing to raise it in its opening brief. That oversight is hard to understand. Nevertheless, the entire opening brief proceeds from the premise that this dispute raises a statutory claim—and therefore by implication not a constitutional one, despite the district court's characterization otherwise—which is in effect the *Dalton* argument that the government advanced below. *See AVAC II*, 770 F. Supp. 3d at 148 n.17. "And once an argument

---

opening brief." Dissenting Op. 28 n.4. That is incorrect. The district court's contrary-to-law determination directly follows its rejection of the government's argument applying *Dalton v. Specter*, 511 U.S. 462 (1994), and contrasts with the ensuing paragraph, where it declined to reach the grantees' Take Care Clause argument (as, therefore, do we). *AVAC II*, 770 F. Supp. 3d at 148 n.17. The district court explicitly determined that the grantees "would be likely to succeed on their claim that Defendants acted *ultra vires*." *Id.* n.18. And the government's briefing on the ultra vires cause of action issue is subject to the same forfeiture analysis as the *Dalton* issue discussed below.

17

is before us, it is our job to get the relevant case law right. Indeed, a party cannot forfeit or waive recourse to a relevant case just by failing to cite it." *United States v. Hillie*, 39 F.4th 674, 684 (D.C. Cir. 2022) (quotation omitted).

The Supreme Court has also held that "when an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993) (citation modified); *see also id.* at 447 ("A court may consider an issue antecedent to and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief." (citation modified)).  Here, the grantees seek to pursue an implied equitable cause of action not arising under the APA. We must therefore determine the scope of any such cause of action, which depends on whether the underlying claim is properly characterized as statutory or constitutional.    And *Dalton* establishes the framework for resolving that question.[7]

This also fits with the purpose of forfeiture doctrine, which is intended to prevent "sandbagging of appellees" and any expectation that judges be "mindreaders." *Jones Lang LaSalle Americas, Inc. v. NLRB*, 128 F.4th 1288, 1297 (D.C. Cir. 2025). Here, the issue was fully briefed below and the grantees were able to respond on appeal in their surreply brief, providing us

---

[7] Contrary to the dissent's assertion otherwise, Dissenting Op. 27–28, the *Dalton* issue is antecedent to the question before us of whether the district court erred in entering an injunction based on a separation-of-powers violation.

18

with adversarial briefing. Thus, we hold that the *Dalton* argument is not forfeit.

In *Dalton*, the Supreme Court reviewed a circuit court's reasoning that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine," and therefore "judicial review must be available to determine whether the President has statutory authority for whatever action he takes." *Dalton*, 511 U.S. at 471 (citation modified). The Court rejected that effort to recast statutory claims as constitutional ones. The Court emphasized that it had "often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority" and explained that otherwise there would be "little need" for the established distinction between unconstitutional and ultra vires conduct. *Id.* at 472 (citations omitted). Moreover, plaintiffs would otherwise be able to avoid statutory limits on review by reframing any alleged statutory violation by the President as a constitutional one. *See id.* at 474.[8]

The grantees cite several cases in support of their right to bring their constitutional claim here but each is distinguishable. First, the grantees point to *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), and *Collins v. Yellen*, 594 U.S. 220 (2021), where plaintiffs

---

[8] The dissent recognizes that not every claim that the Executive violated a statute can be recharacterized as a constitutional claim by appeal to the separation of powers. Dissenting Op. 34–35. But it offers no defensible theory for why *this* claim—that the President violated the ICA and the 2024 Appropriations Act—can be so characterized. Moreover, despite the dissent's occasional suggestion to the contrary, the line between constitutional and statutory claims cannot turn on the amount of disputed spending at issue.

19

brought separation-of-powers challenges to statutory restrictions on the President's power to remove executive officers. But in that line of cases the plaintiffs challenged the constitutionality of the statute itself. From the outset, the government has not contested the constitutionality of the relevant statutes. *See AVAC II*, 770 F. Supp. 3d at 144.[9] And the grantees unquestionably do not do so; on the contrary, they seek to enforce the statutes.

The grantees also cite *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), in which the High Court held that the President lacked the constitutional authority to seize steel mills to avoid a strike and maintain output for the Korean War effort. As the Court later explained in *Dalton*, the "only basis of authority asserted" in *Youngstown* "was the President's inherent constitutional power as the Executive and the Commander in Chief of the Armed Forces." 511 U.S. at 473. "*Youngstown* thus involved the conceded *absence* of *any* statutory authority, not a claim that the President acted in excess of such authority." *Id.*[10]

_____

[9] The dissent makes much of the government's invocation of its Article II powers in the Executive Order and the district court. Dissenting Op. 39–43. But in this Court, the government disclaims any argument that the statutes violate Article II. In failing to address the reviewability or the merits of such an argument, we do not allow the government to "change its position" on appeal. *Id.* at 40. Instead, we simply decline to address the reviewability or the merits of a constitutional defense that the government advanced briefly below and then abandoned.

[10] Many of the dissent's references to *Youngstown* concern Justice Jackson's concurrence, which famously articulated a tripartite framework for assessing interbranch conflicts on the merits. *See, e.g.*, Dissenting Op. 39–43. But we have no occasion to address

20

On appeal, the government disclaims any constitutional defense, although it maintains that the defendants committed no statutory violations. The grantees characterize this as an ad hoc litigating position, claiming that in the executive order and below the government relied exclusively on constitutional authority for impoundment. That is incorrect. The executive order relied on the President's authority under "the Constitution *and the laws of the United States of America*." Reevaluating Foreign Aid, 90 Fed. Reg. at 8,619 (emphasis added). And the government did raise a *Dalton* argument in district court, contending that the dispute was "purely statutory." Opp'n to Pl.'s Mot. for Prelim. Relief at 23, *AVAC II*, 770 F. Supp. 3d 121 (D.D.C. Mar. 10, 2025) (No. 1:25-cv-402), Dkt. 34. Granted, in district court the government went on to assert "vast and generally unreviewable" foreign affairs powers. *Id.* at 24–26 (citation modified). But it further argued—albeit in the context of the grantees' APA claims—that it did not exceed its statutory authorization or act contrary to the statutes. *Id.* at 33–36. In turn, those alleged statutory violations must be the predicate acts for the constitutional claims because without an appropriations statute there could be no improper impoundment. Thus, *Youngstown* is inapposite.[11]

———————————

that framework where, as here, the case is resolved by the antecedent question of whether the grantees had a cause of action in the first place.

[11] The dissent characterizes our position as claiming that "if the President asserts both constitutional and statutory authority to validate his conduct, the court may characterize the whole dispute as statutory." Dissenting Op. 41. Not so. Instead, this dispute is fundamentally statutory because the alleged constitutional violation is predicated on the underlying alleged statutory violations.

21

The grantees further rely on *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), but that case cuts against them. There, healthcare providers brought a Supremacy Clause claim against state officials to enforce the Medicaid Act. *Id.* at 323–24. The Supreme Court acknowledged that under *Ex parte Young*, 209 U.S. 123 (1908), courts may grant injunctive relief against state officials for violations of federal law. *Id.* at 327. But that "judge-made *remedy*" did not "rest[] upon an implied *right of action* contained in the Supremacy Clause." *Id.* (emphases added). Instead, analyzing the text of the Supremacy Clause, the Court highlighted that it is "silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* at 325.[12] As a result, it held that there was no right of action under the Constitution itself. *Id.* at 324–27. Thus, *Armstrong* as well as *Dalton* rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review.

In their surreply brief, the grantees point to two more cases in their attempt to rebut *Dalton*. Neither does the trick. First, the grantees reference *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013). But the dispute there was about whether a federal

---

[12] As the grantees note, *Collins* avers broadly that "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." 594 U.S. at 245. In context, the Court was simply explaining that, because the separation-of-powers doctrine protects "all the people," a clause in the relevant statute transferring shareholder rights did not foreclose shareholders from vindicating rights they held "in common" with other citizens. *Id.* at 244–46. That an aggrieved party with standing may bring a claim to challenge a statute as unconstitutional does not mean that such a party may bring a constitutional claim to enforce a statutory violation.

22

agency had to continue with a mandatory licensing process despite lacking sufficient funds to complete the process, thereby only indirectly implicating appropriated funds. *Id.* at 257–60. More importantly, that case involved a writ of mandamus under the APA to compel federal officers to perform a statutory duty unreasonably withheld rather than a constitutional cause of action. Pet. for Writ of Mandamus at 3, *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) (No. 11-1271) (citing 28 U.S.C. § 1651(a); 5 U.S.C. § 706(1)).[13]

The grantees also rely on *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996). There, we considered whether an executive order relying on authority under a statute that granted the President broad discretion was reviewable for an alleged violation of another statute. *Id.* at 1329–32. We rejected the government's argument that review was unavailable simply because the President claimed authority to act under a different statute that conferred broad authority; otherwise, the President could always invoke such a statute to "bypass scores of statutory limitations on governmental authority." *Id.* Granted, in *Reich* we said that "*Dalton*'s holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President

---

[13] The dissent relies extensively on another mandamus case, *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524 (1838). Dissenting Op. *passim*. There, the Postmaster General refused to pay out an award made to mail contractors by the Solicitor of the Treasury pursuant to statutory authority. The Supreme Court held that a writ of mandamus could issue because the Postmaster's duty was of a "mere ministerial character." *Id.* at 610. But the fact that plaintiffs can sometimes satisfy the stringent standards for mandamus in no way suggests that they can end-run those standards by styling claims that the President violated statutes as constitutional claims implicating the separation of powers.

23

and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available." *Id.* at 1331. But *Dalton* had four holdings. *See Dalton*, 511 U.S. at 476–77. Only the fourth holding was at issue in *Reich*. The third holding explained that statutory claims cannot be transformed into constitutional ones and applies here. Moreover, in *Reich* we emphasized that the presidential action at issue was not "even contemplated by Congress." 74 F.3d at 1332. Here, the ICA provides a mechanism for the President to act on impoundment. Finally, *Reich* states that "an independent claim of a President's violation of the Constitution would certainly be reviewable," but here the constitutional claim is predicated on underlying statutory violations. *Id.* at 1326.[14]

---

[14] The dissent repeatedly suggests that our straightforward application of *Dalton* will insulate large swaths of presidential action from judicial review. *See, e.g.*, Dissenting Op. 46–47. It is mistaken. Presidential action may be reviewed through APA challenges to final agency action by subordinates implementing the President's directives where such review is not otherwise precluded. *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992). And ultra vires review remains available to test presidential action alleged to violate any spending or other statute, provided that plaintiffs can plausibly allege action contrary to a clear and mandatory statutory prohibition. *See Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022). We simply hold that such claims must meet the standards governing review of ultra vires claims, and cannot be recast as constitutional claims through the mere invocation of the separation of powers.

24

In sum, we conclude that *Dalton* controls this case and the grantees lack a cause of action to bring their freestanding constitutional claim.[15]

---

[15] The dissent points out that our application of *Dalton* creates a split with the Ninth Circuit. Dissenting Op. 23, 36–37 (citing *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023)). Indeed, the Ninth Circuit has taken "an expansive view of the constitutional category of claims highlighted in *Dalton*." *Murphy Co.*, 65 F.4th at 1130. But in the very cases that *Murphy Co.* relies on, the Supreme Court has signaled that the Ninth Circuit errs in doing so.

First, *Murphy Co.* cites *Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019), where the Ninth Circuit refused to grant a stay of an injunction preventing the government from reprogramming Department of Defense funds for construction of a border wall. The Supreme Court subsequently granted a stay, reasoning that the government had made "a sufficient showing at this stage *that the plaintiffs have no cause of action*." *Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (mem.) (emphasis added); *see also id.* (Breyer, J., concurring in part and dissenting in part) ("This case raises novel and important questions about the ability of private parties to enforce Congress' appropriations power."); *Nken*, 556 U.S. at 434 (requiring a stay applicant to make a "strong showing that he is likely to succeed on the merits" (quotation omitted)).

Second, *Murphy Co.* cites the merits decision in the same case. Despite the Supreme Court's determination that the government made a strong showing that plaintiffs lacked a cause of action, a divided panel of the Ninth Circuit held that Sierra Club had "both a constitutional and an *ultra vires* cause of action." *Sierra Club v. Trump*, 963 F.3d 874, 887 (9th Cir. 2020). Unsurprisingly, the Court promptly granted certiorari to address the cause of action issue. *See Trump v. Sierra Club*, 141 S. Ct. 618 (2020) (mem.); *see also* Br. for Pet'r at (I) (presenting question of whether Respondents had a "cognizable cause of action"). Ultimately, the arrival of the Biden administration meant there was no longer a live controversy and the

25

2.

In passing, the district court rejected the government's argument that the ICA precludes the grantees from bringing suit under the APA to enforce its provisions. *AVAC II*, 770 F. Supp. 3d at 148 n.17. We thus turn to the question whether the grantees may bring an APA claim alleging that the defendants have acted contrary to law by violating the ICA.

"The APA confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute' but withdraws that cause of action to the extent the relevant statute 'precludes judicial review.'" *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984) (first quoting 5 U.S.C. § 702; and then quoting 5 U.S.C. § 701(a)(1)). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Id.* (citations omitted).

There is a "presumption favoring judicial review of administrative action" but it "is just that—a presumption." *Id.* at 349. As relevant here, it "may be overcome by inferences of intent drawn from the statutory scheme as a whole." *Id.* (citations omitted). "In particular, at least when a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial

_____

Court simply vacated the Ninth Circuit's judgment without issuing an opinion. *Biden v. Sierra Club*, 142 S. Ct. 46 (2021) (mem.). But for that turn of events, this question might already have been resolved by the Supreme Court.

26

review of those issues at the behest of other persons may be found to be impliedly precluded." *Id.* (citations omitted).

In some cases, the Supreme Court has said that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Id.* at 350 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)). Nevertheless, it has "never applied the 'clear and convincing evidence' standard in [a] strict evidentiary sense." *Id.* "Rather, the Court has found the standard met, and the presumption favoring judicial review overcome, whenever the congressional intent to preclude judicial review is 'fairly discernible in the statutory scheme.'" *Id.* at 351 (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 157 (1970)).

The statute at issue in *Block* allowed dairy handlers to seek judicial review—after administrative exhaustion—of the Secretary of Agriculture's orders to set minimum prices that handlers had to pay farmers but nowhere did the statute provide for consumers to obtain review. *Id.* at 346–47. That "omission" from such a "complex scheme" provided "reason to believe that Congress intended to foreclose" review for consumers despite their interests being "implicated." *Id.* at 347. It did not make sense for the Congress to require exhaustion for dairy handlers but not consumers, and allowing consumers to sue would "severely disrupt this complex and delicate administrative scheme," and would enable a handler to circumvent exhaustion by finding a consumer to bring suit. *Id.* at 347–48; *see also Sackett v. EPA*, 566 U.S. 120, 130 (2012) ("Where a statute provides that particular agency action is reviewable at the instance of one party, who must first exhaust administrative remedies, the inference that it is not reviewable at the instance of other parties, who are not *subject* to the administrative process, is strong."). Thus, consumers were by

27

necessary implication precluded by the statutory scheme from suing under the APA. *Block*, 467 U.S. at 352. Recently, the Supreme Court contrasted the scheme in *Block*, providing for review by dairy handlers but not consumers, from one that provided for suit by "any person adversely affected." *FDA v. R.J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1995 & n.8 (2025).

Here, the ICA created a complex scheme of notification of the Congress, congressional action on a proposed rescission or deferral and suit by a specified legislative branch official if the executive branch violates its statutory expenditure obligations. *See* 2 U.S.C. § 682 *et seq.* Moreover, under the ICA, the Comptroller General may bring suit only 25 days after he has provided the Congress with a statement explaining the "circumstances giving rise to the action contemplated." 2 U.S.C. § 687. As in *Block*, it does not make sense that the Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits to enforce the ICA at any time and without notice to the Congress of the alleged violation. 467 U.S. at 347–48. And there is no provision even inferentially allowing "any person adversely affected" to sue. *R.J. Reynolds*, 145 S. Ct. at 1995 & n.8.

The ICA does have a disclaimer that nothing in it "shall be construed" as "affecting in any way the claims or defenses of any party to litigation concerning any impoundment." 2 U.S.C. § 681(3). But that does not mean that any aggrieved party may initiate litigation to enforce the ICA itself. *See Pub. Citizen v. Stockman*, 528 F. Supp. 824, 828 (D.D.C. 1981) (arguing that 2 U.S.C. § 681(3) is a "blatant disclaimer of any congressional design to provide for a private right of action" (citation modified)). Instead, the language disclaims any effect on the

28

claims or defenses of any party *that may bring litigation*.[16]
Section 681(3) also meant that a case then-pending before the
Supreme Court at the time that the ICA became law was not
moot. *Train v. City of New York*, 420 U.S. 35, 41 n.8 (1975).
But that simply confirms that the ICA had no retroactive effect.
*See* Pet'r's Suppl. Br. at 9–11, *Train*, 420 U.S. 35 (No. 73-
1377); *see generally Vartelas v. Holder*, 566 U.S. 257, 266
(2012) (explaining that under the "principle against retroactive
legislation," courts "read laws as prospective in application
unless Congress has unambiguously instructed retroactivity"
(citation omitted)).

The dissent also points to the ICA's legislative history,
Dissenting Op. 38, but nothing in that history alters our
analysis. As the Supreme Court has often admonished,
"legislative history is not the law" and courts must not "allow
ambiguous legislative history to muddy clear statutory
language." *Azar v. Allina Health Servs.*, 587 U.S. 566, 579
(2019) (citation modified). Indeed, the legislative history here
is ambiguous. Section 681(3) originated from proposed
language in the House version of the bill that would have
limited it to litigation about pre-ICA impoundment. *See* Pet'r's

---

[16] One application of section 681(3) may be to allow the
Comptroller General to assert a constitutional claim in addition to the
ICA claim, although that question need not be resolved here. There
is also nothing in the statutory scheme to suggest that parties may not
seek to intervene in a suit brought by the Comptroller General. *See
generally* Fed. R. Civ. P. 24. The dissent argues that the procedures
authorizing the Comptroller General to sue are only "intended to
address discrete rescission or deferral requests affecting specific line-
items of budget authority." Dissenting Op. 38 & n.8. Besides
providing two examples of messages from the Comptroller General
to the Congress, the dissent does not explain why the Comptroller
General is "ill-suited" to bring an action here. *Id.*

29

Suppl. Br. at 6–8, *Train*, 420 U.S. 35 (No. 73-1377). According to then-Solicitor General Robert Bork, the undiscussed deletion of that limiting language from the conference version of the bill was likely "inadvertent." *Id.* at 8–9. Conversely, the Senate Report stated, "The authority of the Comptroller General is not intended to infringe upon the right of any Member of Congress, *or any other party*, to initiate litigation." S. Rep. No. 93-688, at 74 (1974) (emphasis added). But that language was conspicuously absent from the Conference Report. *See* S. Rep. 93-924, at 76–78 (1974) (Conf. Rep.). To find that section 681(3) supports reading in a private cause of action to enforce the ICA, one would have to selectively ascribe meaning to the deletion of the House's limiting language from the final bill but not to the omission of the Senate's explanatory language from the Conference Report.

Accordingly, the grantees have no cause of action to undergird their claim that the defendants have acted contrary to law by violating the ICA.[17]

3.

As yet another alternative to its principal holding, the district court noted that the grantees would likely succeed on

---

[17] The grantees' contrary-to-law claims were based on a variety of substantive provisions, including the 2024 Appropriations Act. The district court appears to have limited its APA preclusion holding to the ICA, *AVAC II*, 770 F. Supp. 3d at 148 n.17, so we need not and do not decide whether the ICA precludes suits under the APA to enforce appropriations acts. And because the ICA's statutory scheme bars the grantees from bringing suit under the APA to enforce the ICA, there is no need to reach the government's argument that the grantees fall outside the ICA's zone of interests or whether the argument is forfeit for not having been raised in district court.

30

their ultra vires claim—in other words, the grantees' non-APA claim that the defendants have exceeded their statutory authority. *AVAC II*, 770 F. Supp. 3d at 148 n.18. The grantees belatedly point to this alternative ground for affirmance in their surreply. In any event, that argument fails as well.

Courts have "recognized a right to equitable relief" from executive action that is "unauthorized by any law and in violation of the rights of the individual." *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1775 (2025) (citation modified). "Because ultra vires review could become an easy end-run around the limitations of . . . judicial-review statutes," the Supreme Court has "strictly limited nonstatutory ultra vires review to the painstakingly delineated procedural boundaries of *Leedom v. Kyne*, 358 U.S. 184 (1958)." *Id.* at 1775–76 (citation modified). The Court further admonished that parties may not "dress up a typical statutory-authority argument as an ultra vires claim." *Id.* at 1776.

To prevail on an ultra vires claim, the plaintiff must establish that (1) review is not expressly precluded by statute, (2) "there is no alternative procedure for review of the statutory claim" and (3) the challenged action is "plainly" in "excess of [the agency's] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (quotation omitted). A defendant "violates a clear and mandatory statutory command only when the error is so extreme that one may view it as jurisdictional or nearly so." *Id.* (citation modified). Moreover, the prohibition at issue must confer rights upon the individual seeking ultra vires review. *See Kyne*, 358 U.S. at 190 (courts "cannot lightly infer that Congress does not intend judicial protection of *rights it confers* against agency action taken in excess of delegated powers" (emphasis added)).

31

Here, the grantees fail to satisfy the third prong of the ultra vires reviewability test.  The ICA provides that the Executive may carry out lawful impoundments subject to certain procedures and restrictions and the grantees can point to no specific prohibition the defendants have violated to an extreme and nearly jurisdictional degree.  And the district court's analysis applying the major questions doctrine is irrelevant to a *Kyne* inquiry.  *See AVAC II*, 770 F. Supp. 3d at 148 n.18. Instead, and as in *Nuclear Regulatory Commission*, the grantees "basically dress up a typical statutory-authority argument as an ultra vires claim."  145 S. Ct. at 1776.[18]

* * *

Because the grantees lack a cause of action, we need not address on the merits whether the government violated the Constitution by infringing on the Congress's spending power through alleged violations of the 2024 Appropriations Act, the ICA and the Anti-Deficiency Act.

**B.**

Finally, the other *Winter* factors do not "strongly favor" an injunction.  *Aamer*, 742 F.3d at 1043.

---

[18] As explained above, we conclude that the grantees lack a cause of action to enforce the ICA at least while the ICA's statutory processes run their course.  To the extent that APA review may be available afterwards or on the basis of another statutory provision, that would provide an alternative procedure for review and thereby independently foreclose the grantees' ultra vires claim.  *See, e.g.*, *Changji*, 40 F.4th at 722.

32

1.

Regarding irreparable injury, the grantees focused their assertions and the district court its analysis primarily on the initial funding freeze. *See AVAC II*, 770 F. Supp. 3d at 133 (citing *AVAC I*, 766 F. Supp. 3d at 78–82). Indeed, some grantees are almost entirely financially dependent on funding from foreign-aid appropriations. *See, e.g.*, J.A. 346. Thus, we may infer financial harm and redressability to establish Article III standing as to impoundment. However, we have also said that "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). The district court made findings of existential financial harm as to the initial funding freeze, *AVAC I*, 766 F. Supp. 3d at 81, but later ruled that the grantees were unlikely to succeed in showing that subsequent large-scale terminations were unlawful, *AVAC II*, 770 F. Supp. 3d at 140–43. Thus, the grantees had to be paid for three-and-a-half weeks' operations completed between January 20 and February 13 but not on their contracts going forward.

Because the large-scale contract terminations were not enjoined, it stands to reason that existential financial harm would already have taken place by the time that the grantees would finally receive unobligated funds for which they first had to compete. Or, if the later opportunity to compete for additional grants could fix the harm, it would not be irreparable. The record is simply less developed about how long the grantees could financially continue without the opportunity to compete for impounded funds as opposed to the funds from existing contracts and why being denied immediate relief as to that opportunity would cause harm the grantees would not suffer anyway. *Cf. Al-Baluchi v. Hegseth*, 140 F.4th 517, 521 (D.C. Cir. 2025) (holding that a Guantanamo Bay

33

prisoner failed to allege irreparable injury from being denied access to a medical review board for a possible determination on repatriation because, even if successful, the government maintained its discretion not to repatriate him). That gap weighs against holding that the irreparable injury factor "strongly favors" the issuance of an injunction.

2.

The remaining preliminary injunction factors merge if the government is the opposing party. *Karem*, 960 F.3d at 668. Although we have said there is "generally no public interest in the perpetuation of unlawful agency action," *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citations omitted), here we have no occasion to address whether there has been a constitutional or statutory violation because the grantees lack a cause of action. Moreover, it is not clear how to balance a public interest asserted on behalf of the Congress against the public interest asserted by the Executive. *See Harris v. Bessent*, No. 25-5037, 2025 WL 980278, at *25 (D.C. Cir. Mar. 28, 2025) (Henderson, J., concurring), *vacated en banc*, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025), *abrogated sub nom.*, *Trump v. Wilcox*, 145 S. Ct. 1415. Therefore, this factor does not—at least "strongly"—favor an injunction.

\* \* \*

The parties also dispute the scope of the district court's remedy but we need not resolve it—or whether it is forfeit for not being raised below—because the grantees have failed to satisfy the requirements for a preliminary injunction in any event.

34

For the foregoing reasons, we vacate the district court's preliminary injunction and remand for further proceedings consistent with this opinion.

PAN, *Circuit Judge*, dissenting:

On the first day of his second term, President Donald J. Trump proclaimed that "[t]he United States foreign aid industry and bureaucracy are not aligned with American interests," and ordered that "no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States." *Reevaluating and Realigning United States Foreign Aid*, Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025). Executive Branch officials immediately suspended and subsequently terminated thousands of foreign-aid grants, with catastrophic consequences for the grantees and the people that they serve.

Two groups of grantees challenged the funding freeze in district court. In relevant part, they argued that the President's unilateral withholding of appropriated funds violated the separation of powers by infringing on Congress's power of the purse. In response, the government asserted that the President has "vast and generally unreviewable" power in "the realm of foreign affairs" under Article II of the Constitution, and that includes the power to withhold foreign aid that has been appropriated by Congress. Defs.' Opp'n to Pls.' Mots. for Prelim. Relief at 2, *Global Health Council v. Trump*, No. 25-cv-402 (D.D.C. Feb. 21, 2025), Dkt. No. 34; *see also id.* at 24. In a thoughtful opinion, the district court ruled for the grantees. It found that the President did not intend to spend the appropriated funds, and that no authority — statutory or constitutional — supported the impoundment of those funds. The district court applied the iconic power-balancing framework formulated by Justice Robert H. Jackson in *Youngstown Sheet & Tube Co. v. Sawyer*, and concluded that the grantees were likely to succeed on the merits of their claim that the President had violated the separation of powers. *See* 343 U.S. 579, 634–39 (1952) (Jackson, J., concurring). After weighing other relevant factors, the district court entered a

2

preliminary injunction that required the government to "make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs." Order Granting in Part and Denying in Part Pls.' Mot. for Prelim. Inj. at 48, *Global Health Council v. Trump*, No. 25-cv-402 (D.D.C. Mar. 10, 2025), Dkt. No. 60 [hereinafter, Prelim. Inj. Order].

On appeal, the government challenges neither the district court's factual finding that the President had no intention of spending the appropriated funds, nor its legal conclusion that his withholding of appropriations likely violated the separation of powers. Instead, the government argues only that the grantees lack a *statutory* cause of action to force the President to obligate the funds in question. Because that argument does not take issue with the central legal analysis that justified the preliminary injunction, our job is easy — we should affirm that ruling. But my colleagues in the majority compensate for the government's litigation missteps by *sua sponte* reframing the case: The majority concludes that the grantees lack a *constitutional* cause of action — an issue that the government did not mention in its opening brief and did not fully develop even in its reply brief.

My colleagues in the majority excuse the government's forfeiture of what they perceive to be a key argument, and then rule in the President's favor on that ground, thus departing from procedural norms that are designed to safeguard the court's impartiality and independence. Moreover, the court's holding that the grantees have no constitutional cause of action is as startling as it is erroneous. The majority holds that when the President refuses to spend funds appropriated by Congress based on policy disagreements, that is merely a statutory violation and raises no constitutional alarm bells. But the factual scenario presented plainly implicates the structure of our government and the roles played by its coordinate branches

3

— roles that are defined by the Take Care Clause, the Appropriations Clause, the Spending Clause, and the vesting clauses of Articles I and II. Moreover, the Supreme Court and our court have stated in no uncertain terms that the Executive, as a constitutional matter, has no authority to disobey duly enacted statutes for policy reasons. *See In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.); *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838). Yet that is what the majority enables today. The majority opinion thus misconstrues the separation-of-powers claim brought by the grantees, misapplies precedent, and allows Executive Branch officials to evade judicial review of constitutionally impermissible actions. I respectfully dissent.

## I.

### A.

"Time and again we have reaffirmed the importance in our constitutional scheme of the separation of governmental powers into the three coordinate branches." *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 273 (1991) (cleaned up); *see also Springer v. Gov't of the Philippine Islands*, 277 U.S. 189, 201 (1928) ("[T]his separation and the consequent exclusive character of the powers conferred upon each of the three departments is basic and vital[.]"). Ours is a "carefully crafted system of checked and balanced power within each Branch" that serves as the "greatest security against tyranny — the accumulation of excessive authority in a single Branch." *Mistretta v. United States*, 488 U.S. 361, 381 (1989); *see also Buckley v. Valeo*, 424 U.S. 1, 122 (1976) ("The Framers regarded the checks and balances that they had built into the tripartite Federal Government as a self-executing safeguard against the

4

encroachment or aggrandizement of one branch at the expense of the other.").

When it comes to the spending of government funds, the separation of powers is particularly stark: "Congress has absolute control of the moneys of the United States." *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992) (cleaned up); *see also* The Federalist No. 48, p. 334 (J. Cooke ed. 1961) (J. Madison) (noting that Congress "alone has access to the pockets of the people"). In Article I of the Constitution, one of the first enumerated powers of the Legislative Branch is described in the Spending Clause, which grants Congress the exclusive power to "pay the Debts and provide for the common Defense and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Moreover, the Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7; *see also United States v. Butler*, 297 U.S. 1, 65 (1936) ("Funds in the Treasury as a result of taxation may be expended only through appropriation."). And of course, Congress has the power to pass legislation, including appropriations laws. *See* U.S. Const. art. I, § 1 ("All legislative Powers herein shall be vested in a Congress of the United States[.]"); *Wilkerson v. Rahrer*, 140 U.S. 545, 562 (1891) (Congress alone holds the "power to make a law."); *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (An appropriations act is "Law.").

The Appropriations Clause "protects Congress's exclusive power over the federal purse." *Dep't of the Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (cleaned up). It is "a bulwark of the Constitution's separation of powers among the three branches of the national Government." *Id.* at 1347. We have recognized that the Appropriations Clause "is particularly important as a restraint on Executive Branch officers: If not

5

for the Appropriations Clause, 'the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure.'" *Id.* at 1347 (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213–14 (1833)); *see also Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) (The Appropriations Clause "was intended as a restriction upon the disbursing authority of the Executive department."); *Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring) (When "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened.").

Congress exercised its exclusive constitutional prerogatives to legislate, to spend, and to appropriate when it funded foreign aid by enacting the Further Consolidated Appropriations Act of 2024 (Appropriations Act). *See* Pub. L. No. 118-47, 138 Stat. 460, 740–50. The Appropriations Act directs specific dollar amounts to specific foreign-aid purposes. For example, "[f]or necessary expenses to carry out . . . global health activities," Congress appropriated "$3,985,450,000, to remain available until September 30, 2025, and which shall be apportioned directly to the United States Agency for International Development." 138 Stat. 740. And within that "global health" category, the Act identified the types of "activities" that must be funded, such as "programs for the prevention, treatment, control of, and research on HIV/AIDS . . . and for assistance to communities severely affected by HIV/AIDS." *Id.* Congress further earmarked funds from the lump-sum appropriations for particular purposes in tables attached to the Act. *See* 138 Stat. 771 ("[F]unds appropriated by this Act [for foreign assistance] shall be made available in the amounts specifically designated in the respective tables included in the explanatory statement" appended to the Act.).

6

Article II of the Constitution vests "the executive Power . . . in a President of the United States of America." U.S. Const. art. II, § 1. The Constitution mandates that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. That "constitutional duty" to faithfully execute the law "does not permit the President to refrain from executing laws duly enacted by the Congress as those laws are construed by the judiciary." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 604 (D.C. Cir. 1974). Indeed, "[t]he Executive Branch does not have the dispensing power," meaning it has no authority to ignore or suspend the law. *Richmond*, 496 U.S. at 435 (White, J., concurring); *Kendall*, 37 U.S. (12 Pet.) at 613 ("[A] dispensing power . . . has no . . . support in any part of the constitution[.]"). Therefore, the President "does not have unilateral authority to refuse to spend [congressionally appropriated] funds." *Aiken*, 725 F.3d at 261 n.1; *see also* Memorandum from William H. Rehnquist, Assistant Att'y Gen., Off. of Legal Couns., to Edward L. Morgan, Deputy Couns. to the President (Dec. 1, 1969), *reprinted in Executive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary*, 92d Cong. 279, 282 (1971) ("With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.").

Congress asserted its exclusive authority over spending and appropriations, and set firm limits on executive power in that sphere, by enacting the Congressional Budget and Impoundment Control Act of 1974 (Impoundment Control Act). *See* Pub. L. No. 93-344, 88 Stat. 297 (codified at 2 U.S.C. § 682 *et seq.*). The Impoundment Control Act confirms that the President has no dispensing power in the realm of obligating appropriations: It requires the President to notify

7

Congress and to secure its permission before he may cancel appropriated funds. Specifically, the Act provides that "[w]henever the President determines that . . . budget authority should be rescinded," he "shall transmit . . . a special message" to Congress. 2 U.S.C. § 683(a). The special message must specify such details as the amount, timeframe, and reasons for the proposed rescission of spending. *See id.* Although a rescission may be "for fiscal policy or other reasons," Congress must take affirmative action before it can take effect. *Id.* § 683(a)–(b). Crucially, "[a]ny amount of budget authority proposed to be rescinded . . . shall be made available for obligation unless, within the prescribed 45-day period, the Congress has completed action on a rescission bill rescinding all or part of the amount proposed to be rescinded." *Id.* § 683(b). The Impoundment Control Act also allows the President to "transmit . . . a special message" proposing a deferral of spending that cannot extend beyond the current fiscal year, provided that the deferral serves certain specified purposes ("to provide for contingencies," "to achieve savings," or "as specifically provided by law"). *Id.* § 684(a)–(b).

If the President does not follow the impoundment-control procedures contemplated by the Act, the Comptroller General may step in. First, if the President withholds funds without transmitting a special message, the Comptroller General "shall make a report" to Congress and "such report shall be considered a special message." 2 U.S.C. § 686(a). Second, if "budget authority is required to be made available for obligation and . . . is not," the Comptroller General may file "an explanatory statement" with Congress. *Id.* § 687. Subsequently, after "25 calendar days of continuous session of the Congress," the Comptroller General is "expressly empowered . . . to bring a civil action . . . to require such budget authority to be made available for obligation." *Id.* The Comptroller General thus serves as an enforcer of the statutory

8

scheme, which controls any efforts by the President to impound appropriated funds.

When the President acts, his power "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585.  Justice Jackson's concurrence in *Youngstown* provides an enduring "tripartite framework" for evaluating whether the President's exercise of executive power comports with the separation of powers demanded by the Constitution. *Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (citing *Youngstown*, 343 U.S. at 635–38 (Jackson, J., concurring)).

The *Youngstown* framework describes three categories of executive action, in which presidential power is positively correlated with congressional authorization and approval.  The first category addresses "[w]hen the President acts pursuant to an express or implied authorization of Congress," and notes that under those circumstances, "his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring).  "If his act is held unconstitutional under these circumstances, it usually means that the Federal Government as an undivided whole lacks power." *Id.* at 636–37.

The second category applies "[w]hen the President acts in absence of either a congressional grant or denial of authority," in which case "he can only rely upon his own independent powers." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).  Within that context, "there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." *Id.*  As such, "congressional inertia, indifference or quiescence may sometimes . . . enable, if not invite" the exercise of executive power. *Id.*

9

In the third and final category, "the President takes measures incompatible with the expressed or implied will of Congress," and consequently, "his power is at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). To justify his actions, "he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* "Courts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject." *Id.* at 637–38. "Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Id.* at 638.

Finally, Article III of the Constitution vests the "judicial Power" in the Supreme Court and the inferior federal courts ordained and established by Congress. U.S. Const. art. III, § 1. The judiciary is tasked with policing the bounds of the separation of powers when the Executive acts without apparent authority. *See, e.g.*, *Youngstown*, 343 U.S. 579; *Zivotofsky*, 576 U.S. 1. The Supreme Court has recognized that the political branches may not be left to determine those boundaries for themselves. *See United States v. Morrison*, 529 U.S. 598, 616 n.7 (2000) ("[T]he Framers adopted a written Constitution that further divided authority at the federal level so that the Constitution's provisions would not be defined solely by the political branches[.]"). It is a "permanent and indispensable feature of our constitutional system" that "the federal judiciary is supreme in the exposition of the law of the Constitution." *Miller v. Johnson*, 515 U.S. 900, 922–23 (1995) (quoting *Cooper v. Aaron*, 358 U.S. 1, 18 (1958)); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Thus, although the courts must "act with care when reviewing actions by other branches," we "may

10

not evade [our] constitutional responsibility to delineate the obligations and powers of each branch." *Halperin v. Kissinger*, 606 F.2d 1192, 1211 (D.C. Cir. 1979).

**B.**

In 1961, Congress "declare[d]" in the Foreign Assistance Act that "a principal objective of the foreign policy of the United States is the encouragement and sustained support of the people of developing countries." 22 U.S.C. § 2151(a). The Act "reaffirm[ed] the traditional humanitarian ideals of the American people and renew[ed] [the nation's] commitment to assist people in developing countries to eliminate hunger, poverty, illness, and ignorance." *Id.*

Since then, Congress has routinely appropriated funds to support those "traditional humanitarian ideals," and the United States has become the single largest aid donor in the world. Most of our country's foreign-aid funding — which until recently accounted for around one percent of the federal budget — has flowed through the Department of State and the U.S. Agency for International Development (USAID). Those agencies have awarded assistance grants or cooperative agreements to implementing partners, which then executed programs that advanced the nation's foreign-aid priorities. USAID and State Department grantees have provided life-changing assistance all over the world, funding programs that, for example, provide humanitarian assistance in refugee camps in Syria, feed nearly a million people in Khartoum, and deliver rehydration salts to toddlers in Zambia who are suffering life-threatening diarrhea.

The norms for distributing American foreign aid were upended on January 20, 2025, when President Donald J. Trump began his second term in office. On that day, President Trump issued an executive order proclaiming that "[t]he United States

11

foreign aid industry and bureaucracy are not aligned with American interests and in many cases [are] antithetical to American values." 90 Fed. Reg. at 8619. "It is the policy of [the] United States," the order continued, "that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States." *Id.* The order directed a "90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy." *Id.* (cleaned up). During those ninety days, "responsible department and agency heads" were required to "immediately pause new obligations and disbursements of development assistance funds," and "make determinations" in consultation with the Office of Management and Budget (OMB) and "with the concurrence of the Secretary of State" "on whether to continue, modify, or cease each foreign assistance program." *Id.*

Secretary of State Marco Rubio promptly issued a memorandum implementing the executive order by "paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department [of State] and USAID." Memorandum from the Sec'y of State, *Executive Order on Review of Foreign Assistance Programs*, 25 State 6828 (Jan. 24, 2025) (J.A. 132). The memorandum ordered that "the review process for proposals for new foreign assistance grants [and] contracts" be "suspend[ed]"; "no new obligations shall be made for foreign assistance"; and, "[f]or existing foreign assistance awards, contracting officers and grant officers shall immediately issue stop-work orders." *Id.* (J.A. 134–35).

Funding recipients immediately began receiving "Notice[s] of Suspension" that ordered them to "stop all work under [their] award(s)," "not incur any new costs," and "cancel

12

as many outstanding obligations as possible." *See, e.g.*, Letter from Philip Denino, Grants Officer, Dep't of State, to Guillermo Birmingham, HIAS Inc. (Jan. 24, 2025) (J.A. 268).

Executive Branch officials were candid about the nature of the "pause." The State Department's website boasted about the money "saved," announcing that "even at this early stage, over $1,000,000,000 in spending not aligned with an America First agenda has been prevented." *Prioritizing America's National Interests One Dollar at a Time*, Dep't of State (Jan. 29, 2025), https://perma.cc/TVP3-BLJK; *see also* Pls.' Mot. for TRO at 12, *Aids Vaccine Advocacy Coal. v. Dep't of State*, No. 25-cv-400 (D.D.C. Feb. 12, 2025), Dkt. No. 13 [hereinafter, AVAC TRO Mot.]. Elon Musk, who was then a special government employee with authority to cut spending, said that it was "[t]ime for [USAID] to die." Elon Musk (@elonmusk), X (Feb. 2, 2025 at 12:20 PM ET), https://perma.cc/8TAB-K2D2; *see also* AVAC TRO Mot. at 12–13. The President himself declared, referring to USAID: "CLOSE IT DOWN!" Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 7, 2025 at 9:31 AM ET), https://perma.cc/LV6L-EH5X; *see also* J.A. 384.

The grantees that brought the instant consolidated suits to challenge the Administration's actions "are all recipients of or have members who receive foreign assistance funding." Prelim. Inj. Order at 6. The grantees alleged that the President, as well as the State Department, USAID, OMB, and their directors (collectively, the "government"), improperly impounded funds that Congress appropriated for foreign-aid programs that are facilitated or run by the grantees.

The grantees brought three types of claims before the district court. The first type was statutory: The grantees argued that the government's suspension of grants and issuance of

13

stop-work orders were arbitrary, capricious, and contrary to statutory and constitutional law, in violation of the Administrative Procedure Act (APA).  Second, the grantees asserted an *ultra vires* claim that the government exceeded its statutory authority.  And the third category of claims was constitutional:  The grantees argued that the government's unilateral withholding of funds appropriated by Congress violated the separation of powers and the Take Care Clause. The grantees sought declaratory and injunctive relief.

The district court issued a temporary restraining order (TRO) in favor of the grantees, relying only on their APA claims.  *See* Order Granting in Part and Denying in Part Pls.' Mot. for TRO at 9, *Global Health Council v. Trump*, No. 25-cv-402 (D.D.C. Feb. 13, 2025), Dkt No. 21 (noting that "[t]he Court need only find that Plaintiffs are likely to succeed on one of these claims for this factor to weigh in favor of a temporary restraining order" and considering only the APA claims).  The district court concluded that the government's "blanket suspension" of funds likely was arbitrary and capricious under the APA, *id.* at 9, and thus enjoined the government from "suspending, pausing, or otherwise preventing the obligation or disbursement of . . . appropriated foreign-assistance funds" or "giving effect to terminations, suspensions, or stop-work orders in connection with . . . foreign assistance award[s]" in existence as of January 19, 2025, *id.* at 14.

The following week, the grantees informed the district court that the government had failed to comply with the TRO. The district court granted a motion to enforce the TRO, giving the government thirty-six hours to unfreeze payments for work completed prior to the TRO's issuance.  *See* Mot. to Enforce TRO Hr'g Tr. at 57–58, *Global Health Council v. Trump*, No. 25-cv-402 (D.D.C. Feb. 25, 2025), Dkt. No. 37.  The government appealed.  We dismissed the appeal for lack of

14

appellate jurisdiction.  *See Aids Vaccine Advocacy Coal. v. Dep't of State*, No. 25-5046, 2025 WL 621396 (D.C. Cir. Feb. 26, 2025).  The Supreme Court denied the government's application to vacate the district court's order.  *See Dep't of State v. Aids Vaccine Advocacy Coal.*, 145 S. Ct. 753 (2025) (mem.).

Meanwhile, the district court proceeded to consider the grantees' request for a preliminary injunction on an expedited basis, and the government completed an "individualized" assessment of foreign-aid grants.  The government's assessment led to a mass termination of foreign-aid funding: After reviewing over 13,000 awards, the government decided that all but 500 USAID awards and 2,700 State Department awards would be terminated.  Joint Status Report at 16 ¶ 3, *Global Health Council v. Trump*, No. 25-cv-402 (D.D.C. Feb. 26, 2025), Dkt. No. 42.

After considering briefing from the parties and holding a hearing, the district court entered a preliminary injunction against the government, as requested by the grantees.  Prelim. Inj. Order at 47–48.  With respect to the APA claims, the district court again concluded that the grantees were likely to succeed on the merits of their argument that the initial blanket suspension of funds was arbitrary and capricious.  *Id.* at 20–24.  The court did not, however, consider the government's subsequent "individualized review" of foreign-aid grants because that review was "a distinct . . . agency action that must be challenged as such."  *Id.* at 27.  The district court then turned to the grantees' constitutional claims.  It noted that those claims "are distinct in scope from Plaintiffs' APA claims, in that they are not premised on the initial blanket directive to suspend funds pending review or an alleged policy to mass terminate aid programs."  *Id.* at 29.  Rather, the constitutional argument "is that, irrespective of any particular agency action that may

15

be subject to APA review, Defendants are engaging in a unilateral rescission or deferral of congressionally appropriated funds in violation of Congress's spending power." *Id.*

The district court applied the *Youngstown* framework to conclude that the grantees were likely to succeed on the merits of their claim that the President had violated the separation of powers. The court determined that the President was "operating in the third category" of *Youngstown* because he had acted incompatibly with the will of Congress. Prelim. Inj. Order at 30, 32; *see also Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). Congress had expressed its will in the Appropriations Act (which "explicitly appropriated foreign aid funds for specified purposes") and in the Impoundment Control Act (which "explicitly prohibits the President from impounding appropriated funds without following certain procedures"). Prelim. Inj. Order at 30–31. Yet it was "uncontested" that the government had "not undertaken the procedures required for the impoundment of congressionally appropriated aid, whether permanent or temporary, by the Impoundment Control Act." *Id.* at 32.

The district court made a factual finding that the government had "no intent to spend" the appropriated funds, stating: "[T]he record here shows that Defendants are acting to rescind or defer the funds Congress has appropriated and have no intent to spend them." Prelim. Inj. Order at 31. That finding was supported by "multiple public" and "contemporaneous statements" by Executive Branch officials, which explained that the purpose of the pause was to "end foreign aid funding" "for policy reasons." *Id.* Notably, the government did not dispute the district court's finding about its intent. *See id.* at 32 ("When given the opportunity in these

16

proceedings, Defendants have not disputed this is their intent.").[1]

Having established that the government had not complied with applicable statutes and did not intend to spend funds appropriated by Congress, the district court considered whether the Executive Branch could justify its actions by "rely[ing] only upon [its] own constitutional powers minus any constitutional powers of Congress over the matter." Prelim. Inj. Order at 32 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). The district court acknowledged that the government had "repeatedly asserted . . . that the President has 'vast and generally unreviewable' powers in the realm of foreign affairs." *Id.* at 33. But the court determined that such assertions did not justify the impoundment of appropriated foreign-aid funds. It reasoned that "the Supreme Court has explicitly rejected" the argument that the President has exclusive power in this sphere and has instead recognized "'the congressional role in foreign affairs.'" *Id.* at 34 (quoting *Zivotofsky*, 576 U.S. at 21). The district court further reasoned that the President's assertion of power to cut off foreign aid was "weaker here than in past invocations in the foreign affairs context," because this case implicates Congress's spending power. *Id.* at 35. Thus, the district court "reject[ed]

---

[1]     When the district court asked government counsel to identify "anything in the record . . . that would suggest that there is an intention to spend the amount that's been sidelined by terminating the large majority of agreements," counsel responded that he was "not familiar with somewhere in the record that there is."  Prelim. Inj. Mot. Hr'g Tr. at 100–01, *Global Health Council v. Trump*, No. 25-cv-402 (D.D.C. Mar. 10, 2025), Dkt. No. 58.  Although the district court granted the government's request for an opportunity to "send . . . a letter after the [motion] hearing," the government did not do so.  *Id.* at 101; *see also* Prelim. Inj. Order at 32 n.13.

17

Defendants' unbridled understanding of the President's foreign policy power, which would put the Executive above Congress in an area where it is firmly established that the two branches share power, where Congress is exercising one of its core powers, and where there is no constitutional objection to the laws it has made." *Id.* at 37–38 (cleaned up).

Finally, the district court concluded that the grantees were likely to succeed on their claim that the government acted *ultra vires* because the government "do[es] not identify any authority, statutory or otherwise, that would authorize this sort of vast cancelation of congressionally appropriated aid." Prelim. Inj. Order at 38 n.18.[2]

Turning to other considerations for granting injunctive relief, the district court found that the grantees would suffer irreparable harm without an injunction and noted that the grantees' proffered evidence of harm had "gone unrebutted by" the government. Prelim. Inj. Order at 38. In particular, the court described the "ongoing" financial harms threatening "the very subsistence" of the grantees, including their being forced to default on contracts, furlough staff, and shutter some of their

---

[2]    We call *ultra vires* review "nonstatutory" (or sometimes "equitable statutory") review because the source of the reviewing court's authority is its equitable powers (rather than any specific statute, like the APA). But an *ultra vires* claim is statutory in nature because it allows for review of whether an agency's action violated a "specific prohibition in a statute." *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1776 (2025) (cleaned up). To prevail on an *ultra vires* claim, the plaintiff must show that "an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute"; no "statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review"; and no "statutory review scheme forecloses all other forms of judicial review." *Id.* (cleaned up) (emphasis in original).

18

offices. *Id.* at 41–42. The district court also concluded that the balance of the equities and the public interest favor the grantees because "there is generally no public interest in the perpetuation of unlawful agency action"; and "the harms that Plaintiffs have suffered — and will continue to suffer absent preliminary injunctive relief — are stark," including "dire humanitarian consequences" and "devastated businesses and programs across the country." *Id.* at 42–43 (cleaned up).

Tailoring "the scope of the injunctive relief" to the "claims that are likely to succeed," the court issued the following injunction:

> Defendants Marco Rubio [Secretary of State], Peter Marocco [Acting Administrator of USAID], Russell Vought [Director of OMB], the U.S. Department of State, the U.S. Agency for International Development, and the Office of Management and Budget . . . are enjoined from . . . giving effect to any terminations, suspensions, or stop-work orders issued between January 20, 2025, and February 13, 2025, for any grants, cooperative agreements, or contracts for foreign assistance. Accordingly, the Restrained Defendants shall not withhold payments or letter of credit drawdowns for work completed prior to February 13, 2025.
>
> The Restrained Defendants are enjoined from unlawfully impounding congressionally appropriated foreign aid funds and shall make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024.

19

Prelim. Inj. Order at 44, 47–48.

The government timely appealed.  We have jurisdiction under 28 U.S.C. § 1292(a)(1).

**II.**

"We review the district court's decision to grant the Plaintiffs' request for a preliminary injunction for abuse of discretion, its legal conclusions de novo, and its findings of fact for clear error." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 726 (D.C. Cir. 2022).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

**III.**

In this case, we consider how the three branches of our federal government operate within the structure created by our Constitution.  Congress exercised its Article I powers to pass legislation that mandates the spending of certain appropriated funds:  It announced the policy objective of providing humanitarian assistance to developing countries, *see* Foreign Assistance Act, 22 U.S.C. § 2151; appropriated funds to pay for that humanitarian assistance for fiscal year 2025, *see* Appropriations Act, 138 Stat. at 740–50; and created a process to ensure that the Executive would spend appropriated funds in the manner directed by Congress, *see* Impoundment Control Act, 2 U.S.C. § 682 *et seq*.

As provided by Article II, the President and the Executive Branch agencies under his leadership were required to take care that those duly enacted laws were faithfully executed.  *See* U.S.

20

Const. art. II, § 3.  When the President refused to obligate the funds appropriated by Congress in the Appropriations Act and declined to follow the procedures for deferring or rescinding that budget authority under the Impoundment Control Act, the district court was called upon to review whether the President's actions were lawful, as contemplated by Article III.  *See* U.S. Const. art. III, § 2; *see also Marbury*, 5 U.S. (1 Cranch) at 177. The district court dutifully applied well-established law and the *Youngstown* framework to identify and address a violation of the separation of powers by the President — *i.e.*, his refusal to spend funds as required by the Appropriations Act because he disagreed with Congress's policy objectives.  *See Youngstown*, 343 U.S. at 635–38 (Jackson, J., concurring); *Aiken*, 725 F.3d at 261 n.1 ("[T]he President does not have unilateral authority to refuse to spend [congressionally appropriated] funds."); *Kendall*, 37 U.S. (12 Pet.) at 613 ("[A] dispensing power . . . has no . . . support in any part of the constitution[.]").  Up until that point, this case was a shining example of how our system of checks and balances is intended to work.

But in the court of appeals, the process has broken down. My colleagues in the majority depart from the norms of impartial appellate review to reverse the district court on a ground that was not properly presented by the government. And they announce a new and sweeping constitutional rule in the President's favor:  According to the majority, the President's refusal to execute a law for policy reasons is merely a violation of the statute that he declines to follow and does not present a constitutional cause of action.  That re-framing of the case reduces the grantees' separation-of-powers argument — which targets an executive order that rescinds tens of billions of dollars of funding — to a mere violation of certain procedures in the Impoundment Control Act.  The majority rules that the only recourse for the President's wholesale withholding of foreign aid lies in the provisions of the

21

Impoundment Control Act that allow the Comptroller General to address discrete rescissions or deferrals that affect specific line-items of budget authority. My colleagues thus avoid reviewing the President's actions by denying that any constitutional issues are even in play. And yet, both the Supreme Court and our court have held that the Executive has no authority — as a constitutional matter — to decline to execute a statute (like the Appropriations Act) due to policy differences. *See Aiken*, 725 F.3d at 261 & n.1; *Kendall*, 37 U.S. (12 Pet.) at 613. It is our responsibility to check the President when he violates the law and exceeds his constitutional authority. We fail to do that here.

Three disparate sets of legal arguments and analyses are now at issue in this case, and laying them out will help to illustrate how we got to this place.

The first set of arguments are the separation-of-powers claims that were asserted by the grantees and analyzed by the district court. The district court held that the President's refusal to obligate foreign-aid funds appropriated by Congress likely violated the separation of powers. The district court applied the *Youngstown* tripartite framework, determined that the President's impoundment of appropriated funds was not supported by statutes or the Constitution, and rejected the President's assertion of "'vast and generally unreviewable' powers in the realm of foreign affairs." Prelim. Inj. Order at 33. That ruling was the sole basis for the district court's determination that the grantees were likely to succeed on the merits and therefore were entitled to a preliminary injunction that required the government to obligate the funds appropriated by Congress.

The second set of arguments are the ones made by the government on appeal. Although the government seeks to

22

overturn the district court's preliminary-injunction order, it does not challenge the constitutional ruling that justified the preliminary injunction. Instead, in its brief on appeal, the government makes a series of arguments that are best described as baffling: The government claims that the grantees have no *statutory* cause of action to challenge the President's failure to spend the appropriated funds. In other words, the government appears to believe that this case turns on whether the Executive violated the Appropriations Act and the Impoundment Control Act, and whether the grantees have private rights of action to enforce those statutes under the APA. That misunderstanding of the pertinent issues causes the government to make arguments that are irrelevant to the district court's reasoning underlying the issuance of the preliminary injunction.

And finally, my colleagues in the majority go in a third direction. They conclude that the grantees do not state a *constitutional* cause of action and merely allege a statutory violation of the Impoundment Control Act. They hold that the Supreme Court's opinion in *Dalton v. Specter*, 511 U.S. 462 (1994), precludes the grantees from transforming their statutory claim into a constitutional one. Relying on that theory of the case, my colleagues "vacate the part of the district court's preliminary injunction involving impoundment." Maj. Op. 5.

I cannot agree with my colleagues' approach. Our job as an appellate tribunal is to review the record in this case and the preliminary-injunction order, based on the arguments properly raised by the parties. Because the government's opening brief did not challenge the district court's ruling on the separation of powers, which is the sole basis for the preliminary injunction, we should simply affirm the district court's conclusion that the grantees are likely to succeed on the merits. My colleagues, however, go out of their way to reach a different constitutional issue that the government discussed in a scant three paragraphs

23

of its reply brief: The majority holds that the President's refusal to execute a duly enacted law is merely a violation of that law, which does not raise a judicially reviewable constitutional issue. Maj. Op. 16, 18–24. That highly consequential holding ignores the line of cases that reject the existence of a presidential "dispensing power" — *i.e.*, a power that allows the President to pick and choose the statutes that he will execute. *See Aiken*, 725 F.3d at 261 & n.1; *Kendall*, 37 U.S. (12 Pet.) at 613. The majority's analysis also misreads the case on which it relies, *Dalton v. Specter*, and creates a split with the Ninth Circuit over the proper interpretation of that precedent. *See Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023) (holding that the President's violation of a statute "will be considered constitutional" if "the President's action lacked both statutory authority and background constitutional authority" (cleaned up)). And finally, the majority glosses over the government's claim before the district court that the President possesses "'vast and generally unreviewable' powers in the realm of foreign affairs" that allow him to impound funds appropriated by Congress for foreign aid. Maj. Op. 20; *see also* Prelim. Inj. Order at 33. The President's reliance on constitutional — not only statutory — authority to defy Congress clearly takes this case out of the narrow confines of the Impoundment Control Act and straight into the *Youngstown* framework.

Because the majority's unprecedented constitutional ruling is procedurally and substantively flawed, I respectfully dissent.

## A.

My colleagues in the majority decide this case on a ground that was clearly and obviously forfeited by the government. The majority holds that the grantees' claim that the Executive

24

unlawfully withheld appropriated funds amounts to a mere statutory violation of the Impoundment Control Act. Maj. Op. 25–29. Relying on *Dalton v. Specter*, the majority holds that the grantees may not turn that statutory violation into a constitutional cause of action. Maj. Op. 18–24. But that argument was not raised in the government's opening brief and therefore is not properly before us. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("A party forfeits an argument by failing to raise it in his opening brief.").

The government's opening brief made no constitutional arguments at all — it neither challenged the district court's primary ruling on the separation of powers, nor asserted that the grantees had failed to state a constitutional cause of action, even though that latter claim was considered and rejected by the district court in the opinion under review. *See* Prelim. Inj. Order at 37 n.17. Indeed, the government cited neither *Youngstown* nor *Dalton* in its opening brief.[3] Thus, under our caselaw, any claim based on *Youngstown* or *Dalton* is forfeited. *See World Wide Mins., Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1160 (D.C. Cir. 2002) ("As we have said many times before, a party waives its right to challenge a ruling of the district court if it fails to make that challenge in its opening

---

[3]    The government's opening brief argues that the grantees "may not enforce" the Appropriations Act or the Impoundment Control Act because "those statutes do not confer any rights on [the grantees] that may be enforced *through an APA suit*." Gov't Br. 27 (emphasis added). The government further argues that "[e]ven if plaintiffs had a basis to seek judicial enforcement of" those statutes, "the district court's mandatory preliminary injunction is unsupported by [the] statute[s]." Gov't Br. 35. Finally, the government calls for constitutional avoidance in interpreting the Appropriations Act and the Impoundment Control Act, arguing that "any ambiguity" in the statutes "should be read to preserve the Executive Branch['s] discretion in the sphere of foreign affairs." Gov't Br. 47.

25

brief."). And we normally will not address a forfeited claim absent "exceptional circumstances" where "errors . . . seriously affect the fairness, integrity, or public reputation of judicial proceedings." *U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 497 (D.C. Cir. 2004) (cleaned up). Here, the government's "failure to pursue one of several available lines of argument is hardly an 'error' of the sort that would warrant exercising our narrowly circumscribed remedial authority." *Id.*

Under "the principle of party presentation . . . we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, 590 U.S. 371, 371–72 (2020) (cleaned up). We have repeatedly explained why we adhere to the rule of party presentation and generally refuse to consider forfeited claims. "The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983). "Considering an argument advanced for the first time in a reply brief, then, is not only unfair to an appellee, but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered." *McBride v. Merrell Dow & Pharms.*, 800 F.2d 1208, 1210–11 (D.C. Cir. 1986) (cleaned up). Moreover, "[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment). Thus, "courts normally are not available to relieve parties from the operation of their own litigation strategies," such as a decision to pursue one legal theory over another. *Conax Fla. Corp. v. United States*, 824 F.2d 1124, 1132 (D.C. Cir. 1987). Applying those principles, we have said that when a party "fail[s] to

26

advance any reasons in [its] opening brief why [the] judgment should be reversed," we "ordinarily will refuse to disturb [the] judgment[]." *McBride*, 800 F.2d at 1210. That is the proper course of action here, where the government has raised no complaints at all about the district court's central ruling on the separation of powers.

Of course, our application of the forfeiture rule is not ironclad, and it is not difficult to find one or two exceptions that, when stretched, might arguably support a court's decision to reach a forfeited issue. That is what the majority does here. But I question the wisdom of making an exception in a case such as this one. The party presentation principle preserves the court's role as a neutral arbiter. *See Greenlaw v. United States*, 554 U.S. 237, 244 (2008) ("Courts do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties." (cleaned up)). We must apply the forfeiture rule consistently to safeguard the public's faith in the court's impartiality. Bending a generally applicable rule to benefit a particular party makes us vulnerable to charges of favoritism and bias. *Cf. Texas v. United States*, 798 F.3d 1108, 1114 (D.C. Cir. 2015) ("Rules are rules, and basic fairness requires that they be applied evenhandedly to all litigants."). That is especially so when the case before the court involves the President of the United States and the court chooses to announce a new constitutional ruling that favors him, even though that constitutional theory was not urged by the government's representatives in court.

My colleagues acknowledge the government's failure to raise *Dalton* and concede that the "oversight is hard to understand." Maj. Op. 16. Yet, they nevertheless reach the *Dalton* argument, stating that the constitutional cause-of-action issue is "not forfeit" because the government's "entire opening

27

brief proceeds from the premise that this dispute raises a statutory claim — and therefore by implication not a constitutional one, despite the district court's characterization otherwise — which is in effect the *Dalton* argument that the government advanced below." *Id.* at 16–17. That convoluted logic takes a far more permissive view of issue preservation than our precedents allow. We routinely refuse to "put flesh on [the] bones" of arguments raised "only in the most skeletal way," *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019), and certainly do not *sua sponte* supply arguments that experienced lawyers have chosen not to pursue, *see Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace."); *Larson v. Navy*, 525 F.3d 1, 5 (D.C. Cir. 2008) ("We decline to revive this case by reading into [the party's papers] an argument not adequately presented.").

To make an exception in this case, the majority misapplies narrow rulings in *United States v. Hillie*, 39 F.4th 674 (D.C. Cir. 2022), and *U.S. National Bank of Oregon v. Independent Insurance Agents of America, Inc.*, 508 U.S. 439 (1993). Those cases do not support consideration of a forfeited argument that is not antecedent to the issues raised by the appellant. *See Hillie*, 39 F.4th at 681–84 (court asked to construe statute must consider caselaw "as to how to construe the same or similar phrasing," even if not cited by the parties); *Nat'l Bank*, 508 U.S. at 447 (court asked to construe statute could answer "antecedent . . . and ultimately dispositive" question of whether statute remained in force (cleaned up)). The majority asserts that the *Dalton* issue is antecedent to determining the scope of the cause of action that "the *grantees* seek." Maj. Op. 17 (emphasis added). But this is the *government's* appeal. Here, the government argues that the grantees could not enforce the Appropriations Act and the Impoundment Control Act through

28

an APA suit.  Whether the district court properly ruled on whether the grantees have a constitutional cause of action is in no way "antecedent . . . and ultimately dispositive" of the statutory issue raised by *the appellants* in this case.  *Nat'l Bank*, 508 U.S. at 447 (cleaned up).  In any event, the rule that "a party cannot forfeit or waive recourse to a relevant case just by failing to cite it" kicks in only "*once an argument is before us*." *Hillie*, 39 F.4th at 684 (emphasis added).  Likewise, only "*when an issue or claim is properly before the court*" does it follow that "the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."  *Nat'l Bank*, 508 U.S. at 446 (cleaned up) (emphasis added).  The cited cases are inapplicable here because the government did not put the *Dalton* argument "properly before" us.  Precedents do not allow a court to revise the litigation strategy of a party and to provide that party with a better argument that allows it to win the case.  I therefore disagree with the majority's decision to forgive the government's poor litigation choices and to award the President a big win on an issue that the government's lawyers did not mention in their primary brief.[4]

---

[4]    My colleagues also address two "alternative cause[s] of action": a contrary-to-law claim under the ICA and the APA, and an *ultra vires* claim, which is not raised in the government's opening brief.  Maj. Op. 25–31.  It is unclear why they do so, as their holding that the grantees have no constitutional cause of action should result in dismissal of the constitutional claim, and any merits arguments that have no connection to the separation-of-powers analysis are irrelevant to the court's granting of the preliminary injunction.  For those reasons, the majority's analysis of those issues is dicta.  *See In re Grand Jury Investigation*, 916 F.3d 1047, 1053 (D.C. Cir. 2019) ("[A] statement not necessary to a court's holding is dictum.");

29

**B.**

**1.**

In my view, the grantees clearly state a justiciable constitutional claim — a violation of the separation of powers. It is settled law that private parties can sue to enjoin government officials from violating the Constitution, including under a "separation-of-powers claim." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (collecting cases). And because "the separation of powers is designed to preserve the liberty of all the people[,] . . . whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *see also Bond v. United States*, 564 U.S. 211, 223 (2011) ("If the constitutional structure of our Government that protects individual liberty is compromised, individuals who suffer otherwise justiciable injury may object."); *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (stating that "the

---

*Melcher v. Fed. Open Market Comm.*, 836 F.2d 561, 565–66 (D.C. Cir. 1987) (Edwards, J., concurring) ("These concluding dicta allude unnecessarily to monumental questions not before this court."). The fact that the district court ruled on the *ultra vires* issue does not affect the analysis, *see* Maj. Op. 15 n.6, because that was not the basis of the preliminary injunction. In any event, the majority leaves open the grantees' APA claims based on the Appropriations Act. *See* Maj. Op. 29 n.17. The grantees therefore are free to pursue that claim on remand. Moreover, the majority's discussion of the grantees' *ultra vires* claim addresses only the ICA. Maj. Op. 31.

30

President's actions may . . . be reviewed for constitutionality").[5]

The facts found by the district court support the grantees' separation-of-powers claim. The district court found that the President withheld billions of dollars in appropriated foreign-aid funding for policy reasons and that he had no intention of ever spending the funds. In addition, the district court found that the President had "not undertaken the procedures required for the impoundment of congressionally appropriated aid" under the Impoundment Control Act. Prelim. Inj. Order at 32. Moreover, as a legal matter, the district court rejected the

---

[5]    My colleagues attempt to distinguish *Free Enterprise* and *Collins* by pointing out that those cases involved challenges to the constitutionality of statutes. Maj. Op. 18–19. They also dismiss *Aiken* and *Kendall* because those cases involved petitions for a writ of mandamus. *Id.* at 22 & n.13. But my colleagues do not explain why those distinctions should make any difference. In rejecting the government's assertion in *Free Enterprise* that "petitioners have not pointed to any case in which this Court has recognized an implied private right of action directly under the Constitution to challenge governmental action under the Appointments Clause or separation-of-powers principles," the Supreme Court recognized the existence of "such a right to relief as a general matter, without regard to the particular constitutional provisions at issue here."  561 U.S. at 487 n.2 (citing *Corr. Serv. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (equitable relief "has long been recognized as the proper means for preventing entities from acting unconstitutionally"); *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution"); *Ex parte Young*, 209 U.S. 123, 149, 165, 167 (1908)). The majority's attempt to throw up barriers is out of step with the broader view of the justiciability of constitutional claims "as a general matter" that was adopted by the Supreme Court in *Free Enterprise*.  561 U.S. at 487 n.2.

31

government's assertion that the President has "'vast and generally unreviewable' power to impound congressionally appropriated aid . . . in the foreign affairs context." *Id.* at 35. The district court thus established that the President acted without statutory or constitutional authority when he withheld the appropriated foreign-aid funds.

The power that the President attempted to assert — a general entitlement to disobey duly enacted laws for policy reasons — is also known as "dispensing power." *See Kendall*, 37 U.S. (12 Pet.) at 613. It is uncontroversial that such a presidential power does not exist. *See id.* ("[A] dispensing power . . . has no . . . support in any part of the constitution[.]"); *Matthews v. Zane's Lessee*, 9 U.S. (5 Cranch) 92, 98 (1809) (Marshall, C.J.) ("The president cannot dispense with the law, nor suspend its operation."); *Nat'l Treasury Emps. Union*, 492 F.2d at 604 ("That constitutional duty" "to 'take Care that the Laws be faithfully executed'" "does not permit the President to refrain from executing laws duly enacted by the Congress as those laws are construed by the judiciary." (quoting U.S. Const. art. II, § 3)). Both the Supreme Court and our court have framed the analysis of that issue in constitutional terms, and have done so in the context of the impoundment of appropriated funds. *See Kendall*, 37 U.S. (12 Pet.) at 612–13 (rejecting the suggestion of a "dispensing power" and compelling the Postmaster General "to pay . . . the amount of the award" ordered by Congress); *Aiken*, 725 F.3d at 261 n.1 ("[E]ven the President does not have unilateral authority to refuse to spend the" "full amount appropriated by Congress.").[6]

---

[6]     *See also Train v. City of New York*, 420 U.S. 35 (1975) (striking down President Nixon's claimed authority to withhold funds); *Clinton*, 524 U.S. at 468 (Scalia, J., concurring in part and dissenting in part) (concluding that *Train* "proved [President Nixon] wrong" in his claim to a "constitutional right to impound appropriated funds" (cleaned up)).

32

Thus, *Aiken* and *Kendall* demonstrate that a decision by the Executive Branch to refrain from enforcing a statute — including an appropriations law — presents a constitutional issue subject to judicial review.

In *Aiken*, we considered the Nuclear Energy Commission's failure to comply with a provision of the Nuclear Waste Policy Act that required the agency to "issue a final decision approving or disapproving" an application to store nuclear waste at Yucca Mountain. 725 F.3d at 257 (quoting 42 U.S.C. § 10134(d)). Although Congress had appropriated funds to allow the Commission to consider the license application, the Commission missed the statutory deadline to issue its decision and admitted that it had "no current intention of complying with the law." *Id.* at 258. Individuals who lived in states where nuclear waste was stored were among the petitioners who sought a writ of mandamus requiring the Commission to obey the statutory mandate. In an opinion by then-Judge Kavanaugh, the court applied the following "bedrock principles of constitutional law": (1) "[T]he President must follow statutory *mandates* so long as there is appropriated money available and the President has no constitutional objection to the statute," and (2) "the President may not decline to follow a statutory mandate or prohibition simply because of policy objections." *Id*. at 259 (emphasis in original); *see also Union Pac. R.R. Co. v. Pipeline & Hazardous Materials Safety Admin.*, 953 F.3d 86, 93 (D.C. Cir. 2020) (Henderson, J., dissenting) ("[F]ederal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreements with Congress." (quoting *Aiken*, 725 F.3d at 260)). Noting that the Executive had no constitutional objection to the statute in question and that the statute did not leave room for any exercise of prosecutorial discretion, the court concluded that the Commission was "simply defying a law enacted by Congress," and "doing so without any legal

33

basis." *Aiken*, 756 F.3d at 261–66.  The court observed that the case had "serious implications for our constitutional structure," and granted the mandamus petition in recognition of "the constitutional authority of Congress and the respect that the Executive and the Judiciary properly owe to Congress."  *Id.* at 267.

In *Kendall*, the Supreme Court rejected the notion of a presidential dispensing power in the specific context of spending appropriated funds.  There, a new Postmaster General had "re-examined the contracts entered into with his predecessor . . . and directed that the allowances and credits should be withdrawn."  37 U.S. (12 Pet.) at 608.  In response, Congress passed a law directing the settlement and payment of the claims.  When the Postmaster General still "refuse[d] and neglect[ed]" to pay part of the sum, affected postal contractors sued to compel payment.  *Id.* at 609.  In defense of his actions, the Postmaster General argued that he was "subject to the direction and control of the President, with respect to the execution of the duty imposed upon him by this law," and that "this right of the President [grew] out of the obligation imposed upon him by the constitution[] to take care that the laws be faithfully executed."  *Id.* at 612–13.  The Supreme Court declined to "cloth[e] the President with" such "a power entirely to control the legislation of congress."  *Id.* at 613.  It said:  "To contend that the obligation imposed on the President to see the laws faithfully executed implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible."  *Id.*

Like in *Aiken* and *Kendall*, the President's refusal to implement the Appropriations Act here creates a conflict between the Legislative Branch and the Executive Branch of constitutional dimensions.  Just as the Executive's refusal to execute the Nuclear Waste Policy Act in *Aiken* had "serious

34

implications for our constitutional structure," 725 F.3d at 267, so too does the President's refusal to execute the Appropriations Act.  In this case, the President decided that he would not spend statutorily appropriated funds because that would not align with his policy preferences.  *See* 90 Fed. Reg. at 8619.  We held in *Aiken* that this is impermissible.  We should do the same here.  *See Aiken*, 725 F.3d at 260 ("[T]he President and federal agencies may not ignore statutory mandates or prohibitions," including congressional appropriations, "merely because of policy disagreement with Congress.").

**2.**

My colleagues in the majority hold that we cannot review the separation-of-powers violation alleged by the grantees because there is no "cause of action" or procedural vehicle to bring it before the court.  Maj. Op. 18–24.  They characterize the grantees' challenge to the President's impoundment of funds as a statutory argument that the President violated the Appropriations Act and Impoundment Control Act; and they determine that *Dalton* forecloses the grantees from transforming that statutory claim into a judicially reviewable constitutional violation.  But the majority offers no persuasive support for its "no-cause-of-action" legal theory, and that theory is inapposite because the President relied on his constitutional authority over foreign affairs to justify the impoundment of funds, which makes *Youngstown* the correct analytical framework.

**i.**

The linchpin of the majority's legal analysis is the Supreme Court's opinion in *Dalton v. Specter*, but the majority misreads the holding in that case.  Maj. Op. 16 ("Here, the grantees assert a non-statutory right to vindicate separation-of-

35

powers principles but they are foreclosed from doing so by
*Dalton v. Specter*, 511 U.S. 462 (1994).").  Although *Dalton*
did reject the proposition that "*whenever* the President acts in
excess of his statutory authority, he also violates the
constitutional separation-of-powers doctrine," *id*. at 18
(emphasis added) (quoting *Dalton*, 511 U.S. at 471), it did not
hold that such an *ultra vires* action by a President can *never* be
a constitutional violation.  In other words, just because the
Court determined that not all such claims implicate the
Constitution, that does not mean that none of them ever do.

The relevant portion of *Dalton* soundly refutes an
argument advanced by a circuit court: that "every action by the
President, or by another executive official, in excess of his
statutory authority is *ipso facto* in violation of the
Constitution."  511 U.S. at 472.  The Court reasoned that the
two types of claims are distinct, citing its cases that "often
distinguished between claims of constitutional violations and
claims that an official has acted in excess of his statutory
authority." *Id*. (collecting cases).  Significantly, the Court also
noted that it had recognized in *Franklin v. Massachusetts* that
"[p]residential decisions are reviewable for constitutionality,"
*Dalton*, 511 U.S. at 471, but it was concerned that "if every
claim alleging that the President exceeded his statutory
authority were considered a constitutional claim, the exception
identified in *Franklin* would be broadened beyond
recognition," *id.* at 474.  That statement shows that the Court
did not mean to preclude constitutional review of *all*
presidential actions that exceed statutory authority — it just did
not want to unduly broaden the exception that permits such
review.

My colleagues' view is that *Dalton* forecloses any attempt
to "assert a non-statutory right to vindicate separation-of-
powers principles."  Maj. Op. 16.  They say that the grantees

36

"may not bring a freestanding constitutional claim if the underlying alleged violation and claimed authority are statutory." *Id.* at 5. But they support that interpretation only with a comment that "plaintiffs would otherwise be able to avoid statutory limits on review by reframing any alleged statutory violation by the President as a constitutional one." *Id.* at 18. Their suggestion that it should not be too easy for plaintiffs to bring constitutional claims does not necessitate barring *all* such claims. Moreover, they do not grapple with the implications of their interpretation. As the Ninth Circuit has recognized, it "cannot be right . . . that as long as an official identifies some statutory authorization for his actions, doing so makes any challenge to those actions statutory and precludes constitutional review." *Sierra Club v. Trump*, 929 F.3d 670, 697 (9th Cir. 2019).[7]

The majority's interpretation of *Dalton* creates a circuit split. In *Murphy Co. v. Biden*, the Ninth Circuit held that, under *Dalton*, "a challenge to presidential action will be considered constitutional, and therefore justiciable under *Franklin*, so long as a plaintiff claims that the President has violat[ed] . . . constitutional separation of powers principles because the President's action [would] lack[] both statutory authority and background constitutional authority." 65 F.4th at 1130 (cleaned up). That court read *Dalton* to hold that "[w]hile an action taken by the President in excess of his statutory authority

---

[7]    My colleagues suggest that their interpretation of *Dalton* will not "insulate large swaths of presidential action from judicial review" because APA challenges and *ultra vires* review remain available. Maj. Op. 23 n.14. But those causes of action are not sufficient to address sweeping executive action. To take an extreme example: What if the President announced that he would stop enforcing all statutes? Under the majority's approach, that would not be a violation of the Take Care Clause but would instead constitute thousands of violations of individual statutes.

37

does not necessarily violate the Constitution, specific allegations regarding separation of powers may suffice." *Id.* (cleaned up); *accord City of Chicago v. Barr*, 961 F.3d 882, 931 (7th Cir. 2020) (not interpreting *Dalton* but holding that the Attorney General's decision to attach conditions to grants "exceeded the authority delegated by Congress in the" relevant statutes *and* "violated the constitutional separation of powers"). Thus, the majority's interpretation of *Dalton* finds little support in the case itself, in the majority's analysis of it, or in the decisions of sister circuits that considered the same issue and came to a different conclusion.

I also disagree with the majority's suggestion that the grantees assert a mere violation of the Impoundment Control Act. *See* Maj. Op. 5. In this case, the President's violation of the Impoundment Control Act is a sideshow. That statute provided a mechanism for the President to lawfully attempt to impound the funds, and his failure to follow its prescribed procedures is evidence that he was, in fact, refusing to obligate the funds in defiance of Congress. But the crux of the separation-of-powers problem is the President's refusal to comply with the Appropriations Act for policy reasons — that was an impingement on Congress's authority under the Spending Clause and the Appropriations Clause, and also violated the Take Care Clause.

The Impoundment Control Act is not meant to cover such a challenge. Under that statute, the President cannot withhold funds without transmitting a special message to Congress that "specif[ies]" things like "the amount of the budget authority proposed to be" rescinded or deferred, and "any account, department, or establishment of the Government to which such budget authority is available for obligation, and the specific project or governmental functions involved." 2 U.S.C. § 683(a); *see also id.* § 684(a). If the President withholds funds

38

without transmitting such a special message, then the Comptroller General "shall make a report" to Congress that includes "any available information concerning" the withholding. *Id.* § 686. And if funds are required to be obligated but are not, the Comptroller General may file "an explanatory statement" with Congress and, after twenty-five days, "bring a civil action" to compel obligation. *Id.* § 687. Those procedures are intended to address discrete rescission or deferral requests affecting specific line-items of budget authority.[8] They are ill-suited to address an executive order that wipes out all "United States foreign assistance," representing tens of billions of dollars and thousands of individual programs. 90 Fed. Reg. at 8619. Moreover, Congress did not intend for those procedures to displace or preclude a constitutional cause of action. *See* 2 U.S.C. § 681(3) ("Nothing in this Act . . . shall be construed as" "affecting in any way the claims or defenses of any party to litigation concerning any impoundment."); *see also* S. Rep. No. 93-688, at 74 (1974) ("The authority of the Comptroller General is not intended to infringe upon the right of any member of Congress, or any other party, to initiate litigation." Rather, the aim is to

---

[8]     *See, e.g.*, *Review of the President's Special Message of June 3, 2025*, B-337581, 2024 WL 1714236 (Comp. Gen. June 17, 2025) (reviewing a special message that proposes rescissions from twenty-two appropriations accounts, including, for example, $168,837,230 from the Department of State's "Contributions to International Organizations"); *Impoundment of the Advanced Research Projects Agency-Energy Appropriation Resulting from Legislative Proposals in the President's Budget Request for Fiscal Year 2018*, B-329092, 2017 WL 6335684 (Comp. Gen. Dec. 12, 2017) (informing Congress of the Department of Energy's initial withholding but subsequent release of $91 million of the Advanced Research Projects Agency-Energy appropriation in fiscal year 2017).

39

allow "congressional action independent of resources provided by the Department of Justice.").

In sum, the majority errs in characterizing the grantees' claim as merely statutory and in applying *Dalton* to deny the grantees a constitutional cause of action.

**ii.**

My colleagues' application of *Dalton* is premised on their determination that the President's withholding of foreign-aid funds presents a "fundamentally statutory dispute." Maj. Op. 5. That premise is incorrect. Before the district court, the government defended the President's actions by arguing that he had "vast and generally unreviewable powers" "in the realm of foreign affairs" under "Article II of the Constitution." Defs.' Opp'n to Pls.' Mot. for Prelim. Relief at 23–26. Thus, the issue before us is the legality of the President's assertion of his Article II powers over foreign affairs to impound foreign-aid appropriations. And that means this case is not a "statutory dispute" but a constitutional one, which the district court properly analyzed under the tripartite framework of *Youngstown*.

The record on review plainly shows that this case is more than just a "statutory dispute." In the executive order pausing foreign-aid funding, the President relied on his authority under "*the Constitution* and the laws of the United States of America." 90 Fed. Reg. at 8619 (emphasis added). Before the district court, the government argued that the grantees' "separation of powers claims . . . fail because the President's powers in the realm of foreign affairs are vast and generally unreviewable." Defs.' Opp'n to Pls.' Mot. for Prelim. Relief at 24 (cleaned up). It identified Article II as the source of the President's power, asserting: "Under Article II of the Constitution . . . , the President has broad authority to attend to

40

the foreign affairs of the nation, including by determining how foreign aid funds are used." *Id.* The district court ultimately determined that the President's foreign affairs powers under Article II were insufficient to justify his actions "in an area where it is firmly established that the two branches share power." Prelim. Inj. Order at 37–38 (cleaned up).

My colleagues make two errors in concluding that the issues before us are statutory and not constitutional: First, they allow the government to change its position on appeal to disclaim any reliance on the President's Article II powers; and second, they misunderstand the relevance of the President's statutory violations in applying *Youngstown*'s constitutional framework.

The majority's characterization of this case as "fundamentally statutory" depends on the government's representation at oral argument that it is "not relying on any constitutional authority . . . to justify" the President's withholding of foreign-aid funds. Oral Arg. Tr. 18–19; *see also id.* at 14 (arguing it has "not advanced in this appeal any sort of freestanding constitutional argument that the executive doesn't have to spend the funds if the statutes require the executive to spend the funds"). That representation, of course, is a sharp break from what the government argued in the district court. Because we are reviewing the district court's ruling, which was based on what the government argued in the court below, the government may not change its position on appeal. *See Baldi v. Ambrogi*, 89 F.2d 845, 846 (D.C. Cir. 1937) ("Nothing is better settled than the rule that one may not try a case upon one theory and then reverse the judgment against him in the appellate court upon another and inconsistent theory which is not presented, urged, or tried in the court below."). Indeed, we have held that a litigant's "obvious about-face render[s] its claims forfeited." *Del. Dep't of Nat. Res. & Env't*

41

*Control v. EPA*, 895 F.3d 90, 96 (D.C. Cir. 2018); *see also id.* ("A petitioner may not take a position in this court opposite from that which it took below . . . ." (cleaned up)). My colleagues thus err in accepting without question the government's abrupt change in tactics, which appears to be motivated by its preference to avoid appellate review of the separation-of-powers issue.

My colleagues also are mistaken in their apparent belief that if the President asserts both constitutional and statutory authority to validate his conduct, the court may characterize the whole dispute as statutory. *See* Maj. Op. 20. They acknowledge that the government previously relied on the President's Article II powers to impound the funds in question, but they note that (1) the executive order referenced "the Constitution *and the laws of the United States of America*," (2) the government raised a *Dalton* argument claiming the dispute was "purely statutory," and (3) the government claimed that it did not exceed its statutory authority or violate any statutes. *Id.* (emphasis in original). That reasoning betrays a misunderstanding of how statutory arguments fit within *Youngstown*'s constitutional framework.

In applying *Youngstown*, the district court engaged in a multistep analysis in which statutory and constitutional issues were intertwined. First, the district court determined that the President had no statutory authority for his actions because he defied the Appropriations Act and did not follow the procedures required by the Impoundment Control Act. With no support from any statute, the President had to rely on constitutional authority alone. *See Youngstown*, 343 U.S. at 585 ("The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself."). The district court noted that the President's actions placed him in the "third category" of *Youngstown*'s tripartite

42

framework because he took "measures incompatible with the . . . will of Congress," as demonstrated by his defiance of the statutes that Congress had enacted. Prelim. Inj. Order at 30 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). The Executive's power was thus "at its lowest ebb." *Id.* (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). In that posture, the President could prevail only if his own constitutional powers over the matter were exclusive. *See id.* at 32 ("Defendants' actions must be 'scrutinized with caution,' and they 'can rely only upon [the President's] own constitutional powers minus any constitutional powers of Congress over the matter.'" (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring))). The constitutional authority asserted by the government was the President's "foreign affairs" power under a "general Article II responsibility to serve as the Executive and take care that the laws be faithfully executed." *Id.* at 32. But, the district court explained, "settled, bedrock principles of constitutional law" prohibit the President from "disregard[ing] a statutory mandate to spend funds simply because of policy objections"; and "the Supreme Court has explicitly rejected" any "unbounded [Executive] power" in the realm of foreign affairs, "where it is firmly established that the two branches share power." *Id.* at 33–34, 37 (cleaned up). Thus, the court concluded that the grantees were likely to succeed on their claim that the President violated the separation of powers.

The district court's chain of reasoning demonstrates that although statutory issues were integral to the analysis, that does not mean that the dispute was not constitutional. Rather, when determining whether the Executive's exercise of authority comports with the separation of powers under *Youngstown*, a court is *required* to examine and apply relevant statutes. *See Youngstown*, 343 U.S. at 635 (Jackson, J., concurring) (beginning the constitutional analysis with determining

43

whether the President "acts pursuant to an express or implied authorization of Congress").[9]  Thus, the majority's application of *Dalton* rests on a mistaken assumption that this case raises only a "fundamentally statutory dispute."  Maj. Op. 5.

In sum, the government undeniably asserted constitutional authority for the President's actions, and this case thus "necessarily turn[s] on whether the Constitution authorized [those] actions."  *Dalton*, 511 U.S. at 473.  It follows that, even under the majority's interpretation of *Dalton*, the grantees may bring a constitutional cause of action here.

## IV.

My review of the district court's preliminary-injunction order has focused primarily on the district court's determination that the grantees were likely to succeed on the merits of their claims.  As discussed, I would summarily affirm that aspect of the preliminary-injunction order because the government failed to challenge the district court's ruling on the separation of powers, which was the basis of the order's analysis of the merits.  *See World Wide Mins.*, 296 F.3d at 1160.  I also would affirm the district court's findings regarding irreparable harm, as well as its weighing of equitable factors and the public interest.  *See Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish that he is likely

---

[9]    The majority attempts to distinguish *Youngstown* on the ground that the President in that case did not assert statutory authority for his actions.  *See Youngstown*, 343 U.S. at 585 ("[W]e do not understand the Government to rely on statutory authorization for this seizure.").  But the point is that when the President's actions are unsupported by statutory authority, "his power is at its lowest ebb."  *Id.* at 637 (Jackson, J., concurring).  Whether that statutory authority is absent because he violated statutes or because he declined to rely on statutes makes no difference.

44

to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.").

The government does not dispute that the grantees have shown harm that is "'both certain and great,' as well as 'actual and not theoretical,'" as the district court found. Prelim. Inj. Order at 42 (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). Indeed, the grantees undeniably have suffered harm from the slashing of their budgets, resulting in large-scale layoffs, shuttered program offices, and deferred payments to vendors. And the effects of the funding freeze have rippled around the world, devastating the grantees' aid programs and the people that they serve. Nevertheless, my colleagues speculate that "it stands to reason that existential financial harm would already have taken place by the time that the grantees would finally receive unobligated funds for which they first had to compete," and notes that "[t]he record is simply less developed about . . . why being denied immediate relief as to that opportunity [to compete for impounded funds] would cause harm the grantees would not suffer anyway." Maj. Op. 32. In my view, my colleagues' understanding of irreparable harm demands an unduly stringent showing from the grantees. As my colleagues acknowledge, we have held that a lost opportunity to receive funding is a cognizable injury. *Cf. CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989) ("[A] plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* . . . even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity." (emphases in original)). Because the government's failure to obligate the appropriated funds denies the grantees any chance of obtaining critical grants before the funding lapses at the end of the fiscal

45

year, there is a sufficient causal connection between the relief requested and the very real harm suffered by the grantees.

The remaining factors — the balance of equities and the public interest — "merge when, as here, the Government is the opposing party." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (cleaned up). Those factors strongly favor the grantees because "there is a substantial public interest in having" the government "abide by the federal laws." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 13 (D.C. Cir. 2016) (cleaned up). That is particularly true when it is likely that the Executive has violated the separation of powers. Contrary to the majority's suggestion, that is not an injury "on behalf of the Congress." Maj. Op. 33. "The structural principles secured by the separation of powers protect" not only Congress and the President, but "the individual as well." *Bond*, 564 U.S. at 222. As the Supreme Court has recognized, "the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty." *Mistretta*, 488 U.S. at 380. It is undeniably in the public interest to respect and enforce this separation of powers — a "basic and vital" feature of our system of government. *Springer*, 277 U.S. at 201; *see also Clinton*, 524 U.S. at 450 (Kennedy, J., concurring) ("Liberty is always at stake when one or more of the branches seek to transgress the separation of powers."); *Youngstown*, 343 U.S. at 629 (Douglas, J., concurring) ("The doctrine of the separation of powers was adopted . . . to preclude the exercise of arbitrary power. The purpose was . . . to save the people from autocracy." (cleaned up)).

46

For the foregoing reasons, I would affirm the preliminary-injunction order to the extent it is no broader than necessary to afford complete relief to the grantees.[10]

\*     \*     \*

In 2013, when a government agency "simply def[ied] a law enacted by Congress . . . without any legal basis," we recognized that the case had "serious implications for our constitutional structure," and granted a mandamus petition to compel the Executive's compliance.  *Aiken*, 725 F.3d at 266–67.  Today, a President defies laws enacted by Congress without any legal basis, and the court holds that he has merely violated a statute, that the Constitution is not even implicated, and that there is no cause of action to challenge the constitutionality of his conduct.  By failing to rein in a President who ran roughshod over clear statutory mandates, the court "evade[s] [its] constitutional responsibility to delineate the obligations and powers of each branch" of our government.  *Halperin*, 606 F.2d at 1211.  The court also departs from the norms of impartial appellate review by resolving this case in the President's favor based on a legal argument that the government clearly and obviously forfeited.  Moreover, the

---

[10]    At oral argument, counsel for the grantees represented that his clients "collectively would compete for . . . 99 percent of the funds" identified, but acknowledged that this figure was not presented before the district court and suggested that we "affirm but only to the extent the injunction was . . . no broader than necessary to provide complete relief to the plaintiffs."  Oral Arg. Tr. 63–64.  I agree that this is the "sensible" approach.  *Id.*; *see also Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562–63 (2025) (staying injunctions "only to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff" and directing "[t]he lower courts [to] move expeditiously to ensure that . . . the injunctions comport with this rule").

47

new constitutional rule that the court announces paves the way for future illegal conduct: The court holds that Executive action that exceeds statutory authority or violates a statute can never be the basis of a constitutional cause of action. To reach that startling conclusion, the court misinterprets *Dalton v. Specter*, and ignores that the government has relied on the President's constitutional authority to justify his actions here, which makes the court's entire analysis under *Dalton* inapposite.

At bottom, the court's acquiescence in and facilitation of the Executive's unlawful behavior derails the "carefully crafted system of checked and balanced power" that serves as the "greatest security against tyranny — the accumulation of excessive authority in a single Branch." *Mistretta*, 488 U.S. at 381. "It is no overstatement to say that our constitutional system of separation of powers [will] be significantly altered" because the court "allow[s] [the Executive Branch] to disregard federal law in the manner asserted in this case[.]" *Aiken*, 725 F.3d at 267. Because the court turns a blind eye to the "serious implications" of this case for the rule of law and the very structure of our government, I respectfully dissent.